# Exhibit 1

OFFICE OF THE UNITED STATES TRUSTEE
NORTHERN DISTRICT OF NEW YORK


IN RE:                      .    Case No. 23-60263-6-PGR
                            .
                            .
M. BURTON MARSHALL,         .    One Lincoln Center
                            .    110 W. Fayette Street, Suite 720
                            .    Syracuse, NY 13202
                            .
          Debtor.           .    June 5, 2023
. . . . . . . . . . . ..


TRANSCRIPT OF 341 MEETING OF CREDITORS
BEFORE ERIN CHAMPION, ESQ.
OFFICE OF THE UNITED STATES TRUSTEE


APPEARANCES:

For the Debtor:           Barclay Damon LLP
                          BY:  BETH ANN BIVONA, ESQ.
                               JEFFREY A. DOVE, ESQ.
                          The Avant Building, Suite 1200
                          200 Delaware Avenue
                          Buffalo, NY 14202-2150

For the Committee:        Bond, Schoeneck & King, PLLC
                          BY:  SARA C. TEMES, ESQ.
                               ANDREW S. RIVERA, ESQ.
                          One Lincoln Center, 18th Floor
                          Syracuse, New York 13202




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

For various creditors:          Longstreet & Berry, LLP
                                BY:  MARTHA L. BERRY, ESQ.
                                313 Montgomery Street
                                Syracuse, NY 13202

                                Campanie & Wayland-Smith, PLLC
                                BY:  TINA WAYLAND-SMITH, ESQ.
                                60 East State Street
                                P.O. Box 70
                                Sherrill, NY 13461

For Salati Trust:               Melvin & Melvin, PLLC
                                BY:  LOUIS LEVINE, ESQ.
                                217 South Salina Street
                                Suite 700
                                Syracuse, NY 13202

**I N D E X**

**WITNESS**                                                          **PAGE**

M. BURTON MARSHALL

   Examination by Ms. Champion                              10
   Examination by Ms. Temes                                 64
   Examination by Ms. Champion                              66
   Examination by Ms. Wayland-Smith                         67
   Examination by Ms. Champion                              73
   Examination by Ms. Berry                                 76
   Examination by Louis Levine                              80
   Examination by Ms. Riggal                                84
   Examination by Mr. Parish                                85
   Examination by Ms. Mirabella                             89
   Examination by Ms. Harp                                  96
   Examination by Mr. Devereaux                             98
   Examination by Ms. Donaldson                            100
   Examination by Mr. Raketa                               105
   Examination by Ms. Broomfield                           107
   Examination by Ms. Tiffany                              111
   Examination by Mr. Wickwire                             114
   Examination by Mr. Sole                                 115
   Examination by Mr. Forth                                119
   Examination by Ms. McVaugh                              119
   Examination by Mr. Sullivan                             120
   Examination by Mr. Gardland                             123
   Examination by Mr. Crosby                               127
   Examination by Mr. Bierworth                            128
   Examination by Ms. Donaldson                            129
   Examination by Ms. Mirabella                            130

1              MS. CHAMPION:  Thank you.  Good morning, everyone.

2     Thank you for your patience this morning.  My name is Erin

3     Champion.  I'm going to be conducting the meeting this morning,

4     on behalf of the United States Trustee.  I am the Assistant

5     United States Trustee for the Utica Office here in the Northern

6     District of New York where this bankruptcy case was filed.

7              This is the meeting of creditors, pursuant to Section

8     341 of the United States Bankruptcy Code in the Chapter 11 case

9     of M. Burton Marshall, Case Number 23-60263.  Today is June 5,

10     2023.  The time is approximately 10:00 a.m.  This is the

11     adjourned date, actually, following the initially scheduled

12     meeting of May 22nd, which was adjourned to today's date due to

13     technical difficulties with the call last time.  And, again, I

14     appreciate everyone's patience during that process.  I know it

15     was tricky.

16              Anyway, before we begin with the meeting itself, I'm

17     just going to take a couple of minutes to explain how I'm going

18     to proceed this morning and how the meeting will go.  And given

19     that the meeting is being held on the phone, pursuant to the

20     amended 341 notice, I just want to go over the procedure, so

21     that we can make sure the meeting is productive, and that

22     everyone has an opportunity to be heard, you know, whoever

23     wants to ask questions, so we'll go over that process.

24              So, I'm going to be the moderator speaker for the

25     day, and I'll be unmuted for the duration of the meeting,

obviously.  And my role will be to ask the Debtor questions

regarding his financial affairs.  Some of you have already

emailed me your name and your phone number to indicate that you

would like to ask Mr. Marshall questions.  Some of the emails I

got, I did not have phone numbers for, and that's the way that

we're going to be identifying you.

But just to make sure that everybody who wants to ask

questions can ask questions, if I don't have the information,

you will have the option of hitting star-zero to speak with the

operator, and then she will be added -- she can add you into

the list of speakers.  But it'll probably be a little while

before we get to that point in the meeting, because I will be

asking the questions first.

So, the order of the meeting is going to be, after I

take appearances from the attorneys, then I'm going to be

putting Mr. Marshall under oath.  I will be asking Mr. Marshall

questions.  I would just ask that you, please, listen carefully

to all of my questions, as it might answer some of the

questions that you have, as well.  It would prolong the meeting

unnecessarily if we continue to ask the same questions

repeatedly, so I would just ask you to be mindful of that.

Then after I conclude my questioning, I will invite

counsel for the Creditors Committee to ask questions of Mr.

Marshall, and then any other attorneys that wish to appear and

ask questions, and then I will be turning it over to those

1  creditors that contacted me in advance to let me know that you

2  would be asking questions.  And you're still welcome to do so.

3  You can still email me your name and your telephone number, the

4  line that you're calling from, and we can make sure you get

5  added to the list of speaking parties or, like I said, if you

6  don't have access to your email at the moment, you can just hit

7  star-zero and speak to the operator.

8        The other thing I want to just mention today is that,

9  it's possible that we might not get through everything that we

10 need to today and maybe not everybody's questions today.  If

11 necessary, I can continue the meeting to another date.  I would

12 just ask everybody to be very patient, because this is a case,

13 obviously, with many creditors, so we just have to make sure

14 that we can get through this process as expeditiously and

15 efficiently as possible.

16       So, another thing I will mention that since we are on

17 a call, I would ask that you please identify yourself before

18 speaking so we can have an accurate record.  If the call is

19 transcribed, we know who is speaking and when.

20       So, the statutory purpose, so the purpose behind the

21 Bankruptcy Code statute for this meeting, it's to provide my

22 office, as well as creditors and other interested parties with

23 an opportunity to examine the Debtor under oath.  If you don't

24 have any questions for Mr. Marshall, that's fine.  It's not

25 required.  You don't have to ask questions.  You can leave the

1  meeting or drop off the call at any time.  You're more than

2  welcome to just stay and listen.

3          So, I would also ask another thing, to keep in mind

4  that this is an opportunity for creditors to ask the Debtor

5  questions related to the bankruptcy case.  It's really not an

6  opportunity to take individual discovery with respect to your

7  individual claim.  Of course, your questions are related to

8  your own personal claims, yes, so what I'm asking is you keep

9  the questions to a minimum and with respect to the Debtor's

10 financial affairs.

11         So, I am recording this meeting on behalf of the

12 Office of the United States Trustee, and I have to emphasize

13 this, there can only be one official recording of this meeting,

14 and it's the recording my by office, the Office of the United

15 States Trustee.  Anyone can get a copy of the recording.  At

16 the conclusion of the meeting today, you can either email me at

17 Erin, E-R-I-N, dot Champion at USDOJ.GOV or you can call my

18 office at (315)793-8191.  I will repeat all of that information

19 again later, at the end of the meeting, but just so you know

20 that it's very important that there is only one official

21 recording of the meeting.

22         Lots of you may not be familiar with the bankruptcy

23 process, so I thought it would be good just to give a little

24 two to three sentence overview.  So, when an individual files

25 for bankruptcy under Chapter 11, that individual is seeking an

1   opportunity to reorganize his financial affairs or liquidate

2   assets to pay his creditors.  So, filing the bankruptcy case

3   allows that Debtor to try to come up with a plan to reorganize

4   his financial affairs and propose a plan of repayment, and

5   while he does those things, he can continue to operate his

6   businesses.  He can continue to own his assets.  They are all

7   still under his control while he's in the bankruptcy.

8          This will allow the Debtor and his professionals to

9   come up with a plan of repayment based on what his assets are,

10  what he plans to do as far as liquidating assets, payments that

11  he might make over a plan of reorganization, and all of those

12  details will be in that document, which will be filed, you

13  know, later on in the case.  That's not something that normally

14  gets filed right away, but you will be looking for that, and

15  you'll have an opportunity to review that and comment on it

16  when that process happens.

17         So, also, in a Chapter 11 case, a Committee of

18  Unsecured Creditors can be appointed by my office, and we, in

19  fact, did that in this case, and there is a Committee, and I

20  believe they're going to be participating in the meeting today

21  through their perspective counsel, Bond, Schoeneck and King.

22         Let's see, okay, I think I probably covered all the

23  preliminary remarks that I wanted to make, so we can actually

24  move on to the portion of the actual meeting at this time.

25  Let's --- so can I first get appearances by Debtor's counsel,

1  please?

2          MR. DOVE:  Good morning, Jeffrey Dove of Barclay,

3  Damon on behalf of Mr. Marshall.

4          MS. CHAMPION:  Thank you.  And, Mr. Marshall --

5          MS. BIVONA:  Beth Bivona --

6          MS. CHAMPION:  Oh, I'm sorry.

7          MS. BIVONA:  -- of Barclay, Damon on behalf of the

8  Debtor.

9          MS. CHAMPION:  Beth, can you repeat that?  I was

10 talking over you.

11         MS. BIVONA:  Sure, I'm sorry.  Beth Bivona, Barclay,

12 Damon, on behalf of the Debtor.

13         MS. CHAMPION:  And is the Debtor present on the call?

14         MR. MARSHALL:  I am.

15         MS. CHAMPION:  Okay.  Moving to prospective Committee

16 counsel, can you enter your appearances?

17         MR. RIVERA:  Hi.  This is Andrew Rivera, Bond,

18 Schoeneck and King, on behalf of the Committee, and I believe

19 Sara Temes is also on the line.

20         MS. CHAMPION:  Thank you.  Are there any other --

21 well, if there are counsel on the line that want to make an

22 appearance that don't have -- that are not unmuted, if you want

23 to just go ahead and contact the operator by doing this -- by

24 hitting star-zero, we can get your appearance noted now, or you

25 can just wait until we do the questions, after I finish with my

Marshall - Champion                    10

1   questioning of Mr. Marshall, and you can enter it at that time.

2           MS. TEMES:  Thank you, and this is Sara Temes.  I

3   think I was on mute.  I'm appearing, also, from Bond, Schoeneck

4   and King, on behalf of the Committee, as co-counsel.

5           MS. CHAMPION:  Okay.  Thank you.  Okay.  Mr.

6   Marshall --

7           MR. MARSHALL:  Yes.

8           MS. CHAMPION:  -- would you, please, raise your right

9   hand?

10          MR. MARSHALL:  Yes.

11          M. BURTON MARSHALL, DEBTOR, SWORN

12          MS. CHAMPION:  And for identification purposes, your

13  attorney has provided me a copy with your driver's license.

14  Can you just give me the last three digits of the

15  identification number on your driver's license?

16          MR. MARSHALL:  Oh, I don't have that on me.  I wasn't

17  aware of this.

18          MS. CHAMPION:  Okay, not a problem.  We can do that

19  at the end or we'll figure out another way to handle that.

20          MR. MARSHALL:  I have a copy in my office here, and

21  I'll have someone get it for sure.

22          MS. CHAMPION:  Okay, perfect.

23                          EXAMINATION

24  BY MS. CHAMPION:

25  Q   Okay, Mr. Marshall, did you review your petition,

Marshall - Champion                          11

1  schedules and the statements that were filed in this case

2  before they were filed?

3  A    Yes.

4  Q    And are they true and accurate to the best of your

5  knowledge?

6  A    Yes.

7  Q    Do you know if there are any amendments or changes that

8  need to be made to the schedules?

9  A    There may be a couple minor amendments of things we found

10 after the fact.  What they are, escapes my mind.  They're very,

11 very minor situations, I know that.

12 Q    Okay.  Thank you.  And did you assist your attorney in

13 preparing the schedules and statements?

14 A    Yes.

15 Q    Also, I have to ask you, since this is an individual case,

16 do you have any obligation to pay anyone any type of domestic

17 support?

18 A    No.

19 Q    All right.  And, Mr. Marshall, what is your current

20 address?

21 A    20 Payne Street, P-A-Y-N-E, in Hamilton, New York.

22 Q    And how long have you lived there?

23 A    Approximately 40 years.

24 Q    Okay.  And who else lives there with you?

25 A    My wife, Megan Marshall.

Marshall - Champion                    12

1  Q    Okay.  And I think on the schedules, you indicated that

2  that property has a value of $475,000.  Is that a tax-assessed

3  value?

4  A    I don't have the tax in front of me.  That's pretty close

5  to the assessed value.

6  Q    Okay.  And you own a number of other properties, which

7  we'll get to in a little bit, but do you have a residence in

8  any of the other properties listed on your schedules, other

9  than 20 Payne Street.

10 A    Yeah, the camp.  That's a seasonal dwelling that is solely

11 used by my family, if that counts.

12 Q    Yeah, where is that located?

13 A    It is on Tara Grove Road, Hamilton, New York.

14 Q    And how long have you owned that?

15 A    Oh, 35 years -- 37 years.

16 Q    Okay.  Okay.  So, Megan Marshall, she is your spouse?

17 A    Yes.

18 Q    And she lives at 20 Payne Street, as well, you said?

19 A    Yes.

20 Q    So, according to your schedules, you owe her $8,719.99.

21 What was that for?

22 A    That was, I had borrowed money from her mother, and her

23 mother passed away, and that became Megan's share after her

24 mother's death.

25 Q    Okay.  And who -- who is Taber Colletti.

Marshall - Champion                    13

1  A    Taber is my step-daughter.

2  Q    Does she live at 20 Payne Street?

3  A    She lives in London.  Her U.S. address is 20 Payne Street,

4  but she lives, physically, in London and has for ten years,

5  approximately.

6  Q    And you owe her money, as well?

7  A    Yes.

8  Q    And what was that for?

9  A    She got a bonus at work, and she lent me the money.

10  Q    Okay.  Did you pay back any money that you borrowed from

11  Megan Marshall or Taber Colletti within the year before filing

12  your case on April 20th?

13  A    Megan, for sure, no, and I don't think Taber, although

14  Taber's is relatively in the last six months, so, no.

15  Q    Okay.  Have you paid back any relatives, in the past year,

16  money that you may have owed them?

17  A    I think Marc Colletti is my step-son, and I think he was

18  paid some money within the last year.

19  Q    Okay.

20  A    I think Keith and Mary Hyde are my brother and sister-in-

21  law, and I think, within the past year, they were paid some

22  money back, also.

23  Q    Okay.  And I believe those were listed in your statement

24  of financial affairs, correct?

25  A    I think so, yes.

Marshall - Champion                    14

1  Q    All right.  Let's move on a little bit to your business

2  structure and the business assets.  Other than your interest in

3  your businesses, do you have any other type of employment?

4  A    I -- I have two sources of employment.  I get a W-2 from

5  Miles B. Marshall, Inc., which is a separate entity, a sub-S

6  corporation that I own all the stock in.  It's an insurance

7  agency, and I work for them, and I get a salary of, I think,

8  $2,000 a week.  And everything else is Burton Marshall, so I

9  don't get any outside income, no.

10 Q    That was Miles B. Marshall, Inc., you said, right?

11 A    Correct.

12 Q    So, you -- have you received W-2 income from Miles B.

13 Marshall, Inc. routinely, let's say, in the past five years, is

14 that -- does that --

15 A    Well, over 53 years, yes.

16 Q    Okay.  All right.  And then you also conduct a number of

17 businesses, individually, through a d/b/a, correct?

18 A    Through a series of different d/b/a's, yes.

19 Q    Right, okay.  So, let's just go through those and get a

20 little bit more information on those.  We'll start with M & M

21 Press.  Can you just describe the nature of that business?

22 A    It's a small, local print shop where we print, you know,

23 stationary and banners and things were local individuals and

24 businesses.

25 Q    And where is that business located?

Marshall - Champion                        15

1  A     37 Milford Street in Hamilton, New York.

2  Q     Is that a property that you own?

3  A     Yes.

4  Q     So, what kind of clients does M & M Press have?

5  A     Individuals and small businesses and some non-profits.

6  Q     And are you continuing to do business?

7  A     That business is still in operation, yes.

8  Q     Okay.  And you use the account at Berkshire Bank that was
9  listed in the bankruptcy paperwork?

10 A     Yes.

11 Q     Okay.  And is that the only bank account you use in
12 connection with M & M Press?

13 A     Yes.

14 Q     And, then, who would handle the day-to-day operations at
15 M & M Press?

16 A     (Indiscernible) is my son, Matthew Marshall.

17 Q     Do you receive any type of income from M & M Press?

18 A     All the income goes into the M & M Press checkbook and
19 then immediately goes into M. Burton Marshall's checkbook, and
20 all the bills for M & M Press are paid out of M. Burton
21 Marshall, what I would call, the big checking account.  The
22 only reason there's a separate checking account for M & M Press
23 is the bank required it, along with a doing-business-as
24 certificate.  They would not let me deposit checks in the
25 Burton Marshall account that were made out to M & M Press.  So,

Marshall - Champion                          16

1  if you come in today and pay $100 for printing, it goes into

2  M & M Press, and then when there's enough money in that

3  checking account, it all goes over to the M. Burton Marshall

4  checking account.

5  Q    Okay.  Is that the same set-up for the other d/b/a's, as

6  well?

7  A    Yes.

8  Q    Okay.  So, Marshall Tax Service --

9  A    Well, that is Burton Marshall, and there's no separate

10 checking account for that, other than Burton Marshall.

11 Q    Okay.  All right.

12 A    Right.

13 Q    That was my question.  So, all of the income --

14 A    Oh, wait, I take it back.  There is a -- sometimes, people

15 make checks out to Burton Marshall Tax Service, and the bank

16 required that I get a doing-business-as and open a separate

17 checking account for that, and if there's ever any money in

18 there -- because that happens infrequently -- there might be

19 $1,000 at most.

20 Q    So, you'd have the same type of set-up, then?  If

21 somebody, you know, pays you, it gets deposited into the

22 Marshall Tax Service account, and then you transfer it to the

23 M. Burton Marshall account?

24 A    If someone writes a check out to the Marshall Tax Service,

25 it's a bank requirement.

Marshall - Champion                                17

1  Q    Right.

2  A    And that would transfer over to the M. Burton Marshall

3  checking account, yes.

4  Q    Okay.  And then the expenses of Marshall Tax Services?

5  A    Are all paid out of the M. Burton Marshall checking

6  account.

7  Q    Okay.  What kind of services do you provide under Marshall

8  Tax Service?

9  A    I prepare income taxes for individuals and small

10 businesses, and we do payroll taxes and sales tax preparation.

11 Q    Okay.  Have you ever provided any investment services, in

12 relation to that business?

13 A    Years ago, I was a certified financial planner, and that

14 ended more than 20 years ago.

15 Q    Okay.  And who is in charge of the day-to-day business at

16 Marshall Tax Service?

17 A    Myself.

18 Q    Okay.  And do you have employees?

19 A    I do.

20 Q    And who are they?

21 A    My employees?  I have 25 --

22 Q    Well, do you have --

23 A    -- employees.

24 Q    Do you have -- how -- okay.  Well, how many full-time?

25 A    In the office, there is Kim and Gary and Joy and -- and

Marshall - Champion                          18

1  right now, there's probably eight full-time inside employees.

2  Q    Okay.  And are any of them your relatives?

3  A    The only relative that's my employee is Matthew Marshall,

4  because the payroll for M & M Press goes through Burt Marshall.

5  Q    You mean the M. Burton Marshall account?

6  A    Yes.

7  Q    Okay.  So, the payroll for Marshall Tax Service, does that

8  run through M. Burton Marshall, as well?

9  A    Yes, yes.

10 Q    All right.  And then how about Marshall Moving?  What kind

11 of services do you provide through Marshall --

12 A    We used to move -- and I closed that business.  We haven't

13 moved anyone in over a year.  We've closed that business and

14 closed -- either closed or are closing the checking account.

15 I've given the documents to close the checking account.  We

16 used to move a lot of students from Colgate Campus to storage

17 units is what that primarily was, and we no longer do that.

18 Q    Okay.  So, that business closed.  When -- when did you say

19 that was?

20 A    I just closed it in the last couple of weeks, because we

21 have this extra checking account that nothing's going through

22 it, and it's a waste of time to horse around with it.

23 Q    Okay.  And then, how about Marshall Storage, what is that?

24 A    That is -- again, that's a bank requirement.  People make

25 checks out to Marshall Storage to pay for the rent on the

Marshall - Champion                    19

1 storage units, but all of the money gets transferred over to M.

2 Burton Marshall checking account.  And that's just another

3 rentals.  I have three different storage locations.

4 Q    Okay.  So, you've got three different storage locations,

5 and so, Marshall Storage is just, really, typical, what you

6 would see, those big storage -- groups of storage units, right?

7 A    Yes.

8 Q    And, then, how many units are in each location?

9 A    I think at the -- we call it the north side, I think

10 there's 86.  At the south side, I think there's 66 or something

11 like that.

12 Q    Okay.  And how -- how --

13 A    The third location is a big old beautiful dairy barn that

14 we -- so we call it Big Stuff Storage.  We store big stuff,

15 such as cars and boats and campers.

16 Q    Okay.  And how long have you had that business?

17 A    I've had that business for 15 or 20 years.

18 Q    And what percentage, would you say, of the units are

19 rented?

20 A    Today, 99 to 100 percent.

21 Q    And do you personally store any of your own belongings in

22 any of the units?

23 A    There's one unit that has stuff that we use in business

24 for the rentals, so they brought -- I don't know what's up

25 there.  I've never been in the unit.  There's probably salt for

Marshall - Champion                                    20

1  when we plow the driveways in the Winter, and that's pretty

2  much what's in there.  But my own, personal items, no.

3  Q    Okay.  And then same type of set-up with the banking?  Do

4  you know, would money go into Marshall Storage, the account,

5  and then get swept into the M. Burton Marshall big account, as

6  you called it?

7  A    Yes.

8  Q    How do you designate or keep track of what went into the

9  M. Burton Marshall account, based on which business it came

10 from?

11        Do you know what I'm asking?  Maybe I'm not asking

12 that in a -- so, when all of these -- all of this revenue --

13 A    Well, I get to see what -- it's sent electronically, so

14 you can see it goes from account, you know, whatever the

15 numbers are, into the other account, whatever the numbers are.

16 Q    So, if you wanted to figure out, okay, well, how much

17 money is Marshall Storage making versus Marshall Moving --

18 A    Well, we have a -- we keep separate records of how much

19 rent we take in.

20 Q    Okay.  All right.

21 A    But, that's all separate records.   We have all of those,

22 of course.

23 Q    And how -- how do you keep those records, what format?

24 A    (Indiscernible).

25 Q    Like is it Excel or what kind of --

Marshall - Champion                    21

1  A    Oh, It's a -- we have a service -- a storage service that

2  provides it to me electronically through the storage, an app.

3  Q    So, what -- if you wanted to do a revenue comparison with

4  all of your business interests, how would you look at that?

5  A    How would I find it out, you mean?

6  Q    Yeah.

7  A    Well, with the storage business, we ask the machine how

8  much revenue we took in, in such and such a period of time, and

9  the same with the regular rental company.  We have an

10 application for that.  It's a different service, but it's the

11 same sort of thing.  For the tax business, we do it out of the

12 receipt book.  Anytime I do a tax, we write a receipt, and we

13 add those up, and M & M Press, we keep track of manually, on a

14 yellow piece of paper.  Anytime we take in money, we write down

15 the receipt number, and the sales tax we collected and keep it

16 by the month.

17 Q    Okay.  So if I were to look at your bank statements for

18 the last year, with -- well, if I were to look at the M. Burton

19 Marshall big account statements, how would I know which amounts

20 are coming into that account that came from rentals versus

21 storage versus M & M Press?

22 A    Well, M & M Press would be a withdraw from the M & M Press

23 account going into Burt Marshall.  That's how you would find

24 that out.

25 Q    Well, no, if I'm just looking at the M. Burton Marshall

Marshall - Champion                              22

1  account statements, how do I tell where that money came from?

2  A    It would be the deposits from the other accounts would

3  have the account that it came from.  You can  tell that way.

4  Q    So, really, you can't tell unless you're looking at the

5  transfers from the other accounts?

6  A    Well, with the caveat that anything -- the storage units

7  and the rents are on these apps, and those people deposit us

8  once periodically when they receive the monies.  And you can

9  tell where that money came from.  And, certainly, the bulk of

10 the storage and the bulk of the rents, 90 percent is coming in

11 through this service, and they're depositing it to my account.

12 Q    Do you know the name of the service?

13 A    One is AppFolio.  We can find out the other one.

14 Q    AppFolio?

15 A    Yeah.  I also have the last four of my driver's license,

16 is you want that now.

17 Q    Oh, great.  Yeah, I think just three numbers.

18 A    The numbers are four, one, two.

19 Q    Oh, perfect, that's what I have.  Okay, check that off

20 now.

21        Okay.  So, the money -- so, tenants or people renting

22 the storage units, they just, when the hit the payment on line,

23 pay it, like, electronically pay, then that money gets held by

24 this electronic service, AppFolio, and then they make a deposit

25 to your account directly.

Marshall - Champion                              23

1  A    Yes.

2  Q    And is that once a month?

3  A    No.  It's as they receive the money.  There's a little lag

4  time, maybe two or three days.  So, today, I'm getting --

5  today's the fifth -- I'm getting a lot of rents in today that

6  people probably paid on the first of the month.  The biggest

7  day for the rents won't be until the 7th or 8th, and I'll take

8  in a lot of money on the 7th or 8th.  This is that lag time.

9  Q    Okay.  So, each of these businesses that we've talked

10 about -- and there's others -- you know, Marshall Maintenance,

11 I don't think we've covered -- and then, obviously, the

12 rentals, have you always used Berkshire Bank for those

13 accounts?

14 A    No.  Before Berkshire, which I've used for ten years or

15 so, I used the Community Bank in town, and before that, I used

16 the NBT Bank in Hamilton.

17 Q    Okay.  And other than the accounts that you listed in your

18 schedules, which are all at Berkshire Bank, do you have any

19 other checking, savings or any other money market accounts?

20 A    I have no money market accounts.  I have no savings

21 accounts, and I am pretty sure I don't have any other checking

22 accounts.

23 Q    Okay.  So you have the M. Burton Marshall account, which

24 is the big account.

25 A    Yes.

Marshall - Champion                        24

1   Q   You have M & M Press, Marshall Tax Service, Marshall

2   Moving, Marshall Storage, Marshall Maintenance and Marshall

3   Rentals, right?

4   A   Right.  And the Marshall Maintenance and the Marshall

5   Moving are in the process of being closed, if they haven't

6   already been closed.

7   Q   Okay.  So, Marshall Maintenance is being closed, you said?

8   A   Yes.

9   Q   What did that -- what was the purpose of that business?

10  What did it do?

11  A   People would ask me if we had a handyman available to go

12  over and do jobs at their home or business.  So someone would

13  say, I need someone to, you know, change my water heat or put

14  salt in my soft water or some small, little job like that.

15  Q   Okay.  And then, Miles B. Marshall, Inc., what -- is there

16  a separate bank account for that business?

17  A   Two separate bank accounts for that.

18  Q   Where are those bank accounts?

19  A   Berkshire Bank.

20  Q   And when was Miles B. Marshall incorporated?

21  A   1962.

22  Q   And you're the sole owner, correct?

23  A   I own all the stock of Miles B. Marshall, Inc., yes.

24  Q   And it's an active corporation?

25  A   Yes.

Marshall - Champion                    25

1  Q    And I think you said earlier that you receive a salary of

2  $2,000 a week, was it?

3  A    $2,000 a week, and then I'll take bonuses out.  The

4  bonuses and insurances come the end of January or February, so

5  there's -- and, in fact, left-over money in that business, I'll

6  take it out then as a distribution or bonus, whatever you want

7  to call it.

8  Q    Right.  Okay.  So that business is an insurance agency,

9  right?

10  A    Yes.

11  Q    Okay.  So, how does that work?  I mean, are you an agent,

12  and you sell a particular --

13  A    Yes.

14  Q    -- type of insurance?  Explain that.

15  A    Miles B. Marshall, Inc. is an agent, yes.

16  Q    For which insurance companies?

17  A    For many different insurance companies, the largest of

18  which is New York Central Mutual Fire Insurance Company.

19  Q    Okay.  And then, what kind of insurance do you sell?

20  A    Auto insurance, home owner's insurance, small business

21  insurance, worker's compensation.

22  Q    Okay.  So, you don't do any life insurance?

23  A    Yes, we do a little bit of life insurance, but not a lot.

24  But, yes, we do.

25  Q    Okay.  So, in your schedules, you attributed a value of $3

Marshall - Champion                                    26

1  million to Miles B. Marshall, Inc.   What was the basis for

2  that value?

3  A    Well, currently, we're having an appraisal made, and I

4  should receive that within, hopefully, this week.   This

5  person's late, but it's three times annual commissions, which,

6  generally, has been a good rule of thumb for the value of an

7  insurance agency.

8  Q    Three times that annual commissions, okay?

9  A    Last year, it exceed 1.1 million, I think.

10 Q    And have you ever sold investments as part of the

11 insurance company, insurance agency?

12 A    No.  I take that back.  I had a Series 6 or Series 7

13 license years and years ago, 30 years ago, and I would sell

14 tax-deferred annuities, mostly to people who worked at non-

15 profits, so, like, school teachers and people that worked in

16 the hospital, that sort of thing.  And I used that back then.

17 And at some point, that came around to me doing full-time, and

18 I was not able to do that, and so I surrendered my license.

19 This was back in th '80s, at least.

20 Q    All right.   So, I'm just going to make a couple of

21 document requests while I'm thinking of it.  I would like to

22 see the tax returns for the corporation for 2022 and 2021.  And

23 I do have your personal income tax for 2022, but I'd also like

24 to see 2021.

25 A    My lawyer has been provided --

Marshall - Champion                    27

1  Q    And I can follow-up with your attorney.

2  A    -- (indiscernible) he can forward that to you.

3  Q    Yeah, I can -- I can follow-up with him.  I just wanted to

4  get that on the record before I forgot.

5  A    '21 and '20, you want the corporate tax?

6  Q    Yes.

7  A    Okay, that's not a problem, and we'll get it to you,

8  probably, today.

9  Q    Okay.  So, other than what we've talked about and what

10  we've covered, do you have any other ownership interests in any

11  other businesses?

12  A    No.

13  Q    And what is your education background, Mr. Marshall?

14  A    I went to high school.  I have a lot of years worth of

15  college.  I quit college.

16  Q    Okay.  So are you a CPA?

17  A    No, I am not.

18  Q    So you are a tax preparer, is that a correct term?

19  A    The service has a designation called enrolled agent to

20  practice for the IRS --

21  Q    Oh.

22  A    -- which involved a two-day exam, and I did that 37 or 38

23  years ago, so I'm an enrolled agent.

24  Q    Okay.  So, you're an enrolled agent.  Do you have any

25  other types of licenses or certifications?

Marshall - Champion                     28

1  A    I'm a certified insurance counselor, and the license, I

2  have a New York State life insurance agent's license and a

3  property and casualty agent's license.

4              (Telephone conference interruption)

5  A    Are you there?

6  Q    I'm still here.  I'm not really sure what that is.

7              MS. CHAMPION:  Jeff, are you still on?

8              MR. DOVE:  Yes, I am still on.

9              MS. CHAMPION:  All right.  Let's just take a quick

10  little break.  I'm just going to message the operator to see

11  what happened there.

12              THE OPERATOR:  Excuse me.  You're back in the call.

13              MS. CHAMPION:  Okay, great.  Thank you.

14  BY MS. CHAMPION:

15  Q    Okay.  So, Mr. Marshall, you can hear me still?

16  A    Yes, I can.

17  Q    Okay, great.  Okay.  So, we had just left off, and you had

18  just described that you had agents licenses.  Okay.  So, that's

19  still -- you are still active.  You are still an agent.  You're

20  still selling policies through Miles B. Marshall Insurance,

21  right?

22  A    Yes.

23  Q    Okay.  And then your tax preparation business, when is the

24  last time you prepared a tax return for a client?

25  A    Saturday.

Marshall - Champion                          29

1  Q    Okay.  So, you're continuing to do that?

2  A    Yes.

3  Q    Okay.  I know that you had had some health problems.  We

4  don't need to get into details, but you had said that that

5  affected your -- your tax service business.  Is that still the

6  case?

7  A    It's the case that I lost a significant portion of my

8  business while I was sick, and some of that business will never

9  ever come back, because you do taxes predominantly late in

10 January, February, March and April, and I was sick the end of

11 January, February and March, and I got back in the office, I

12 think the end of March on a limited basis.

13 Q    Okay.  So, but you expect to be still doing those

14 services, let's say, next tax season?

15 A    As of today, that's what I expect, yes.  A lot of it

16 depends on all of this bankruptcy stuff plays out, and --

17 Q    Okay.

18 A    -- it's very discouraging, but, yes, that's my plan today.

19 Q    Okay.  So, in your schedules under other amounts that

20 someone owes you, so we're talking about people that owe you

21 money --

22 A    Right?

23 Q    -- it shows that you're a mortgagee on a couple of

24 different properties, several different properties?

25 A    I think it's four, yes.

Marshall - Champion                    30

1  Q    Okay.  Do you know when you loaned those individuals

2  money?

3  A    Not off the top of my head.  I can certainly find out

4  pretty quickly.

5  Q    Okay, yeah, that would be great.  And if you need

6  reference to where it is in your schedules, it's Part 4 --

7  A    Well, the Strong Collins --

8  Q    -- question 30.

9  A    -- one is right here.  It looks like I sold you that

10 property.

11                          (Pause)

12 A    The one in Poolville that goes to Strong Collins, it looks

13 like I sold about March of 2010.

14 Q    Okay.  So, then, what, you just took back the mortgage

15 yourself, then?

16 A    Yes.  And the Miller property, it looks like their first

17 payment was September of '18, so I would have sold it,

18 probably, August of '18.

19 Q    Okay.  And then what about the other two?

20 A    I'm digging as fast as I can.  And Jones, it looks like

21 2000.

22 Q    Okay.

23 A    October 26th, 2007 is looking at that quickly.

24 Q    There's a fourth one?

25 A    Oh, the fourth one is Hubbertville, and I think I sold

Marshall - Champion                                    31

 1  that.  Wrong folder.  I can't put my hands on that fourth one

 2  now, but it's been eight years, probably.

 3  Q    Okay.  All right.  It wasn't within the last year?

 4  A    No, no, certainly not.

 5  Q    And those individuals are continuing to make payments

 6  under those mortgages to you?

 7  A    They are.

 8  Q    Okay.  I know I asked you about money markets earlier, but

 9  you do have any interest in any bonds or mutual funds or

10  stocks?

11  A    No.  My use for those were all liquidated prior to the

12  filing of the bankruptcy.

13  Q    And when were they liquidated?

14  A    Well, I was in the hospital, so probably February of this

15  year.

16  Q    And what was it?  Was it stocks, mutual funds?  Was it in

17  a brokerage account?

18  A    There was no bonds.  And there was a brokerage account

19  with Leigh Baldwin in Cazenovia, and I owned some individual

20  stocks, all water type stocks.

21  Q    Okay.  So, all of your stocks have been liquidated at this

22  point?

23  A    Yeah.  I own no stock, other than Miles B. Marshall, Inc.

24  Q    Right, right, right.  What about any retirement accounts?

25  A    None.

Marshall - Champion                                    32

1  Q    Have you ever had any?

2  A    In the past, I have had, yes.

3  Q    How recently?

4  A    15 years ago.

5  Q    Okay.  And, Mr. Marshall, have you ever been subject to an

6  audit by the IRS?

7  A    No, I've never been audited by the IRS.

8  Q    All right.  We're going to move on now to the portion of

9  your schedules, Schedule E/R where you list your creditors and

10  the people to whom you owe money.

11  A    All right.

12  Q    So, there's roughly about 900 individuals that you list in

13  your schedules from whom you borrowed money in the form of

14  promissory notes, is that correct?

15  A    Yes.

16  Q    Okay.  So, a key piece of information that's actually

17  required to be disclosed that was not included in that

18  information was the dates that those debts were actually

19  incurred.  So I'll get to that in a few minutes, but I do have

20  a couple of questions I want to ask you before we get into that

21  deeper.  So, in general, when you received these monies from

22  these individuals that you owe money to, was that deposited

23  into the big account, the --

24  A    Yeah.

25  Q    -- M. Burton Marshall Berkshire Bank account?

Marshall - Champion                              33

1  A    Yes.

2  Q    Okay.  And some of them are probably notes that you had

3  prior to the Berkshire Bank account, is that --

4  A    Yes.

5  Q    -- is that possible?

6  A    Yes.

7  Q    Okay.  So, the older ones could go back to that Community

8  Bank or MBT account that you referenced earlier?

9  A    Yes.

10 Q    Okay.  But would those be the only three possible places

11 where those monies that you borrowed would have been deposited?

12 A    Yes.

13 Q    Okay.  And, then, did you also make the payments under

14 those notes from that same account?

15 A    Yes.

16 Q    Okay.  And how did you keep track, then, of what was due

17 under each of those promissory notes?

18 A    Each promissory note was, by itself, segregated, and

19 there's a -- each note would have a balance there.  There's a

20 column for money they put in and a column for interest they've

21 earned, and a column for money that's taken out.

22 Q    Okay.  So when you say segregated --

23 A    So, each person, person A will have a separate account,

24 person B, person C, da-dah, di-dah, di-dah.

25 Q    So, they had a separate account, what do you mean by that,

Marshall - Champion                              34

1   if it was all going in the M. Burton Marshall big account?

2   A    I mean, they would have a separate note.

3   Q    Okay.  All right, a separate note.

4   A    I always attach this worksheet, so to speak, that shows

5   how much their balance is.

6   Q    So, the worksheet, is that an electronic worksheet or is

7   that actually something you're doing on paper?

8   A    Well, originally, we did it manually, and then, at some

9   point, we switched over to electronically.

10  Q    Okay.  So, what kind of electronic program are you using?

11  What kind of software?  Was it an Excel program or something

12  else?

13  A    Well, no, it's a program we designed ourselves.

14  Q    Okay.  All right.  Who designed it?

15  A    David Will.

16  Q    I'm sorry, say that again?

17  A    David Will.

18  Q    David Will, W-I-L-L?

19  A    Correct.

20  Q    Okay.  And does he work for you?

21  A    Yes.

22  Q    He's an employee?

23  A    Yes.

24  Q    Is he still an employee?

25  A    Yes.

Marshall - Champion                    35

1  Q    Okay.  So, this program that he created, then, you keep on

2  your computer in your office?

3  A    Yes.

4  Q    Okay.  Now, do you also keep, like, a separate file on

5  each of these notes, a physical file?

6  A    Yes.

7  Q    And that would include, what, like correspondence,

8  statements?

9  A    It would include, well, all of the above.  It would

10  include a copy of the original note, and then the transaction

11  history and any correspondence or anything we receive, so some

12  of them are very thick, and many are very thin.

13  Q    Okay.  How many of those files would you say that you

14  have?

15  A    900.

16  Q    Okay.  So, 900, and so, equal to the number of people that

17  were listed in your schedules, roughly?

18  A    Roughly.

19  Q    Okay.  Okay.  So, getting back to the requirement to

20  include the date that those debts were incurred, I think that's

21  important information, and you would be able to get that

22  information, correct?

23  A    Yes.

24  Q    Okay.  So, I think your schedules should reflect that and

25  need to be amended to show when those dates were -- when those

Marshall - Champion                                    36

1  debts were actually incurred.

2  A     Okay.

3  Q     So, would you -- if I wanted to take a look at, just,

4  like, let's say, just a list of all these notes and the dates

5  that they were incurred, would you be able to access that

6  information relatively easily?

7  A     The notes that were created after it was electronically,

8  yes.  There's still some notes that were done manually that we

9  converted to electronic on such and such a date, and those

10 would be somewhat more difficult to obtain, but, ultimately,

11 you can obtain them, yes.

12 Q     Okay.  So, you would be able to extract information out of

13 this software or this program that David Will created.  Like,

14 you know, I want a list of all of the notes and --

15 A     Those that were created before we went electronically,

16 yes.

17 Q     Okay.  All right.  So, did you convert, then, all of the

18 pre-electronic filing system, did you convert all of those

19 folders or those notes --

20 A     Yes.

21 Q     -- into the electronic format --

22 A     Yes.

23 Q     So, everything should be accounted for in that program?

24 A     Yes.

25 Q     Okay.  So, when you borrowed these funds from these

Marshall - Champion                                    37

1  individuals, it was on a promissory note?

2  A     Yes.

3  Q     Okay.  So, what did you promise these individuals in

4  return for the money you borrowed?

5  A     Eight percent interest in most cases.

6  Q     And so, what were the terms?

7  A     Each note was different terms.  Some people, we said,

8  well, we'll pay you the interest monthly, if that's what they

9  wanted, or quarterly or annually.  Some people, we'd pay their

10 quarterly estimated income taxes.  Each one was individual to

11 itself.

12 Q     So, how did you keep track of that if they were all

13 different types of arrangements?

14 A     With good bookkeeping.

15 Q     This information would somehow be --

16 A     It would be incorporated into the electronic system, so if

17 somebody was getting paid quarterly, we would update that note

18 three months from today, for example, and it would kick it out

19 of the suspend system or if it was monthly interest or next

20 year, if we're paying somebody's quarterly payments, we have a

21 list of whose quarterly payments we were paying for the income

22 taxes.

23 Q     And did you provide these individuals with a periodic

24 statement of their account?

25 A     Yeah.  Anytime money went in or went out, they would get a

Marshall - Champion                                    38

1  statement.

2  Q    But not on a regular -- you know, like say I give a loan

3  to somebody or take a loan, you know, I would get a monthly

4  statement showing what my balance is, so --

5  A    They weren't all monthly.  Some people wanted it

6  quarterly.  Some people wanted it annually.  Some people didn't

7  want us to update the interest at all for tax purposes, said

8  wait until I retire or some such time.

9  Q    Okay.  So, how did these arrangements come about?

10  A    Rephrase the question, please.

11  Q    Tell me about -- I'm just curious.  I mean, these are a

12  lot of different -- 900 different individuals that you borrowed

13  money from.  So, is it a situation -- you know, what was that

14  conversation like.  Ho did you approach these people for money?

15  A    Well, primarily speaking, most people had heard about

16  through word of mouth, so they'd come in, and say that they

17  wanted to lend me money.

18  Q    So, they heard that, through word of mouth, that other

19  people were lending you money --

20  A    Yes.

21  Q    -- and so they also wanted to lend you money?

22  A    Yes.

23  Q    So, they knew this was a situation --  to the best of your

24  knowledge -- I know you can't speak for these individuals, but

25  your understanding is that they knew that this was money that

Marshall - Champion                                   39

1 they were lending you?

2 A    Yes.

3 Q    Okay.  And did you present it as an investment opportunity

4 for them?

5 A    I did not present it as an investment opportunity.  I

6 presented it as they were lending me money, in return for,

7 generally speaking, eight percent interest.

8 Q    What did you tell them that they were lending you money

9 for?

10 A    For my -- predominantly, the real estate business, to buy

11 more real estate, to make improvements in the real estate, to

12 pay bills in the normal course of business for the real estate,

13 pay debt service on the real estate loans.

14 Q    And did you make them aware of that -- were they aware of

15 -- well, let me rephrase that.

16       So, you told them, when they said, hey, I want to

17 lend you some money, you said, okay, I'm going to borrow X

18 amount of dollars, and I'm going to buy real estate with that?

19 Is that how most of those went?

20 A    They -- most people -- some people asked.  Some people

21 didn't ask what I would do with the money.  Some people would

22 come in and say, gee, I'd like to lend you $10,000, and that

23 would be, basically, the end of the conversation.  And some

24 people would sit down and have a lengthy conversation.  And

25 some people, I would take out to different projects or

1  buildings and show them.  It depends on what someone wanted.

2  Q    Okay.  So, let me skip ahead to a couple of things.  When

3  did you first start that program of borrowing money to and

4  (indiscernible)?

5  A    I don't know for sure, but it was in the early '80s.

6  Q    Okay.  So, that's about 30 years?

7  A    Well, it's about 40 years.

8  Q    It's about 40 years.  Okay.  So, I reviewed just some of

9  the proofs of claims that were filed in the case, just to kind

10  of get an idea of what these notes were about, and I saw that

11  there was an addendum to a note that had a number of 4,818 on

12  it.  So, does that mean that there is -- potentially, there was

13  5,000 promissory notes or borrowing agreements out there?

14  A    It means that if you had a note, and then you came in a

15  year later, and said, I want to --

16  Q    Right, I get that.

17  A    -- add $10,000 to the loan, it would be an addendum, as

18  opposed to a new note.

19  Q    So, the note, itself, though, had a number on it.  It was

20  like 4,818.

21  A    Correct.

22  Q    So, in your estimation, would you have about that many

23  notes, meaning, over the years, that's how many notes you were

24  generating?

25  A    Oh, no, there's not that many outstanding, because some of

Marshall - Champion                            41

1  them paid off.  Many have been paid off.

2  Q    Well, right.  Right.

3  A    People came in to -- but over the course of years, yeah,

4  that's the number.

5  Q    Okay, all right.  So, what's the average you would -- I

6  was -- the average yearly total, I guess, of all the payments

7  that you were making under these notes, I would say?  I mean,

8  you don't have to go back 40 years.  But let's just say in the

9  last five years, how much were you paying out on average?

10 A    I don't know off the top of my head.  I'd have to check my

11 end-of-year statements to see, because those, I don't have at

12 this -- you know, at this desk.

13 Q    Okay.  So, and you said that the individuals could decide

14 whether they wanted, you know, interest payments monthly,

15 quarterly, yearly or deferred until retirement, correct?

16 A    Correct.

17 Q    Okay.  So, say an individual wanted their interest on a

18 quarterly basis, then, would you write a check, then, out of

19 that M. Burton Marshall account?

20 A    Yes.  Yes, we'd write a check.

21 Q    Okay.  All right.  So, just before you filed your case,

22 you made several payments to creditors on the same day.  How

23 did you determine who you were going to pay before you filed

24 your bankruptcy?

25 A    What do you mean several payments?  I paid everyone a half

Marshall - Champion                    42

1  of one percent of the principal.  That was just before we filed

2  bankruptcy.

3  Q    Yeah.  I have a couple of those questions, but

4  specifically, so you -- you took a certificate -- or you took a

5  credit counseling class online, probably, right?

6  A    Yes.

7  Q    Okay.  And that was for the purpose of you filing for the

8  bankruptcy, correct?

9  A    I took that counseling because I understood, based on what

10  my attorney said, that I had to take the class, yes.

11  Q    Okay, good.  And it looks like that was done on April

12  10th, so just ten days before you filed.  But you also made

13  several payments to creditors on that same, exact day.  So you

14  cut checks to different people that you owed money to.

15         I am asking you, why those people?

16  A    Not knowing the specifics of who it was, I'm not sure.

17  One was Ed Vollmer.  I know he's dying, and we wanted to give

18  him 1,000 bucks or something like that.

19  Q    Okay.

20  A    I think I have that written down somewhere.  I'm just

21  trying to look through my notes.  I'll get back to it.  So, do

22  you know how much average income that you get from your rental

23  properties in a year, on average?

24  A    The rents take in, I think -- I think close to $3 million.

25  Q    Okay.  And how much do you pay out in property taxes a

Marshall - Champion                         43

1 year?

2 A    Oh, in taxes -- we just (indiscernible) village taxes --

3 they were roughly 150.  The school tax is much larger.  It's

4 probably 300, and probably six or $700,000.

5 Q    Okay.  All right.  So, there's creditors that you list

6 that aren't individuals, necessarily.  There's, you know, fire

7 departments, cemetery associations --

8 A    Correct.

9 Q    -- living trusts, estates that you list in your schedules.

10 Was that also for the same type of arrangement under the

11 promissory note for those transactions?

12 A    Yes.

13 Q    So, it was the same terms, the eight percent?

14 A    Yes.

15 Q    And did those associations -- I'm just asking you in

16 general, because, I mean, there's a lot of creditors here so

17 it's difficult to narrow down on just one single one, but you

18 had just said earlier that people approached you, because they

19 had heard, oh, I leant Burt Marshall money, and, you know, you

20 should do that, too.

21       Was that the same type of thing that happened with

22 these other creditors, non-individual creditors?

23 A    These would be someone or someones that had lent me money

24 that's on the Board or is trustee or some such thing like that.

25 Q    Okay.  So, what about, like decedents' estates, were you

Marshall - Champion                                    44

1  approached by, what, the Executor of that estate?

2  A    Those -- there's no new money coming in from an estate, to

3  the best of my knowledge.  Those all came about, someone that

4  had a note passed away --

5  Q    I see, okay.

6  A    -- so we rewrote the note in the name of the estate.

7  Q    I understand.  Okay.  All right.  When was the last time

8  you borrowed money from an individual under the promissory note

9  agreement?

10 A    I would think in January, because I'd been in the

11 hospital.  I got out in December, and then I was working a

12 little bit, and then I had, effectively, a relapse in the end

13 of January, and that -- there was no money borrowed after I

14 went in the hospital the second time, so in January.

15 Q    So, the -- do you remember how much it was for?

16 A    I do not.

17 Q    Do you remember what you did with the money?

18 A    Put it into the Bur t Marshall checking account.

19 Q    So, the payments that you made under these notes to these

20 creditors over the years, what source of money, income or

21 revenue did you use to make those payments or interest

22 payments?

23 A    Again, all the monies coming in, effectively, went into

24 the Burt Marshall checking account.  So, my wages went into

25 that account.  My Social Security check was in that account.

Marshall - Champion                          45

1 All of the rents go into that account.  All of the money from

2 M & M Press was in the account.  People lend me new money, it

3 goes into that account.  So, all the money goes into that pot,

4 if you will.

5 Q    So, the new money, then, that you were getting by

6 borrowing money from individuals could have been paying out

7 money you owed to other individuals, correct?

8 A    It could have been partially used for that, yes.

9 Q    So, there is no separate account or any type of fund for

10 this eight percent fund?

11 A    Correct.

12 Q    And, like, can you explain that, again, to me?  What is

13 the eight percent note fund?

14 A    Well, there is no fund.  People would lend me money, and I

15 don't know where the word fund came from.  I did not --

16 Q    I think it's actually on your documentation.

17 A    Well, I did not put it there to the best of my knowledge.

18 Certainly, other people that I'd loan money to call it a fund,

19 but I do not call it a fund.  But the money would just come

20 into the checkbook, and we had all of the notes that we kept

21 track of separately, so we could keep track of how much I owed

22 them.

23 Q    So, you never contacted people in writing and said, you

24 can always put more money into this eight percent note fund,

25 eight percent promissory note fund is exactly the words?

Marshall - Champion                                46

1  A    Well, if the word fund is in there, it's a mistake, and it

2  ought not be included there, and I recall I ever wrote any

3  letters that they could put money in, you know, but I borrowed

4  more money from them.

5  Q    Okay.  All right.  And then, how was the interest

6  calculated?  What type of formula did you use?

7  A    It was a formula on the computer divided by 365 days.  So

8  if you had X amount on January 1st, and you come in February

9  15h, we would update the interest, and that would be calculated

10 by 46 days divided by 365 days times eight percent.

11 Q    Okay, so a straight eight percent, then?

12 A    Yes.  I mean, there's one case where it's six percent, but

13 99.9 percent are eight percent, yes.

14 Q    Okay.  So, based on your schedules, it looks like most of

15 your creditors are in the Central New York area, but definitely

16 not all of them.  In fact, you owe a lot of money to people

17 from all over the country and even out of the country, you

18 know, Alaska, Hawaii, California, Montana, Japan.  Did those

19 individuals reach out to you or was it the other way around?

20 A    No, they reached out to me.  They were -- I did their

21 taxes or they were friends of friends, word of mouth, or they

22 were people that were here that moved away, and in a lot of

23 cases, they're family.  So, the parents might live here and

24 they moved to, for example, California.  There's the one person

25 in Japan or Taiwan or something, I know, and that person, he's

Marshall - Champion                    47

1  from Sherburne, New York, which is ten miles down the road.  He

2  just happens to live there -- family.

3  Q    So, again, okay, you would do these people's individual

4  tax returns, and they would say, oh, Burt, I also heard I can

5  lend you money?  Is that how you're saying the transactions

6  went?

7  Q    Or -- or was it, were you -- were you approaching them,

8  saying, hey, if you lend me X-amount of dollars, I can --

9  A    Certainly, on occasion, I would approach them and ask them

10 if they would lend me money, but not the majority of the times.

11 The majority of the times, they would ask me.

12 Q    And what would they ask you exactly?

13 A    Well, everyone would ask differently.  They'd ask, you

14 know, I heard you paid eight percent or some such thing like

15 that, and then, we'd have a conversation about it.

16 Q    Okay.  Okay.  So, moving to the rental properties, you own

17 more than about 100 different properties located in the Madison

18 County area, correct?

19 A    Correct.

20 Q    And how did you attribute a value for each of those

21 properties when you were preparing your schedules?

22 A    The values were based on the taxable assessed value.

23 Q    And are you going to be having those properties appraised?

24 A    Presumably.  That's going to be up to the financial people

25 and my attorney.  It probably won't be my decision.

Marshall - Champion                        48

1  Q    Have you ever had an appraisal done of all of your assets?

2  A    No.

3  Q    Okay.  And then, you've got about 240 tenants, according

4  to your schedules and --

5  A    Well, there are apartments, and then there's another 160

6  -- 140 storage tenants, yes.

7  Q    Okay.  So, and they're primarily residential properties,

8  right?

9  A    Not totally, but, yes.

10  Q    So, you do have commercial tenants?

11  A    Yes.

12  Q    Do you know how many?

13  A    Well, in this office here, I rent to myself, and that was,

14  you know, our sole one.  I have a commercial building next

15  door, here, and that is, one, two, three, four, so that would

16  be five, and then (indiscernible) four or five tenants, ten, so

17  15 or so commercial tenants.

18  Q    And do you have written commercial lease agreements with

19  the commercial tenants?

20  A    The lease is different than the residential lease, yes.

21  Q    So, you do have written leases in the commercial lease

22  agreements, right?

23  A    Yes.

24  Q    Okay.  And then, what about your residential properties?

25  Do those tenants have a written lease?

Marshall - Champion                                    49

1  A    Yes.

2  Q    Okay.  And how do tenants normally pay their rent?

3  A    Most people pay through the app, and so it's mainly

4  electronically.

5  Q    Do any of your tenants pay in cash?

6  A    Yes.

7  Q    How many would you say, what percentage of your tenants?

8  A    I would say 85 to 90 pay through the app, and the cash

9  people pay one percent or two percent.

10  Q    Okay.

11  A    A small number.

12  Q    And did that cash get deposited into the M. Burton

13  Marshall account?

14  A    Yes, it did.  Once in awhile, I would take out $100 for

15  myself, but we've noted that down, and we have a cash thing,

16  because the cash would come up short by what I took out.  But

17  normally, yes, all the cash is deposited except for that.  I

18  give myself an allowance of $100 a week.

19  Q    $100 a week allowance for, what?

20  A    Cash.  You know, to get a hair cut or stop at the farmer's

21  market or some such thing.

22  Q    From the rental income?

23  A    Yeah.

24  Q    Okay.  Or the tax income.  Sometimes, tax clients would

25  pay in cash, but it all goes into one area, and I would just,

Marshall - Champion                    50

1  like, write a note to whoever was in charge of that, that I

2  took out $100 in cash.

3  Q    Okay.  So, there's a mortgage listed on a property located

4  at 98 Holland Street in Hamilton, and it's just shy of $80,000

5  owed to George Bullock, Sr.?

6  A    Yes.

7  Q    And it looks like you incurred that debt January 24th of

8  this year?

9  A    We acted to buy it -- and I don't have it in front of me

10 -- in October/November, and it took that long for the attorneys

11 to catch up with the paperwork.

12 Q    Okay.  So the closing was probably some time in January,

13 then?

14 A    Well, I don't have it in front of me, but that sounds

15 about right, December or January.

16 Q    Okay.  So, it looks like, based on the County records,

17 that you purchased it for $110,000?

18 A    Right, I gave them a down payment.

19 Q    Okay.  The down payment was about $30,000, then?

20 A    I think it was 25, but --

21 Q    25/30?  Okay.

22 A    Yes.

23 Q    Would that 25 or $30,000, would that have come out of the

24 M. Burton Marshall account?

25 A    Yes.

Marshall - Champion                          51

1  Q    Okay.  So, as far as the vehicles that you own, you list a

2  2016 Dodge Caravan, a 2016 Subaru Forester and a 2019 Ford 250.

3  Are those the only vehicles that you own?

4  A    Yes.

5  Q    And which vehicle do you primarily drive?

6  A    I drive the Chrysler product.  My wife drives the Subaru

7  product.  And the truck is a plow truck.  I've never driven

8  that.  One of my people is the plow person, and they drive it,

9  and they, you know, move materials around, but predominantly,

10 it's used for plowing.

11 Q    Okay.  You also, in your schedules, list some household

12 items, including a painting and jewelry.  How did you arrive at

13 those values?

14 A    Just a ballpark.  The one painting, we paid $4,500 for, so

15 we figured that's worth a little bit more.  That's a local

16 artist who just passed away.

17 Q    Okay.

18 A    And the jewelry was my wife's, and (indiscernible).  I

19 listed that, and she inherited that from a family member.

20 Q    Do you have an insurance policy covering the contents of

21 your home?

22 A    Yes.

23 Q    Do you know what the value is?

24 A    On the contents?

25 Q    Yeah.

Marshall - Champion                                        52

1  A    Well, it's 100 percent of what's on the house, and so,

2  it's -- the house is insured for one and a half million or some

3  sort, so it'd be another one and a half million on the

4  contents.

5  Q    Okay.

6  A    But only because it's a function of how much insurance you

7  write on the house --

8  Q    Right.

9  A    -- with that particular insurance contract.

10 Q    But you have any, like, specific riders for --

11 A    Just for the jewelry.

12 Q    You do have a rider for the jewelry?

13 A    Yes.

14 Q    And do you know how much that is for, how much the policy

15 is for?

16 A    It's for the same values as that jewelry is listed for.

17 Q    Okay.  So, you also list five different life insurance

18 policies?

19 A    Correct.

20 Q    And they're all term life policies, is that correct?

21 A    Yes.  Yes.

22 Q    And I don't think you listed the beneficiaries of those

23 policies?

24 A    The Estate of M. Burton Marshall is on the three big ones.

25 Q    That have the face value of six million?

Marshall - Champion                              53

 1 A    Right.  And then the small ones with Globe, I think, my

 2 wife, Megan Marshall, is the beneficiary.

 3 Q    Okay.  So there's three separate policies that have a face

 4 value of six million, so are those the ones that the Estate of

 5 Burt Marshall is the beneficiary?

 6 A    Correct.

 7 Q    That's correct?

 8 A    Yes.

 9 Q    So, on your 2022 federal income tax return, you did report

10 dividends from several water companies and utility services, is

11 that the -- with respect to the stock that you were referencing

12 earlier?

13 A    Yes.

14 Q    Okay.  And you don't have any of those anymore?

15 A    I own no stock currently other than Miles B. Marshall,

16 Inc.

17 Q    Do you own any type of Crypto currency?

18 A    I do not.

19 Q    Have you ever?

20 A    I have not.

21 Q    Okay.  And do you own any real estate in any country,

22 other than the U.S.?

23 A    No.

24 Q    And have you ever?

25 A    No.

Marshall - Champion                          54

1   Q    Do you have any accounts that are outside the United

2   States?

3   A    I do not.

4   Q    And have you ever?

5   A    No.

6   Q    Okay.  So, when you filed different applications that were

7   heard by the Court  -- well, your attorney filed them.  But you

8   prepared an affidavit in support of those requests, you know,

9   and one of the -- in that affidavit, you had discussed that

10  your Chapter 11 case was precipitated largely by your recent

11  hospitalization and your loss of income as a result of that.

12  Do you remember that affidavit that I'm referring to?

13  A    Yes.

14  Q    Okay.  So, prior to that onset of that illness and the

15  hospitalization, were you having any financial difficulty?

16  A    No, it was business as usual.  I always paid all my bills

17  on time for -- up until when I got sick.

18  Q    So, were you able to make payments to your creditors when

19  they came due or when they asked for their money?

20  A    Yes, until I got sick.  Yes.

21  Q    And what time frame was that, approximately, when you --

22  A    30 days.

23  Q    Just 30 days ago?

24  A    No.

25  Q    No.  I'm asking, like, when -- when did that illness

Marshall - Champion                        55

1  hospitalization come about?

2  A     December, last year, December 5th.

3  Q     Okay.  So prior to December, 2022, you were able to make

4  payments to creditors when they came due or when creditors

5  asked for money?

6  A     Yes.

7  Q     Okay.

8  A     I think I made payments all the way through the first

9  illness, when I came home, through the end of January.

10  Q     Okay.  All right.  I'm going to move to your schedules of

11  your income and in your expenses.  And I might have to get some

12  clarification from your attorney, and maybe an amended schedule

13  -- I'm not sure -- because it just seemed a little bit

14  confusing to me.

15        And, specifically, when you listed your income from

16  your rental properties and from operating a business, you

17  listed $225,807.

18  A     That's a lovely income, I presume.

19  Q     Right.

20  A     Yes.

21  Q     Is that -- was that gross or net income?

22  A     Gross.

23  Q     Okay.

24  A     $225,000 a month.

25  Q     Okay, all right.  Because on the schedule, itself, it asks

Marshall - Champion                                    56

1  for the net income, so that's actually gross is what you're

2  saying?

3  A    Yes.  That's either my mistake or the attorney's mistake,

4  but it's definitely gross.

5  Q    Okay.  So, then, on the expense side of it, then, would

6  the expenses from your rental property business, are those

7  accounted for in your list of your personal expenses?

8  A    I'm not sure what you mean when you say personal expenses.

9  Q    Okay.  So, this is your personal bankruptcy, and in your

10 personal bankruptcy, you have to disclose the information about

11 your income, your personal income, and then, also, the expenses

12 that you have on a monthly basis.  But since your individual

13 income and expenses are so closely -- so closely intertwined,

14 it's a little bit difficult to tell what exactly is going out

15 as far as expenses not related to the rental business.

16 A    The expenses listed at the bottom under line 21 for the

17 different businesses definitely, yes.

18 Q    Okay, all right.  So, the $225,807, the gross amount of

19 income that you just referred to in Schedule I, is that for all

20 of your businesses?

21 A    Well, let me see Schedule I.

22 Q    I don't think it is.  I think it's just because the

23 rental income, because if you look -- that's at line eight on

24 schedule --

25 A    Wages, line 8A is the gross monthly income.

Marshall - Champion                                57

1  Q    Is that just with respect to the rental properties?

2  A    Yes.

3  Q    Okay.  And then the other income is listed below under 8H,

4  correct?

5  A    8H is the storage income.

6  Q    The storage and then the different mortgages.

7  A    And then the U-Haul and the M & M Press.

8  Q    Okay.  So, now, going back to Schedule J.  Just flip your

9  page over if you're looking at Schedule I.

10 A    Right.

11 Q    Then, if you see under line 21 --

12 A    Okay?

13 Q    -- so, those are the payments that you're making -- that

14 you're making -- or, basically, the expenses of the various

15 businesses, correct?

16 A    Line 21?

17 Q    Yeah.  So, you've got mortgages.  You've got M & M Press.

18 A    Mortgages.  Ten or 12 properties have mortgages, and

19 that's the properties were the mortgages are on, and then the

20 rest is a monthly expense for each of those businesses, yes.

21 Q    Oh, okay.  All right.  So, under rentals, there's $180,000

22 of monthly expenses listed.

23 A    Right.

24 Q    What would that be for?

25 A    Real estate taxes and insurance, maintenance, repairs.

Marshall - Champion                          58

1  Q    Okay.  And then what kind of expenses do you have related

2  to the M & M Press business?

3  A    Payroll, costs of good sold, electricity, heat, supplies,

4  repairs.

5  Q    Okay.  Okay.  Okay.  So you also completed another

6  statement of your income that's actually called Chapter 11

7  Statement of your Current Monthly Income, and what that is, is

8  it takes the income that you received in the last six months

9  prior to filing, and it -- it shows, you know, what your gross

10  wages were, what income from -- that you had from your rental

11  properties and what not.

12        It shows a net monthly income average, during the six

13  months prior to filing, from rental or other real property in

14  the amount of $11,547 a month.  Do you see that?

15  A    No, I don't know what schedule we're looking at.

16  Q    There's a separate form.  It, sort of at the top, it says,

17  Official Form 122-B.  It's about maybe a quarter --

18  A    Yeah, 1220B, here.

19  Q    Okay, great.  Okay.  So, go down to the bottom, where you

20  see, number six, net income from rental and other real

21  property.

22  A    Right.

23  Q    So, this $225,000, that came from Schedule I that we had

24  just talked about.

25  A    Right.

Marshall - Champion                         59

1  Q    And then the expenses $214,000 that I am assuming is the

2  $180,000 for the rental, and then the M& M Press expenses, and

3  the other things that we just went over.  So, if you see, it

4  shows what the net of that is, monthly, as $11,547.  Do you see

5  that?

6  A    Yes, I do.

7  Q    Okay.  All right.  So, your net monthly income, then, now,

8  wait.  Before I get to that question, then, going above that,

9  do you see net income from operating a business, profession or

10 farm?

11 A    Yes.

12 Q    And that's $49,449.  What -- what is that -- what is that

13 from?

14 A    That is -- I assume that's the tax business of the M & M

15 Press business.

16 Q    Okay, all right.  So that would -- probably would add up,

17 if we went back and added all of the income from the mortgages

18 and then the M & M Press, right?

19 A    Well, the mortgages are listed on line ten.  I get Social

20 Security, plus those four mortgage payments, and that's listed

21 on line ten.

22 Q    Okay.  So, this form, basically -- let's go back to the

23 statements of the current monthly income.  So it adds,

24 basically, all of the net income that you have that, you know,

25 it's kind of summarizing, if you will, the information that was

Marshall - Champion                              60

1  in your Schedules I and J.

2  A    Right.

3  Q    So, at the very bottom of the next page, so, under line

4  11, it says, calculate your total monthly income.  Do you see

5  that?

6  A    Yes.

7  Q    And it's about $42,669 --

8  A    Right.

9  Q    -- would be your monthly income, is that correct?

10 A    That's what it says, yes.

11 Q    Okay.  So, then, that's a long way around to ask you this

12 next question, how is it that you were able to afford to make

13 such large payments to your creditors in the 90 days before you

14 filed?

15 A    Well, I cashed out all the stocks.

16 Q    And how much did you get for that?

17 A    Close to a million dollars.  There was 400-and-some-

18 thousand in the brokerage account, and there was a number of

19 utility stocks, and they were between 30 and $50,0000 apiece.

20 Q    Okay.  So, the payments that you made, according to your

21 paperwork, the statement of financial repairs, the payments

22 that you -- the loan repayments that you made to individuals,

23 just in January, totaled over 1.2 million dollars.

24         Is that -- did you get -- well, let me ask you, where

25 did you get that money to make those payments?

Marshall - Champion                           61

1  A    Well, it came from my wages, my Social Security, the cash

2  flow, people would lend me money still in January.  A lot of

3  that -- at the end of January, my bonuses came in.  I think I

4  took out approximately $120,000 in bonuses in January.

5  Q    Okay.  So, when you liquidated the stock, did you get a

6  check in the mail?

7  A    Yes.

8  Q    And then what did you do with that check?

9  A    I deposited into the M. Burton Marshall checking account.

10 Q    For each of those stocks that you had, is that the case?

11 A    Yes.

12 Q    Okay.  So, in January, you paid over 1.2 million dollars.

13 In February, you paid $50,000 to noteholders, $50,000 to your

14 attorney and $50,000 to Lee Woodard, who I believe is your

15 wife's attorney, is that correct?

16 A    Yes.

17 Q    Okay.  So, you paid for her legal expenses?

18 A    Well, she has no other income.  Yes, I did.

19 Q    Okay.  So, 1.2 million in January.  About 150 in February.

20 In March, you paid about $123,000 for property taxes, but you

21 also paid over $455,000 to various noteholders, do you remember

22 that?

23 A    I know that it was done, yes.

24 Q    Where did that money come from?

25 A    Well, it was left over.  There was a large balance in the

Marshall - Champion                                    62

1  checking account from January from cashing in the different

2  stock investments.  I got my bonus, and I continue getting

3  Social Security and a paycheck all that time and profits from

4  the rentals.

5  Q    So, the noteholders to whom you paid out of that $455,000,

6  how did you decide who you were going to pay?

7  A    Everyone got paid.

8  Q    What do you mean?

9  A    All the 900 people got paid.

10 Q    They got paid what?

11 A    One-half of one percent of what we calculated the balance

12 was.

13 Q    And why did you decide to do that?

14 A    Because that was all the money that I could afford at that

15 time.

16 Q    So, you -- was it your intention, then, to try to pay

17 people before you filed your bankruptcy case?

18 A    It was my intention to show good faith, and I -- that's

19 the only good faith I had at that point.

20 Q    Okay.  And, then, you made two additional payments to your

21 attorney in April, just shy of $95,000.  Did that money come

22 from the M. Burton Marshall account?

23 A    Yes.

24 Q    Okay.  And where did you get the money to pay for that?

25 A    Out of that checking account, the same thing.

Marshall - Champion                                    63

1  Q    So, the stock sale, the money that you had from your

2  wages, bonuses, et cetera, correct?

3  A    Yes.

4  Q    Okay.

5  A    And profits from the rentals.

6  Q    Okay.  I probably have more questions, but I'm just going

7  to go back through my notes, at this point, and while I do

8  that, I'm going to actually turn it over for questions, first,

9  by Committee counsel.

10 A    Let me go pee, first, okay?

11 Q    Oh, okay, sure.  Sure.  We can take a quick, you know, a

12 few minute break.  Not a problem.

13                      (Off the record)

14                      (On the record)

15         MS. CHAMPION:  Okay, great.  We are back on the

16 record, and as I was saying, I probably have a couple of more

17 questions, but at this point, we will go ahead and turn it over

18 to the Committee.  But before we do that, I just want to -- the

19 individuals that had emailed me that wish to ask questions, if

20 you haven't already, and I'm just trying to figure out the best

21 way to do this -- I think probably you should do the star-zero

22 to connect with the operator, so then you will be unmuted at

23 the time when we are ready to call on you for questions.

24         So, we'll just do the best we can with that process,

25 but I'd just ask everybody be patient.  Okay, at this time, I'm

Marshall - Temes                                      64

1  going to go ahead and turn it over to Committee counsel.

2              MS. TEMES:  Thank you.  This is Sara Temes.

3                            EXAMINATION

4  BY MS. TEMES:

5  Q    Mr. Marshall, thank you for taking our questions.  Many of

6  our questions have already been asked by the U.S. Trustee, but

7  we also have just a few related to, starting with the area Ms.

8  Champion was just referring to, the payments within 90 days of

9  the bankruptcy filing.  Were these payments mostly interest?

10 The payments that are not the half-of-one-percent payment, the

11 other payments listed, were they mostly interest payments to

12 noteholders?

13 A    Can you rephrase that question?  I'm not quite sure I

14 understand.

15 Q    Yes.  So, those listed payments that were made within 90

16 days, and some of them are listed as loan repayments, and

17 they're payments that were made throughout the 90 days prior to

18 the filing of the petition.  There is one payment listed,

19 obviously, for the noteholder payments, half of one percent

20 that was in the amount of, I think, $455,000.  There are many

21 other payments that are listed, also, as loan repayments.  For

22 example, and I would say that these are the first few that are

23 listed there on page -- of part 3 of the statement of financial

24 affairs, there are payment to, maybe, Jimmy Fisher (phonetic)

25 for $10,000 on January 21st.

1  A    Well, we're still doing the normal course of business so

2  he apparently called for the $10,000 to be repaid, and we paid

3  him.

4  Q    Okay.  So, when did you cease making those regular

5  payments to noteholders?

6  A    Sometime when I was in the hospital, and there was -- I

7  think it was the first week in February or something like that.

8  Q    Okay.  Okay.  And then the -- turning, then, a little bit

9  farther on to part four of the statement of financial affairs,

10 where there's a list of pending lawsuits, were any of these --

11 there's not really a date on these, but they do mostly relate

12 to 2023, as far as I can tell.

13 A    All of the lawsuits against me are related to noteholders.

14 Q    Okay.  And none of them are commenced before January,

15 2023?

16 A    Correct.

17 Q    Okay.  I have just one other related to the schedules of

18 assets and liabilities.  There were -- Ms. Champion asked a

19 question earlier related to one of the most recent mortgages,

20 and I think that -- that was --

21 A    Yes?

22 Q    -- the George Bullock was from January -- January 24th,

23 2023, but it was related to a transaction earlier that didn't

24 close until later.  The -- going to the list of real property

25 owned, were any -- was any real property purchased after that

1 property that was purchased --

2 A    No, that was the last property I purchased.

3 Q    Okay.  All right.  That makes sense.  And, then, I guess,

4 just one last thing.  The security deposits that are held in

5 separate accounts for tenants, were there -- are there escrow

6 accounts that have not been set up yet or even just, as your

7 general practice in the past, before you do set up a new escrow

8 account, are those monies in the general Burton Marshall bank

9 account?

10 A    Well, if someone gives us cash, then, yes, we'll write a

11 Burton Marshall check to open it, but most people, we get them

12 to write their own check directly to Berkshire Bank.

13 Q    Okay.  Okay.

14        MS. TEMES:  That's all I have for now, Ms. Champion.

15        MS. CHAMPION:  Thank you.

16                        EXAMINATION

17 BY MS. CHAMPION:

18 Q    Mr. Marshall, I just want to clarify your testimony to

19 make sure I have this and it's accurate, did you or did you not

20 ever approach any one of your creditors to invest in an eight

21 percent fund?

22 A    I wouldn't use the word invest, no.  I didn't use the word

23 fund, no, but I approached some people, not many, some people,

24 and asked if they would loan me, yes.

25 Q    But  you did not approach them about an investment

1  opportunity, correct?

2  A    No, I did not.

3  Q    Okay.  Okay.

4  A    They lent me money, and they received eight percent

5  interest.

6  Q    Okay.  All right.

7          MS. CHAMPION:  We are going to try to do this.

8  Hopefully, this works.  I do have a couple of people already on

9  the line that are unmuted, but are -- the operator is having

10 trouble with some of the individuals' phone numbers that have

11 already contacted me.  So, I think if you still want to ask Mr.

12 Marshall questions, please dial star-zero and speak with the

13 operator.

14         But, first, we do have Tina Wayland-Smith on the line

15 and ready to go if the operator wants to unmute her line.  Ms.

16 Wayland-Smith, you can go ahead and ask your questions.

17         MS. WAYLAND-SMITH:  Thank you, Ms. Champion.

18                          EXAMINATION

19 BY MS. WAYLAND-SMITH:

20 Q    Mr. Marshall, I represent a lot of people, and I'm getting

21 asked a lot of the same questions by them, and I'm going to

22 start off with, how is it that you thought you were going to be

23 able to provide all these creditors with eight percent interest

24 on the money they gave you?

25 A    I thought that the real estate would appreciate more than

Marshall - Wayland-Smith                          68

1  the eight percent interest that I was paying.

2  Q    And how was that going to happen in your mind?

3  A    Well, it was being improved continually, and the

4  appreciation of real estate, particularly, Hamilton real estate

5  has appreciated significantly in the last three/four years.

6  Q    Many of these people, you've destroyed generational

7  wealth, and they want to know how you feel about that.

8  A    I feel horrible.  I'm suicidal.  I'm depressed.  I'm

9  getting counseling.  You know, this was never intended.  This

10  is not a purposeful thing.

11  Q    Do you have any offshore accounts?

12  A    I do not.

13  Q    Okay.  When was the last time you received money for a

14  promissary note?

15  A    Probably in January of this year.

16  Q    Okay.  And did you speak with any creditors or anybody who

17  was seeking to invest with you in January?

18  A    Yes.

19  Q    Do you know who you spoke to?

20  A    Not off the top of my head, no.

21  Q    Okay.  And did you tell people how things were going in

22  January?

23  A    I probably said that 2022 was the best year we ever had.

24  The insurance business had the best year.  The rentals had the

25  best year they ever had.  M & M Press had the best year it ever

Marshall - Wayland-Smith                    69

1  had.   Things were --

2  Q    So things were going well?

3  A    Except for the medical, and the second medical thing.

4  Q    When was the first time you consulted with a bankruptcy

5  attorney?

6  A    I was in the hospital, so it must have been February of

7  2023.

8  Q    And was that Mr. Dove?

9  A    Yes.

10 Q    And when did you realize you were having financial

11 difficulties?

12 A    When I was laying in the hospital, and my staff notified

13 me that many people were calling notes, and there wasn't going

14 to be enough money to pay people.

15 Q    Okay.   Talking about all of these notes that went out in

16 January, who signed those notes.   I'm sorry.   Let me rephrase

17 that.   Who signed those checks?   You sent checks out.

18 A    I'm not sure if they have a stamp with my name on it or if

19 one of my employees was authorized to sign checks.   I don't

20 have those checks in front of me and don't know who actually

21 signed them.

22 Q    Are any of your employees authorized to sign checks on

23 your behalf?

24 A    Denise could sign checks, if they have the money, and

25 there might be a couple.   I'd have to look at the signature

Marshall - Wayland-Smith                           70

1  first to see who was authorized to sign.

2  Q    Okay.  Did you ever tell any of the 900 people that you

3  had enough life insurance to cover all of the debts you owed?

4  A    No.  I told people I had life insurance.  I never

5  intimated it was enough to cover all of the debts.

6  Q    You told them not to worry about it, because if you died,

7  you had enough life insurance to cover it, you never told

8  anybody that?

9  A    Not to my knowledge, I did not.

10 Q    Okay.  And you spoke with Ms. Champion and answered a

11 question of hers, saying that you never used the eight percent

12 fund language, is that true?

13 A    That's true.

14 Q    Okay.  And what if I told you, I had a hand-out with your

15 letterhead on it that's dated, by my client, December 3rd,

16 2010, that the title of it is the "Eight Percent Fund".  It

17 does say that you would earn eight percent interest, and that

18 funds could be added to the promissory note at any time.

19        Did that come from you?

20 A    It probably did.  I'd say I'd forgotten that we ever had

21 such a paper.

22 Q    And I have several clients, because I represent 25 or 26,

23 that have handed me these from different -- different time

24 frames when they invested with you.

25 A    Well, then I thank you for making --

1 Q    Do you want to change your answer?

2 A    Well, apparently, I did use the word, fund.

3 Q    Okay.  And isn't it also true that on many occasions, when

4 you would be doing somebody's tax return, you would note to

5 them how much interest income they had, and tell them that you

6 could get them more interest income?

7 A    Oftentimes, when I was doing taxes, we'd discuss how much

8 interest they'd earned and how much eight percent would earn

9 them in a year or so.

10 Q    Okay.  So, you did have those discussions with your tax

11 clients?

12 A    Occasionally, yes.

13 Q    And it's probably more than occasionally, wasn't it?

14 A    Well, that's not likely.  I do a lot of taxes.

15 Q    Well --

16 A    At least 700 taxes a year.

17 Q    And what do you charge for a tax return?

18 A    The (indiscernible) is a hundred and --

19 Q    An individual tax return, nothing fancy with it?

20 A    150-bucks to 200-bucks, depends what's involved.

21 Q    Okay.  I'm just looking at my notes.  And you're -- you

22 made -- is it your testimony that you only took out $100 a week

23 from all of this money that came in?

24 A    For cash, I took $100 a week.

25 Q    Okay.

Marshall - Wayland-Smith                              72

1  A    Most bills would be through the checking account, of

2  course.

3  Q    Okay.  So, all your personal bills were paid through M. B.

4  Marshall --

5  A    Yes.

6  Q    -- checking account, as well, correct?

7  A    Yeah.  The $100, that was just for cash purchases, a hair

8  cut or the farmer's market or whatever.

9  Q    Okay.  So, if you went grocery shopping, that money came

10 out of the M. B. --

11 A    Yeah, it would go onto a charge card, and at the end of

12 the month, they would pay the charge card.

13 Q    Okay.  So, you did all your personal business on a charge

14 card, and then that would be paid through M. B. Marshall.

15 A    Most of the personal business on a charge card that was

16 paid through Burt Marshall's checking account, yes.

17 Q    Okay.  And did your wife also have a card to that account?

18 A    Yeah, a Discover card.

19 Q    Okay.  Did any of your other family members have credit

20 cards that would have been paid through the M. B. Marshall bank

21 account?

22 A    No.

23 Q    Okay.  Let me just check my notes.

24        MS. WAYLAND-SMITH:  Ms. Champion, I believe those are

25 all of my questions.

Marshall - Champion                    73

1        MS. CHAMPION:  Okay, thank you.  Before we move onto

2  the next person to ask questions, I have a couple of more

3  questions for you, Mr. Marshall.

4                        EXAMINATION

5  BY MS. CHAMPION:

6  Q    When is the last time that you purchased real estate

7  investment property?

8  A    The Bullock property which closed in January of 2023.

9  Q    How many real estate investment properties do you think

10 you purchased in 2022?

11 A    Zero.

12 Q    What about 2021?

13 A    Zero.

14 Q    Okay.  Pursuant --

15 A    I haven't brought any properties in four or five years.

16 Q    Okay, four or five years.

17 A    The last year, I brought four or five in one year, and

18 then none until Bullock.

19 Q    Okay.  And some of the documentation that was attached to

20 several of the proof of claims, just ones that I reviewed,

21 there was a letter on your letterhead prepared by Denise

22 Schultz.  Who is Denise Schultz?

23 A    She's an employee of mine.

24 Q    Is she still employed by you?

25 A    Part-time, yes.

Marshall - Champion                                    74

1  Q    Okay.  And, in the letter, she refers to the eight percent

2  promissory note fund, and then also refers -- or -- or notes

3  that the individual giving you money for that fund can make a

4  withdrawal request upon 30-days' notice.  So, what were they

5  withdrawing from?

6  A    They were withdrawing from their promissory note.

7  Q    So, they were taking back the money that you owed -- that

8  they -- that they lent you?

9  A    Yes.

10 Q    But that money was coming from where, exactly?

11 A    The M. Burton Marshall checking account.

12 Q    Okay.  So, did you ever use any other individual's money

13 that they lent you to make payments, if a creditor did want to

14 withdraw from their note or this fund?

15 A    Well, I don't use the word fund, so --

16 Q    Okay.  Let's just say, note, because you said they can

17 withdraw from their note.

18 A    The money would go into the M. Burton Marshall checking

19 account, and it was not segregated, people funding money on a

20 promissory note, so, yes, people were paid back out of what was

21 in the checking account.  Whether it came from people lending

22 me money or it came from cash flow out of the different

23 businesses or my paychecks or the bonuses or the Social

24 Security, it's all in one checking account.

25 Q    Did you ever have any type of difficulty making those

1 payments if a creditor did request a withdrawal from their

2 note?

3 A    There were difficulties, sometimes, when the school taxes

4 would come due or the town taxes would come due, sometimes.

5 Not the town taxes, so much, because the bonds

6 (indiscernible), sometimes the village taxes, and those were

7 when the difficulties would occur.

8 Q    So, another question, and I -- I appreciate Ms. Temes

9 asking about this, because I had this in my notes but just

10 skipped over it, but you list a number of lawsuits in your

11 statement of financial affairs.  What's the basis for those

12 suits?

13 A    Me not being able to pay back the people that filed the

14 suits.

15 Q    Okay.  So, in other words, those people made a request for

16 a withdrawal, and you couldn't pay them, is that right?

17 A    Correct.

18 Q    Okay.  All right.

19         MS. CHAMPION:  At this point, I have Martha Berry

20 unmuted, and you can go ahead and ask your questions.

21         MS. BERRY:  Thank you, Ms. Champion.

22                          EXAMINATION

23 BY MS. BERRY:

24 Q    Mr. Marshall, I'm Martha Berry, and I represent a number

25 of noteholders, and I have a few follow-up questions.  You told

Marshall - Berry                                          76

1  Ms. Champion that you previously had a retirement account, and

2  I think you said it was about 15 years ago, but what happened

3  with that account?

4  A    I cashed it out.

5  Q    Why did you cash it out?

6  A    I probably needed the money.

7  Q    Did you need the money to pay noteholders?

8  A    It was a long time ago, and I can't recall, and it was not

9  a large amount of money.

10 Q    Do you know what the value of your retirement account was

11 when you cashed it out?

12 A    It was around $100,000, perhaps less.  It was a long time

13 ago.

14 Q    Okay, thank you.  You've told people that at times you did

15 solicit monies -- I will note use the word, fund -- from

16 noteholders, and I just have a couple more specific questions

17 about that.  Did you solicit monies in January of 2023?

18 A    Probably, yes.

19 Q    And what about in December of 2022, did you solicit

20 monies?

21 A    Probably, yes.  I was in the hospital for part of that

22 time, so I'm not clear about December.  In January, yes.

23 Q    And were the funds -- the monies that -- well, did people,

24 then, give you money in response to your requests for funds in

25 December and January?

Marshall - Berry                           77

1  A    In January, I know of one person that lent me some money.

2  They did not give me any money.  And in December, I don't know.

3  I can't recall asking but I certainly could have, but I was in

4  the hospital most of the time.

5  Q    And what did you use the monies for that were loaned to

6  you in December of 2022 and January of 2023?

7  A    Well, some of the money was used to make the down payment

8  on the Bullock property, regular cash flow expenses and to --

9  to debt service.

10 Q    Did you use any of the monies that were given to you in

11 December of '22 and January of '23 to pay any noteholders?

12 A    Partially, probably, yes.

13 Q    At some point, did you or somebody from your office inform

14 noteholders that you were not making any payments on their

15 notes, if they asked to withdraw their funds?

16 A    In February of 2023, yes.

17 Q    Was anybody told before February of 2023 that they could

18 not withdrawal the funds from the notes that they had with you?

19 A    No.  No, I don't think so.

20 Q    In the past, did you ever have difficulties paying a lump

21 sum withdrawal request, and did you need, instead, to make

22 payments over time?

23 A    No, not to the best of my knowledge, I -- to the best of

24 my knowledge, I've always made all of the payments within the

25 30-days' notice.

1  Q    When -- at what point did you realize you would not be

2  able to pay back the noteholders?

3  A    In February of 2023.

4  Q    Mr. Marshall, is it fair to say that a good portion of the

5  monies that you owe people on these notes is interest?

6  A    I think we calculated the, roughly, 55 -- these are rough

7  numbers -- $55,000 in principal and the amount over and above

8  as interest.

9  Q    55-million?

10  A    Million, yes, excuse me.

11  Q    Okay, all right.  Thank you.  Did you tell any noteholders

12  that you were not able to pay them the balance due on your

13  notes when you were -- at a time when you were also paying

14  other noteholders back on their notes?

15  A    When I stopped, I stopped.  The only exception to that is,

16  three or four people came, and they had extreme circumstances,

17  and need a thousand or 2,000-bucks.  I talked with my attorney,

18  and he said, that's okay for small amounts.  So, there were,

19  you know,  four people, maybe five people that received small

20  amounts, and that's the only exceptions to that.

21  Q    In January, you made a significant payment to a noteholder

22  of over $600,000.  At that time, had you told other noteholders

23  that you were not able to pay them back?

24  A    No.

25  Q    Where did you get the $600,000 to pay the noteholder in

Marshall - Berry                           79

1  January?

2  A    How do you know it was a $600,000 payment?

3  Q    I'm sorry.  I didn't hear that, Mr. Marshall.

4  A    (Indiscernible) making a $600,000 payment.

5  Q    On your schedule, it lists a $660,000 payment on January

6  13 of 2023.

7  A    I -- is that a handwritten thing?  There was a payment of

8  60-some-thousand dollars.

9  Q    This is on your bankruptcy schedule, sir.  This is where I

10 got the information.

11 A    What --

12 Q    The payments that you made -- the payments that you made

13 before you filed for bankruptcy.

14 A    There is not a $600,000 payment.  I think -- when I do

15 these forms, I do them in hand, and the attorney's office does

16 it on the computer, and there was a 60-some-thousand dollar

17 payment to someone in January.  I'm thinking that it was a

18 typographical error is what I think.

19 Q    Okay.  I think that's all the questions that I have.

20 Thank you.

21 A    You're welcome.

22       MS. CHAMPION:  Thank you.  Okay.  I think -- let's

23 see.  Where are we next.  Are there -- let's start with, are

24 there any other -- if there's any other attorneys that want to

25 be unmuted to ask questions?  If you could --

Marshall - Levine                    80

1          MR. LEVINE:  Yeah, me, Lou Levine.

2          MS. CHAMPION:  Okay, all right.  Great.  Thank you,

3 Lou.  Yes, if you could just note for the record, your

4 appearance, and then you can go ahead and ask your questions.

5 Thanks.

6          MR. LEVINE:  Okay.  Lou Levine, Melvin and Melvin.  I

7 represent Carol Salati and Steven Scheinman and a few other

8 people.

9                        EXAMINATION

10 BY MR. LEVINE:

11 Q    Mr. Marshall, in your statement of monthly income form,

12 you said you're spending $214,260 as operating expenses, and

13 you may have been asked this, but what were those operating

14 expenses?

15 A    Operating expenses, let me see this form here.  This is

16 form 122-B?

17 Q    Yes.

18 A    Operating expenses are real estate taxes, payroll,

19 repairs, maintenance.

20 Q    Is any -- let me ask you, is any part of that $214,000

21 interest payments to your investors?

22 A    I wouldn't use the word, investors.  I would use the word,

23 noteholders, and, no.

24 Q    Okay.  So, none of that is interest.  Okay.  And do you

25 know how much in interest payments you were making to your

1 noteholders every month?

2 A    I have it on an annual basis, not a monthly basis.

3 Q    What is it on an annual basis?

4 A    Well, 90 times eight is -- just this last year, we've been

5 close to $7 million.

6 Q    And you paid off -- every year, you paid off $7 million in

7 interest?

8 A    Well, it's not necessarily paid out.  A lot of that, is we

9 would update the notes, and that would trigger that numbers, so

10 if you had a note --

11 Q    Okay.  Well, I'm asking -- I'm asking about cash payments.

12 How much in cash --

13 A    Oh, that I do not know.

14 Q    -- and by cash, I mean, check, but --

15 A    I do not know.

16 Q    Okay.  You think it was $7 million a year?

17 A    No, not that we sent out in checks, no.

18 Q    Okay.  So, do you know how much you were paying out in

19 interest in actual checks and cash?

20 A    Well, no cash, all checks, and I do not know.  I could --

21 someone can find that out, when the computer guy gets off

22 vacation.

23 Q    Okay.  I would like to know that.  Of your -- how many

24 notes -- you paid off some notes in total, is that correct or

25 not?

Marshall - Levine                                              82

```
 1  A    In what time frame?  You mean just recently?

 2  Q    Anywhere in the last ten years.

 3  A    Oh, yeah, many notes were paid in full.

 4  Q    Okay.  And who has the records of that?

 5  A    They're in this office.

 6  Q    Okay.  Is there any person except you who has those

 7  records?

 8  A    Denise Schultz would be able to pull them up.

 9  Q    Okay.  Well, what I meant, you, I meant you or your

10  employees.

11  A    No, no one else.

12  Q    Did you ever use an independent accountant?

13  A    No.

14            UNIDENTIFIED SPEAKER:  Where did the money go in '21

15  and '22 if you didn't buy properties?

16            MR. LEVINE:  I'm sorry, Mr. Marshall, I didn't hear

17  you.

18            MR. MARSHALL:  I didn't say anything.

19            MR. LEVINE:  Well, I hear somebody saying something.

20  Okay.

21            MS. CHAMPION:  Yes, there is somebody speaking, and

22  I'm sure you're in the conference room unmuted, because you're

23  going to ask questions, but if you could just, you know, hold

24  your questions or your comments until you are called upon, that

25  would be helpful so Mr. Levine can finish his questioning.
```

1  Thanks.

2          MR. LEVINE:  Thank you, Erin.  I'm just looking at my

3  notes right now.

4  BY MR. LEVINE:

5  Q    How many -- in the last ten years, how many parcels of

6  your real estate did you sell?

7  A    The only parcels I sold in the last ten years, I sold the

8  four that I get mortgages on, and I can't recall selling

9  anything else in the last ten years.

10  Q    Okay.

11  A    There was a townhouse that I owned that I sold, and that

12  was close to -- yeah, maybe 11 years ago or maybe nine years

13  ago.  I don't know off the top of my head.

14  Q    Okay.  Okay.  If I understand you, you weren't sending out

15  a check every month to all of the noteholders for interest, is

16  that correct?

17  A    Correct.  Some people wanted a monthly check.  Some people

18  wanted it quarterly.  Some people wanted it to just accumulate.

19  It was, what they wanted is what we did.

20  Q    Okay.  Of all of your holders, how many people got an

21  interest check at some time during the year of 2022?

22  A    Well, probably three-quarters, I would guesstimate.

23  Q    Okay.  Do you have any ideas right now how  your plan of

24  reorganization might treat these --

25  A    No.

Marshall - Riggal                                      84

1  Q    -- your assets and your debts?

2  A    I'm going to sign a contract with the Elgon Group, and

3  they're the money guys, so they've been in here going over the

4  books, and we've toured the properties.  And they're going to

5  come up with a plan very shortly.  They just came in here a

6  week ago or ten days ago.  It's not too long now.

7  Q    Okay.  On your properties, did you -- did you pay cash for

8  all of them or do some of them have mortgages that you have to

9  pay?

10 A    I think there's 12 or 14 mortgages that I pay.

11 Q    Let me just look at my notes one more time.  I think

12 that's all the questions I have for now.  Thank you very much,

13 Mr. Marshall, and Erin.

14         MS. CHAMPION:  Thank you.  Thank you.  Okay.  We've

15 got a bunch of people in the waiting room, so I'll just go

16 ahead and call on these various creditors.  Catherine Riggal,

17 do you still have questions for Mr. Marshall, and if you do,

18 you can ask those now.

19         MS. RIGGAL:  Thank you, Ms. Champion.

20                           EXAMINATION

21 BY MS. RIGGAL:

22 Q    Mr. Marshall, you're contending that these are just

23 personal loans?

24 A    Yes.

25 Q    Why does my letter say from M. Burton Marshall for

Marshall - Parish                                    85

1  investment in the eight percent fund?

2  A    Well, they were personal loans.  There was never a fund,

3  and those were mistakes on my staff's part.

4  Q    And my other question was, you said you had 12 to 13

5  mortgages that you pay?

6  A    Yes.

7  Q    When were these mortgages taken out?

8  A    Oh, a variety of times.  Some are close to fruition, and

9  some are -- nothing in the last two or three years, except

10 Bullock -- Bullock cause he's a new one -- and within the last

11 ten years.

12 Q    Okay.  That's all I had.

13          MS. RIGGAL:  Thank you, Ms. Champion.

14          MS. CHAMPION:  You're welcome.  We can go to Tom

15 Parish next.

16          MR. PARISH:  Hi, can you hear me?

17          MR. MARSHALL:  I heard you.

18          MR. PARISH:  Okay.

19                         EXAMINATION

20 BY MR. PARISH:

21 Q    Burt, earlier, when you were talking to Ms. Champion, it

22 was said you had a net income of about $42,000 in your business

23 per month, is that correct?

24 A    Yes.

25 Q    Okay.  So, if you have a net income of $42,000, and you

1  have to pay $600,000 a month in interest, please explain to me

2  how that makes sense?

3  A    Because the income was done after I stopped paying the

4  noteholders, so this does not include any of that.

5  Q    That's okay.  What would you say it was in December or

6  October, during the best year you ever had?

7  A    Well, it would be greater than $42,000.

8  Q    Obviously, but I'd like a number please.

9  A    I do not have a number off the top of my head.

10 Q    Okay.  Is it less than $100,000?

11 A    Probably, yes.

12 Q    Okay.  So, you have to pay $600,000 a month on your notes,

13 and yet, you're only making net, you say, $100,000, what

14 happened -- where's -- how do you make up that half a million

15 dollars?

16 A    Well, some of it, obviously, was borrowed money, and --

17 Q    So, you got that much in a month, half a million dollars?

18 A    Yes, some months.  Yes.

19 Q    Okay.  So, you had the best year ever, and two months

20 later, you're declaring bankruptcy, so that's kind of

21 surprising.  My other question is you have abused and taken

22 advantage of the trust that the Hamilton community placed in

23 you for decades.  Why haven't you publically apologized to our

24 community?

25         MR. DOVE:  This is Jeff Dove.  I'm going to object to

1 this form of questioning and instruct Mr. Marshall not to

2 answer.

3 BY MR. PARISH:

4 Q   Okay.  So, I guess you have single-handedly ripped this

5 town apart to the point where it may take years to heal.

6        MR. DOVE:  This is Jeff Dove.  I'm going to object to

7 the form of the question, if there is a question and ask that

8 Mr. Parish ask about assets and liabilities and restructuring

9 proposals, as is the intention of a Section 341 Meeting.

10        MR. PARISH:  Okay, okay, fair enough.

11 BY MR. PARISH:

12 Q   Now, Mr. Marshall, you stated to the noteholders that you

13 were going to invest that money in Hamilton real estate.  You

14 also just stated that you have brought one property for a

15 little over $100,000 the last two years.  You've also stated

16 that, I believe, you spend less than $100,000 a month

17 maintaining these properties.  So, if, as you stated, you're

18 getting up to, like, half a million dollars a month from new

19 noteholders, what did you do with all that money that came in

20 the last two years, if you had very little in your bank

21 account?

22        MR. DOVE:  I'm just going to object to the form of

23 the question, but Mr. Marshall may answer, if you can.

24        MR. PARISH:  Well, do you want me to rephrase it?

25        MR. MARSHALL:  I'll answer your question.  I don't

Marshall - Parish                                88

1  have a problem with it.  A large part of the money goes into

2  capital improvement.  We just finished a job on Manson Street

3  that cost 350 to $400,000.

4  BY MR. PARISH:

5  Q   Okay, but, so that's the income of one month.  What about

6  the other 11 months?

7  A   Now, that's just one project.  There are ongoing projects

8  all the time.

9  Q   Okay.  So, this is my final question.  Then I'll stop.

10  You stated earlier that you thought you had about $55 million

11  in principal, is that correct?

12  A   Yes.

13  Q   Okay.  Your properties are only worth $21 million.

14  A   Well, that's the assessed value.  I think --

15  Q   Well, tell me the real value, then.

16  A   Well, I don't have the real value, but I think it's

17  significantly more than $21 million, which is just the assessed

18  value.  The assessments are way, way low.  One example is of a

19  property in Earlville where the assessment is $105,000, and the

20  annual income is $85,000.  So, how much is that property worth?

21  Hundreds of thousands of dollars more than the assessed value.

22  Q   But, still, there's a -- just with the principal, not

23  including all the interest, you know, because that 55 is really

24  $90 million, where are those tons of millions of dollars?

25  Where did they go?  They weren't put in property improvement,

Marshall - Mirabella                                          89

1  because you can't tell me that, you know, every property is

2  worth a million dollars more than --

3  A    Every property is not worth a million dollars more.

4  Q    You think?

5  A    They are not worth a million dollars more.

6  Q    Right.  So where did that $70 million go?

7  A    Tom, there is no hidden money or offshore money or

8  anything.  It went into my checkbook, and paid out those

9  expenses that I pay out of the checkbook.

10 Q    I don't understand how it could -- well, I'm going to let

11 other people talk.  Thank you for listening, and I'll get off.

12 Bye-bye.

13        MS. CHAMPION:  Okay.  Thank you, Mr. Parish.  We can

14 have Karen Mirabella, at this time, ask your questions.  And if

15 you could just try to keep to the financial affairs, assets,

16 liabilities and restructuring of the Debtor?  Thanks.

17        MS. MIRABELLA:  Yes.  Good afternoon, Ms. Champion

18 and Mr. Marshall.

19                          EXAMINATION

20 BY MS. MIRABELLA:

21 Q    Now, Mr. Marshall, did you personally sign each and every

22 promissory note that you issued to the creditors?  Is it your

23 signature?

24 A    Yes.

25 Q    Okay.  How was the value of your -- well, you may have

Marshall - Mirabella                    90

1 answered this, but I just want to make sure I'm correct, the

2 value of your real estate parcels, that was determined by

3 assessed value only?

4 A    Yes.

5 Q    This part of the schedule?  Okay.  Okay.  Who was managing

6 your business during your illness?

7 A    Well, my staff took over, and different people did

8 different things, at that point.  I had a very good staff, and

9 they were able to continue with the businesses, not necessarily

10 as usual, but keep up with the work flow, except for the taxes.

11 Q    Okay.  Could you state the names of the person or persons

12 employed by you who were aware of this eight percent situation?

13 A    Denise Schultz was the person that wrote the checks, and

14 everyone in the office is aware of what's going on here, but

15 Denise is the -- you know, the check writer.

16 Q    Okay.  And how many people are currently employed by you,

17 as opposed to the number of people employed by you a year ago,

18 if you lost employees?

19 A    Oh, I have lost employees.  I lost, I think, four

20 employees.

21 Q    Okay.  And is Daryl Marshall employed by you?

22 A    He is.

23 Q    And what is his role as an employee?

24 A    Files.

25 Q    Files?  Okay.  How much revenue does your insurance

Marshall - Mirabella                                      91

1 business -- does the insurance business produce annually?

2 A    It did over a million this past year.

3 Q    One million, okay.  And how about the storage business?

4 A    $170,000 roughly.

5 Q    170, okay.  And if you prepare taxes year round, how much

6 does your tax preparation business produce annually?

7 A    Well, last year, 2022, was roughly $650,000, but, now, you

8 know, the business is gone, if I do business next year, I have

9 no idea what it will be.

10 Q    Okay.  And are you entitled to an inheritance or the life

11 insurance proceeds upon someone's death, such as a spouse or a

12 parent or a sibling?

13 A    Well, my mother is 97, and I don't know if I'm in her Will

14 or not.  Probably, I am.  And my wife has life insurance.  I'm

15 probably a beneficiary on that, and that's all I'm aware of.

16 Q    Okay.  Do you have any idea of the value that that might

17 be?

18 A    My wife's life insurance?

19 Q    Yeah.

20 A    Probably $150,000, maybe 250, not more than that.

21 Q    Okay.  And are you  the beneficiary or a trustee of a

22 Trust?

23 A    No.

24 Q    Okay.  And are you an investor in --

25 A    Nothing.

Marshall - Mirabella                                        92

1  Q    -- any -- anything in another state or in another country?

2  A    No.

3  Q    Okay.  And going back to -- oh, what is the value of the

4  Miles B. Marshall stock?  Do you know what the value of that

5  is?

6  A    We're waiting for an appraisal.  I always thought it was

7  $3 million, and now, it's a lot less because I'm losing a lot

8  of business, so --

9  Q    Okay.

10  A    -- it's $2 million now.

11  Q    $2 million okay.  And you mentioned that you have a truck

12  that has a seasonal plow business.  How much revenue does this

13  bring in?

14  A    None.  It's our own buildings.

15  Q    Oh, okay.  Okay.  Now, let's see.  Are you being audited

16  by the IRS?

17  A    No.

18  Q    No.  And how about, are you being investigated by the

19  Securities and Exchange Commission?

20  A    No.

21  Q    No, okay.  Let's see.  And from January 1st, 2023 to April

22  20th, 2023, you sent checks to 32 individual creditors that

23  were not were not business or expense-related.  The total

24  amount was $1,170,418.85.  Three of those checks were dated

25  after April 10th, which was the date you completed your

Marshall - Mirabella                                    93

1 bankruptcy creditor counseling, so you were well aware that you

2 would be filing for Chapter 11.  Please explain how you

3 selected all of these individual creditors, and why checks were

4 sent when you knew you would be filing for bankruptcy, which

5 could show favoritism on your part?

6 A    I don't believe we showed any favoritism, and who were the

7 checks to?

8 Q    Well, there's a list.  There's a list in your schedules.

9 There's a list of the 32 individuals, as well as businesses and

10 expense-related, but there is a list of the 32 individual

11 creditors that were sent checks after January 20th -- after

12 January.

13 A    What page?

14 Q    Oh, I don't have it in front of me right now.

15        MS. CHAMPION:  It's in the statement of financial

16 affairs.  This is Erin Champion.

17        MS. MIRABELLA:  Oh, thank you, Erin.

18 BY MS. MIRABELLA:

19 Q    That is the same list you listed that you said was,

20 possibly, an error.  Randall and Nancy Blass received on

21 January 13th, 2023, according to your schedule --

22 A    That was before everything happened, they had called for

23 a note payment in January.

24 Q    Yeah, that was the one that you listed $660,000 --

25 $660,019, leaving down a balance owed to them of $532,000.  So,

Marshall - Mirabella                                    94

1  that's the one you said might be a typographical error?

2  A    There was one to Estate of McSwain that was $60,000 that

3  we paid in January.

4  Q    Well, I can't -- and so, I'll get the list up.  So, do you

5  see the list that I'm referring to?

6  A    I don't see the list.  I have a lot of papers here.

7  Q    Yeah, take your time.  It is -- it's the statement of

8  financial affairs, and it's page 14 of 17 -- page four.  I'm

9  sorry.  I apologize.  Page four of 17.

10                        (Pause)

11            MS. CHAMPION:  Do you have that, Mr. Marshall?

12            MR. MARSHALL:  I can't find it here.  Again, there's

13  a lot of paperwork here.

14            MS. CHAMPION:  At the top, there's case number, and

15  then it'll say document number four at the very top of it, and

16  it's 17 pages.  And I think what she is referring to is page

17  eight of 17 under Randall and Nancy Blass.

18            MR. MARSHALL:  I don't have a copy of that.  Oh,

19  wait, here it is, statement of financial affairs.

20            MS. CHAMPION:  Yeah.

21            MR. MARSHALL:  Is that the page?

22            MS. CHAMPION:  And at the top, there's page eight of

23  17.

24

25            MR. MARSHALL:  Page eight.  There's six.  There's

Marshall - Mirabella                                    95

1  seven.  There's eight.

2  BY MS. MIRABELLA:

3  Q    And it's on the third line down.

4  A    Yeah.  See, when I did these, I did these in pencil, and

5  sent them to the attorney to computerize, and I think that

6  should be $60,000, not $660,000.

7  Q    Okay.  Well, I just wanted to call to your attention these

8  32 individuals that were paid after January 1st and prior to

9  April 20th, just, again, asking how these people were selected,

10 when many other folks asked for payment and were not even met

11 -- their calls weren't returned.  Their emails weren't

12 returned, but yet, they asked for payments, and that  didn't

13 happen?

14 A    Well, the bulk of those was before February 8th.  Well,

15 all of these in January was before February 8th, and a lot of

16 these others were supplies and that sort of thing.

17 Q    Well, I understand that, Mr. Marshall.  I was just

18 referring to the 32 creditors were loan repayment is the

19 (indiscernible).

20       MS. CHAMPION:  Ms. Mirabella, do you have a question

21 in that regard or --

22       MS. MIRABELLA:  No.  Actually, I don't.  I think -- I

23 think I've finished with my questions.  Thank you very much,

24 Ms. Champion and Mr. Marshall.

25       MS. CHAMPION:  Okay.  How about Ronald Harp, do you

Marshall - Harp                    96

1 have questions?  And just keep in mind, too, if questions have

2 already been answered just to move the process along, so we can

3 get to everybody, I would be appreciate -- or appreciative of

4 that.  So, Mr. Harp, with that, you can go ahead.

5           MS. HARP:  Yes.  My name is Diane Harp.  Thank you,

6 Ms. Champion and Mr. Marshall.

7                       EXAMINATION

8 BY MS. HARP:

9 Q    I'm just calling in regards to (indiscernible) what he had

10 invested with you.  You stated January, 2022 is the last time

11 you received money from any creditors, and that on January

12 24th, you purchased a home, I believe, for $135,000, if I'm not

13 mistaken?

14 A    It was in that ballpark, yes.

15 Q    Okay, yeah.  No, that's fine.  My mother-in-law had

16 requested, a formal written requested her money on December

17 12th.  We had sent that to you, and I was just wondering why

18 she never received payment?

19 A    She called me after the fact.  I talked with Rhonda, who

20 is your sister, I believe?

21 Q    Yes.

22 A    Her daughter.  And Ronnie (indiscernible), and then she

23 said, don't pay her, and then, later on, your Mom sent the

24 second request saying, oh, now, I really do want the money.

25 That's how that happened.

Marshall - Harp                                  97

1 Q    Yeah.  No, I know, but we all made that one request, and

2 that was January 12th.

3 A    Well, I think there's two, but I can certainly check my

4 offices.  We would have copies of them.

5 Q    I'm sorry?

6 A    There were two, and the first one was made by Rhonda, and

7 then, there was a second one sent, and, again, I have copies of

8 those in the file somewhere.

9 Q    All right.  I guess that is my only question.  Thank you

10 for your time.

11        MS. HARP:  And thank you, Ms. Champion.

12        MS. CHAMPION:  Okay.  Thank you.  Can we go with

13 Brian Empie, at this point.

14        MR. EMPIE:  No, basically, what I've already heard,

15 this question that I had in mind was asked, so --

16        MS. CHAMPION:  Okay, thank you.

17        MR. EMPIE:  -- it has been answered, so thank you.

18        MS. CHAMPION:  Okay.  And then, how about Scott

19 Devereaux?  Mr . Devereaux?

20        MR. DEVEREAUX:  Yes, hi, I'm here.

21        MS. CHAMPION:  Okay, great.  If you have questions,

22 you can go ahead and ask now.

23        MR. DEVEREAUX:  Oh, yes.

24                          EXAMINATION

25 BY MR. DEVEREAUX:

1  Q    So, Burt, I guess one of my questions would be, how do you

2  -- how do you regularly monitor or assess the amount of what

3  you owe to creditors versus what your investments are currently

4  worth and how much income they're producing in order to

5  basically stay out of the red?  Do you have monthly actuarials

6  or a yearly actuarial that you look at?

7  A    I do not.

8  Q    Spreadsheets or anything like that that kind of let you

9  know that this is -- this is basically where we're at as far as

10 what everything is worth and versus what I owe creditors?

11 A    No, I do not have any such statements like that.

12 Q    Okay.  I -- I have another question.  So, I had spoke to

13 you on the phone right after you had filed for bankruptcy, and

14 you apologized to me for this mess, and you stated you took

15 full responsibility for it.  What, specifically, were you

16 apologizing for, and what was the mess you had created that is

17 leaving your creditors with basically -- well, according to the

18 media outlets at 20 cents on the dollar of their -- of their --

19 the money that they have loaned you?

20 A    I apologize for money that I am now not able to pay back.

21 Q    Okay.  Anything more specific on how that works?

22 A    On how me being sorry works?

23 Q    Well, I guess, specifically, I guess, what exactly

24 happened?  What caused the -- the failure of the ability to pay

25 off your creditors?

Marshall - Devereaux                                      99

1  A    The initial cause is myself being in the hospital for six

2  weeks, not getting cash flow.

3  Q    Okay.  The last question is, normally each year we get --

4  during tax season, we get a form showing the interest income

5  that we're required to pay taxes on.  What would we expect to

6  get this year?

7  A    I'm not sure if interest will be paid, you know, up until

8  now or up until some future date.  If we do accrue some

9  interest or pay some interest, you'll get a 1099, but I would

10  also not do your taxes, but I would assume that you will be

11  able to take a -- they'll deduct something on the claim that

12  you file, and that as money comes back, you'll have income.

13  Q    Okay.

14  A    You know, it's capital gain income, at that point, but

15  you'll have -- but you'll have a loss initially, but, yeah, I'm

16  not doing your taxes, so I don't that specifically, but

17  probably, that's what it'll be.

18  Q    Okay.  And then my last question is, I understand that the

19  -- that the assessments of all of your properties may be a low

20  ballpark figure of what they're worth, do you, I guess, in your

21  head or your mind, do you think that the properties are worth

22  enough to pay back your creditors at least their principal?

23  A    That, I don't know.  It depends on how the creditors

24  community feels about the restructuring.  In other words, if

25  they force us to sell all the property at once, we'll get a low

Marshall - Donaldson                    100

1  number.  And if some people are willing to take payments over,

2  as an example, five years, then, you know, we could get more

3  over a longer period of time.  It depends.  If Koby comes in

4  and buys something or if it all goes to non-Koby.  I just --

5  there's too many variables for to speculate at this point.

6  Q    Okay.  I'm sorry.  I'm just looking at the list of

7  questions I had to see if they've already been answered.

8        MS. CHAMPION:  Okay, thank you.  We can take

9  questions from Troy Taylor next.

10       MR. DOVE:  This is Jeff Dove.  Troy is the financial

11  advisor.  I'm not sure if he actually has questions.

12       MS. CHAMPION:  Oh, that's right.

13       MR. TAYLOR:  I don't have any questions.  I'm just

14  here, basically, listening, and also to the extent, Jeff,

15  there's a question that I can answer, I'm happy to, so --

16       MS. CHAMPION:  That's fine.  Yeah, we just got a list

17  of people that are on unmute.  I'm just making sure that none

18  of them have any questions.  How about Debbie Donaldson?

19       MS. DONALDSON:  Yes, hi.  Thank you, Ms. Champion.

20                          EXAMINATION

21  BY MS. DONALDSON:

22  Q    Mr. Marshall, first of all, I was glad to know that you

23  were able to be released from the hospital and were on the

24  mend.  I was very glad to hear it for you.

25  A    Thank you.

Marshall - Donaldson                              101

1  Q    You're welcome.  Well, my aunt and uncle did business with

2  you.  My mother and father did business with you.  When my

3  parents passed, I had the account rolled over to me as the only

4  surviving heir, and that was in March of 2019.  My only

5  question, I think, is you said that you, you know, started the

6  bankruptcy proceedings and weren't able to make payment because

7  of a loss of income.  And I'm interested to know, did all of

8  your tenants stop paying rent, your rentals, and your --

9  A    The tenants are paying rent, but the calls to repay the

10 loans exceeded the cash flow.

11 Q    I see, okay, so you still had income coming in; it just

12 wasn't enough to cover everything?

13 A    Yes, exactly.

14 Q    I see.

15       MS. DONALDSON:  And, Ms. Champion, one question for

16 you, please?  I am my own person.  I am not represented by an

17 attorney, at this point, but are we, as individuals, allowed

18 copies of all of these schedules that are being referenced?

19       MS. CHAMPION:  You would have -- you are entitled to

20 them, yes, but you can request a copy through the Bankruptcy

21 Court Clerk's Office.

22       MS. DONALDSON:  Okay.

23       MS. CHAMPION:  I think there's probably copying

24 charges, but you'll have to call them and ask the Clerk's

25 Office.  That information can be found on line.  I just don't

1 have their number handy at the moment.

2          MS. DONALDSON:  No worries.  Thank you so much.

3 Thank you, Mr. Marshall.

4          MS. CHAMPION:  Okay.  We can go with James Cook next?

5          MR. COOK:  Thank you.  Can you hear me?

6          MS. CHAMPION:  Yes.

7          MR. MARSHALL:  Yes.

8          MR. COOK:  Okay.

9                        EXAMINATION

10 BY MR. COOK:

11 Q    Let's go back to 2022.  Do you believe that in 2022, that

12 the value of your properties, which is what we all assumed you

13 were doing with our money was investing it in properties, which

14 should have -- I mean, the property that you first bought years

15 and years ago should be worth much more than what you paid for

16 them.  Do you believe that the best value, at that time, in

17 2022, was enough to repay everybody?

18 A    No, it was not.

19 Q    Okay.  Well, obviously, even though your mother is in her

20 nineties, you're not going to live forever.  What was the plan

21 when you were going to retire to pay everybody back the money

22 that you borrowed?

23 A    Again, I thought that the real estate would appreciate

24 more than the interest, but I also didn't -- didn't realize how

25 much the COVID raising the cost of materials had affected the

Marshall - Cook                                   103

1  renovation projects, too, and that -- that was also a factor.

2  Q    Well, the renovation projects would have been for new

3  properties.  You could have stopped buying new properties or

4  stopped taking money.

5  A    Renovations are on, not necessarily new properties.  It

6  was -- a lot of it's on old properties and their time to come

7  up to renovate.  But, again, in my mind, the properties would

8  appreciate more than the interest cost.

9  Q    Well, I would be very surprised if they didn't considering

10 the current state of real estate.  And this whole this was

11 precipitated by your inability to do tax returns, which begs

12 the question, why did you need money from your interest tax

13 returns to pay money invested in your real estate properties?

14 A    The tax preparation business created cash flow, which went

15 into that checkbook and paid people back.

16 Q    So you were -- yeah, but that's not what we invested in.

17 We didn't invest in or have any -- many of us didn't even know

18 you did taxes.  There should have been enough money generated

19 from the rental income to meet ongoing expenses, and if -- if

20 you had -- and if you did have that much income coming in, none

21 of this would have happened, but you, somehow or the other,

22 you're not getting enough income from your properties, so

23 you're relying on other sources of income, which had nothing to

24 do with our loans.

25            MS. CHAMPION:  Mr. Cook, do you have a question for

Marshall - Cook                          104

1 Mr. Marshall.

2 BY MR. COOK:

3 Q    Yeah.  What -- what was -- okay.  What is your estimation

4 of what percentage we're going to get?

5 A    Well, it's too early to tell that.  It depends on what the

6 real estate sells for, and I don't have a clue.  I suspect

7 it's going to be significantly more than the number that the

8 newspapers were parroting about.

9 Q    Well, you've been in this business an awful long time, and

10 you know your properties, and the real estate is on the high

11 end right now, so I'm just curious why you think that you're

12 not going to get enough to give us at least a significant

13 amount of what you owe us?

14 A    Well, it depends on how you define significant, and, again

15 it depends on how the properties sell.  If somebody comes in

16 and buys 50 properties all at once, it will be a different

17 price than if they have to be sold one at a time and involve

18 real estate brokers.  There's many variables.  I would be

19 remiss to give a number now.

20 Q    All right.  Thanks.  I'm done.

21        MS. CHAMPION:  Okay, thank you.  I have, next, Alex

22 Raketa.

23        MR. REGINA:  Yes, Alex Raketa.

24        MS. CHAMPION:  Regina, sorry.  Go ahead.

25                          EXAMINATION

Marshall - Raketa                    105

1  BY MR. RAKETA:

2  Q    Mr. Marshall, Alex Raketa.  I'm with Hinman, Howard and

3  Kattell.  I apologize if you answered this.  You were about to

4  talk about something tangentially related to this when the

5  operator jumped on with me, but the value of the real estate

6  that you reported on your schedule, did you say that those are

7  the assessed values of those properties?

8  A    Yes.

9  Q    Are you familiar with the fractional assessment of real

10 estate in New York?

11 A    No.

12 Q    Have you ever heard of an equalization rate?

13 A    I've heard of that, yes.

14 Q    So in some municipalities, the assessed value of the

15 property could be 80 percent of the full value of the property

16 or six percent of the full value of the property or in some

17 places, it's 100 percent, but usually, on the tax form, there

18 is reported somewhere on the tax roll, here is the full value

19 of the property.  Do you know if you used the full value of the

20 property or --

21 A    No, I used the assessment.

22 Q    I'm sorry, say that again?

23 A    The assessed value was used.

24 Q    Okay.

25         MR. TAYLOR:  This is Troy Taylor from the Elgon

1   Group, the financial advisor.  I just want to reinforce

2   something that Mr. Marshall said a few times.  How

3   strategically these properties are monetized are going to drive

4   a tremendous amount of the value -- the determination of the

5   value, from a timing standpoint, if their sold in bulk, and to

6   some -- to some extent, for anyone on this call to ask Mr.

7   Marshall or ourselves to try to put on a value, we need to let

8   the marketplace determine the value.  But strategically, how

9   these things are done is going to be the single most important

10  thing that is going to determine the amount of recovery for all

11  the noteholders.  It's very early on right now.  We're getting

12  our arms around things.  But the strategic part of how these

13  things are sold will be, probably, the single most important

14  day of the case.

15          MR. RAKETA:  Thank you for your commentary.

16  BY MR. RAKETA:

17  Q    Mr. Marshall, you've been very careful, now, not to use

18  the word investor or the word fund.  Has somebody instructed

19  you not to use those words?

20  A    No, I have not been using those words myself for a long

21  time.

22  Q    Other than in the various correspondence that people have

23  brought to your attention?

24  A    Yeah, right, which was an error in office procedure.

25  Q    But nobody has said  to you, please don't use the word

Marshall - Broomfield                    107

1  investment with regard to these accounts or these promissory

2  notes or please don't call it a fund?  Nobody has said that to

3  you recently?

4  A    Not to the best of my knowledge, no.

5  Q    Okay.  I have no further questions.  Thank you.

6         MS. CHAMPION:  Thank you.  And then the last

7  individual I have on line waiting with the operator is

8  Stephanie Broomfield, so if there are other creditors that

9  believe their question hasn't been asked yet, if you want to

10 just hit star-zero to connect with the operator and we'll make

11 sure that you can ask it, but I believe that we only have one

12 more individual, and that is Ms. Broomfield, you can go ahead.

13         MS. BROOMFIELD:  Thank you.  Good afternoon,

14 everybody.

15                        EXAMINATION

16 BY MS. BROOMFIELD:

17 Q    My question is -- I have a few questions.  Burt, did you

18 feel, given that you have financial background, do you feel

19 that keeping all the accounting, all the deposits and

20 withdrawals in one account was good -- acceptable business

21 practice?

22 A    It was acceptable to us, but I don't know what you mean by

23 acceptable business practice.

24 Q    It seems to me it's probably more difficult to trace the

25 deposits and withdrawals and interest payments for all of the

Marshall - Broomfield                    108

1  parties, the promissory noteholders, when it's bundled with

2  several different businesses, M & M Press, the moving, et

3  cetera, so that those that were -- believe in you, you were not

4  protecting.  I do not believe that was the best way to be able

5  to report on those funds.

6       Do you?  Did you ever think about separating the

7  accounting, so that your different businesses would be mutually

8  reportable?

9  A    I did not think about that, no.

10 Q    I didn't think you had, but just wondering.  It is very

11 clear, after you filed Chapter 11, it's a ten minute's math

12 exercise that the interest that -- that these interest

13 payments, just the interest payments far exceeded the amount of

14 the business profit in addition of these legal liabilities far

15 outweighed your assets, and I did calculate that the principal

16 amount is probably in a $50 million range, which you confirmed

17 at slightly higher than that.

18      And my question is, why didn't you understand that

19 you would not be able to honor neither the interest nor the

20 principal note (indiscernible)?

21 A    I assumed that the real estate would appreciate more than

22 the interest cost.

23 Q    It seems like a gross overestimation from my perspective.

24 At any point, did you ever consider capping the funds and not

25 accepting new funds, say, in 2010, when you probably were under

1  water?

2  A    I don't recall thinking that in 2010, no.

3  Q    Well, is there any way for you, at any given time, given

4  how quickly you did file Chapter 11, that you knew what the

5  principal amounts were, and could you access that information

6  quickly?

7  A    I never made my people run a total of the notes until

8  after we filed the bankruptcy.

9  Q    Do you know approximately when you hit about $20 million

10 in principal amount?

11 A    No, I don't know.

12 Q    You said earlier that Denise Schultz was aware of and can

13 access some of this information, and you did mention another

14 person that did develop a proprietary program so that you could

15 get out of the paper world on these promissary notes, which is,

16 again, rather surprising, but didn't he know -- wasn't he able

17 to put it together and test the numbers and run scenarios where

18 you could determine at any given point what's the principal and

19 what the interest due was for any particular noteholder or as a

20 group?

21 A    Well, any particular noteholder, it was easily accessible

22 how much their principal and interest was, yes, and we could

23 have added all of the noteholders together to get those

24 numbers.

25 Q    And you weren't interested to do so?

Marshall - Broomfield                     110

1  A    Well, I did the interest once a year when I did the taxes.

2  Q    Oh, speaking of that, of course, since all of us have been

3  paying taxes on the interest -- I was going to add an

4  adjective, but I'll leave that to your imagination -- so, we

5  have been paying taxes on a well -- that's my final statement.

6       MS. CHAMPION:  Okay.  We do have a few more people to

7  ask questions who have just joined, but I do have to take a

8  quick bathroom break, so we'll just take a quick break and then

9  get back on.  Thank you.

10                      (Off the record)

11                      (On the record)

12       MS. CHAMPION:  Okay.  This is Erin Champion.  We can

13  go back on the record.

14       MR. MARSHALL:  Erin, can I clarify one thing?

15       MS. CHAMPION:  Absolutely.

16       MR. MARSHALL:  Someone asked me the question if

17  anyone instructed me not to use the word fund or investments,

18  and I -- my attorney had reiterated not to use those words.  I

19  was aware of that and was not using them before, but he did

20  reemphasize to me that, so I just wanted to clear that up.

21       MS. CHAMPION:  Okay.  Thank you.  Okay.  We have

22  another attorney on the line, so I'm going to take her next.

23  Kristin Tiffany, if you want to ask your questions, you can do

24  that now, and if you would just note your appearance, first.

25                      EXAMINATION

1  BY MS. TIFFANY:

2  Q    Someone previously mentioned Gerald Marshall was an

3  employee of yours.  Are they related to you?

4  A    Daryl -- Daryl Marshall.

5  Q    Daryl?

6  A    D-A-R-Y-L.  Daryl is my brother.

7  Q    And they're in charge of files?

8  A    Well, he's not in charge of anything.  He files.

9  Q    Oh, he files?  He's files away documents?

10 A    Right.

11 Q    And does that include the notes?

12 A    No.  He has nothing to do with the notes.  Daryl is sort

13 of quasi-special needs.  He had spinal meningitis when he was

14 young, and he's as deaf as can be, and he just files.  That's

15 all Daryl does.

16 Q    Okay.  And is it your position that -- I believe today

17 I've heard that the Miles B. Marshall, Inc., may be valued at

18 $3 million, but I think I've heard $2 million, as well.

19 A    Prior to this bankruptcy stuff, it was worth about $3

20 million, and since we've filed bankruptcy, I've lost a lot of

21 business, and I think now, I'd be lucky to get $2 million.  I'm

22 waiting for the appraisal.  We're getting it appraised.  It's

23 been taking six weeks.  It should come in this week, but that

24 was pre-bankruptcy, and I think that number will come in close

25 to three, but I think now business is fleeing, so I think it's

Marshall - Tiffany                          112

1  down around two.

2  Q    And what program was it that you used to keep the ledger

3  on each note?

4  A    We have a program we devised ourselves.  It's not a

5  commercial program.

6  Q    And is this program through Microsoft Excel or is it

7  coordinated with QuickBooks or affiliated with --

8  A    It has nothing to do with QuickBooks, and I don't know --

9  it's a program using File Maker as a base.

10 Q    And is there a person in your office, in particular, who

11 maintains this program?

12 A    David Will.

13 Q    Wells?

14 A    Will, W-I-L-L.

15 Q    And if you hadn't purchased property in 2022 and in the

16 four years prior to that, what were you telling these creditors

17 who were lending you money?  What were you telling them that

18 this money was being used for if you weren't purchasing

19 properties at that time?

20 A    That it was being used for capital improvements to

21 priority owned properties.

22 Q    And that's what you were telling them?

23 A    Yeah.  I told them it was used for business, cash flow, to

24 pay bills and for capital improvements.  That's where --

25 improvements were expensive.

Marshall - Tiffany                     113

1  Q    And did all the noteholders receive the same guidance to,

2  you know, contact you and give you 30 days, and they could have

3  their note repaid?

4  A    Yes.

5  Q    And why did you need 30 days?

6  A    Because, oftentimes, if somebody requested money the day

7  that school taxes or town taxes or something like that, there's

8  not enough money, but 30 days is a reasonable amount of time.

9  Q    And so, what did you need to do during those 30 days to

10 get, say, additional money?

11 A    Well, sometimes I didn't need to do anything.  Sometimes,

12 we paid them that moment, and sometimes, we waited until the

13 rents came in or cash flow or grabbed someone else that owed me

14 money or whatever until the checkbook got up to the amount.

15 Q    And if I wanted a list of the names, addresses and phone

16 numbers of your employees who worked for you in the last three

17 years, how would I go about obtaining this?

18 A    Talk to my attorney.

19 Q    Is there something on file in your office?  Is it a record

20 with your payroll company?

21 A    We do our own payroll, and I know my people's names and

22 addresses and phone numbers.

23 Q    And you said you do your own payroll?

24 A    In the house, yes.

25 Q    And those funds come from the M. Burton Marshall account?

Marshall - Wickwire                    114

1   A    Yes.

2   Q    I have no further questions.  Thank you.

3        MS. CHAMPION:  Kristin, if you could just put your

4   appearance on again, because there was a little bit of a delay,

5   so I didn't get your appearance and who you were appearing on

6   behalf of.

7        MS. TIFFANY:  Absolutely.  Kristin Tiffany, attorney

8   from the Crossmore Law Office on behalf of Youth Policy

9   Institution and Martin Murray.

10       MS. CHAMPION:  Great.  Thank you so much.  So we do

11  have some additional folks that are waiting to ask questions.

12  Again, I'd just remind people, if you can avoid, you know,

13  repeating some of the same questions that were already asked,

14  we can probably get this done -- this portion of the meeting,

15  anyway, done fairly soon.  Okay.  So we've got -- next up is

16  Stephen Wickwire.  You can go ahead and ask your questions now.

17       MR. WICKWIRE:  Can you hear me?

18       MS. CHAMPION:  We can hear you, yes.

19       MR. WICKWIRE:  Okay.

20                        EXAMINATION

21  BY MR. WICKWIRE:

22  Q    Burt, Steve Wickwire with a question.  You have, over the

23  years, told me repeatedly that you had a $100 million policy in

24  case something happened.

25  A    I never said that, Stephen.  I have $18 million in life

Marshall - Sole                          115

1  insurance.

2  Q    I repeatedly heard you say that.  You've told me that.

3  You told my wife that that you had a $100 million policy.

4  A    I disagree 100 percent.  I have never told anyone that I

5  have $100 million life insurance policy because I don't.

6  Q    That's fine.  I feel very deceived.  I always thought the

7  world of you, but that's all I have to say.

8        MS. CHAMPION:  Okay, thank you.  Can we move next to

9  Ian Sole?

10       MR. SOLE:  Yes, this is Ian Sole.  Can you hear me?

11  You can hear me okay?

12       MS. CHAMPION:  Yes, we were just getting a little bit

13  of background noise maybe from another caller, but we can hear

14  you.

15       MR. SOLE:  Okay.

16                      EXAMINATION

17  BY MR. SOLE:

18  Q    I basically have two questions.  As a preamble to that,

19  Burt, you have been doing business for, I believe, many, many

20  years, if not decades, in Madison County.

21  A    Yes.

22  Q    And, obviously, you didn't get to having what I believe

23  from the filings is about $90 million in promissory notes,

24  outstanding overnight.  That happened over a long period of

25  time.

Marshall - Sole                                116

1   A     Yes.

2   Q     And over a number of years.  Would it be a fair question

3   to ask that, at some point, along the curve between your

4   ongoing business, which generates X-amount of monthly income

5   and the liability that you were getting in order to service the

6   debt from the promissory loans led you to realize that you

7   needed new loans in order to cover the debt serving costs of

8   existing loans, and if so, when did you realize that that was

9   the case?

10  A     I always thought that the real estate would appreciate

11  more than the interest cost.

12  Q     So, recognizing, based on earlier conversations -- I don't

13  want to repeat a lot of what earlier people have said, but

14  based on approximately a $7 million annual servicing debt and

15  three -- I think I heard you say approximately three-quarters

16  of that was being paid out in checks, that would equate to

17  approximately $400,000 a month in check payments to service

18  these promissory notes.  And I think I heard you say that, in

19  your best month, you were netting from your ongoing business,

20  approximately $100,000 in net profit.  That gap of $300,000,

21  you were covering that with new loans?

22  A     Some of it, yes.

23  Q     I guess -- I guess that's a statement from me, and also my

24  question -- my first question is, it's obviously disappointing

25  -- extremely disappointing that someone involved in finance, as

Marshall - Sole                                    117

1  far as taxation and so forth, it didn't overly concern you at a

2  much earlier time that, clearly, it was -- the numbers weren't

3  working, that you had a much higher debt servicing cost than

4  you were able to cover with the income from ongoing businesses.

5        My second question, however, is absolutely debt

6  service costs with the promissory note, would it be a fair

7  question to say that your current ongoing business, which is

8  the rental income, storage units, potentially may go back to

9  doing tax preparation.  I believe, do you also have an

10 insurance business?

11 A    I have an insurance agency, yes.

12 Q    An insurance agency.  Would it be fair to say that the

13 combined income from those businesses make it a viable, ongoing

14 business, absolutely cost of the debt servicing of the

15 promissory notes?

16 A    Maybe, but I don't know how much the insurance business is

17 going to suffer from the bankruptcy, and I don't know how much

18 the taxes is going to suffer, I mean, about by a third, and th

19 taxes is probably by a half or more.  I have no idea at this

20 point.

21 Q    But I think it's also fair to say that a majority or a

22 large portion of the gross income, if not net income, of your

23 businesses is the rental properties of residential and

24 commercial, the 100-plus properties and the -- I'm not sure how

25 many storage units you have, but unless people just stop living

Marshall - Forth                               118

1  in your properties, you still have all that income, correct?

2  A    Correct.

3  Q    So, I'm not sure I heard a clear answer.

4  A    Correct.

5  Q    Thank you.  Those are my questions.

6           MS. CHAMPION:  Thank you.  We can move to Paul Forth.

7           MR. FORTH:  Good afternoon.  Can you hear me?

8           MR. MARSHALL:  Yes.

9           MS. CHAMPION:  Yes, we can.

10          MR. FORTH:  Thank you, Erin.  Thank you, Burt.

11                         EXAMINATION

12 BY MR. FORTH:

13 Q    I didn't get notified of this meeting today.  I only found

14 out by chance by one of the neighbors, somebody that is on

15 that.  I'm just wondering why that didn't occur and how many

16 other people may have not known about this meeting today, so I

17 wanted to make that point.  And I was curious, do we know how

18 many participants are on today for this meeting?  We knew we

19 were up to 100 or so when the system crashed last time.

20          MS. CHAMPION:  I don't really know the answers to

21 those questions, but do you have any questions related to Mr.

22 Marshall's assets, liabilities.  You can certainly email me any

23 other administrative type questions, you can email me directly,

24 but as far as questioning Mr. Marshall, do you have anything

25 for him.

Marshall - McVaugh                              119

1          MR. FORTH:  No, most everything I had has been

2    answered, so we thank you.

3          MS. CHAMPION:  Okay.  Thank you.  Okay.  Let's move

4    to Kirstin McVaugh.  I think I'm saying that right, Kristin

5    McVaugh.  Okay, maybe she dropped off.  Okay, we can go --

6          MS. McVAUGH:  No, I'm here, can you hear me?

7          MS. CHAMPION:  Yes, we can hear you.

8          MS. McVAUGH:  Okay, great.  Thanks.

9                         EXAMINATION

10   BY MS. McVAUGH:

11   Q    I have two quick questions or hopefully quick.  I want to

12   circle back to the term life insurance policy.  I know that

13   life insurance was brought up in conversations with my husband,

14   as well, as being an important factor in terms of repayment, if

15   anything was to happen to Burt, so I am curious, what is the

16   term on those policies, and how much is being paid out per year

17   for those policies?

18   A    Each of those three big policies are about 14 or $1,500 a

19   month, and they're, each of them, 20 or 25-year terms, and I

20   think there's one year, two years and three years left on each

21   of the three different policies.

22   Q    Okay.  Thank you.  And my second question, perhaps, is for

23   the financial advisor who is on the call.  I know that Burt

24   mentioned that three-quarters of the creditors received

25   interest payments in some form throughout the year.  Well,

Marshall - Sullivan                    120

1 about a quarter, roughly, did not, and so that means that one

2 quarter of the promissory noteholders have not received

3 interest, but will also have to pay taxes on that interest, so

4 I'm curious if all of the noteholders will be treated the same

5 in the repayment process once this is all figured out.

6        MR. TAYLOR:  This is Troy Taylor.  We've been

7 engaged, now, approximately a week.  We're addressing issues

8 exactly like you just said.  At this stage, we're trying to get

9 facts, (indiscernible) what's been done and what hasn't been

10 done.  You know, a number of the things that we've talked about

11 on this call, by (indiscernible) we want to basically make sure

12 we've got our hands wrapped around the facts around these

13 things, and obviously, everything will be done according to

14 what's -- the program, the bankruptcy law and the, you know,

15 the chapter.  But right now, it is a very complicated set of

16 facts, and we are about to (indiscernible) complex.

17        MS. McVAUGH:  Thank you.  That's all I have.  Thanks.

18        MS. CHAMPION:  Let's move to Dennis Sullivan.

19        MR. SULLIVAN:  Hello, Dennis Sullivan.

20                        EXAMINATION

21 BY MR. SULLIVAN:

22 Q    Burt, with my two notes, my son's note and my mother's two

23 notes, since we had our interest set up to be automatically

24 reinvested, was the money considered a new principal deposit,

25 so in the future, through bankruptcy, would the money be paid

Marshall - Sullivan                             121

1  by a percentage, have the rollover interest compilated in?

2  I know some people receive monthly checks with interest, where

3  ours was reinvested, so I'd like to know how that is --

4  A    That's probably a question for the attorney, but I think

5  the interest -- everyone's interest is going to be accumulated

6  up to date, as I understand it, and then everyone will get

7  their pro rata share, as I understand it.

8  Q    But what -- what my question, Burt, is, that can go back

9  one month.  Let's go back for the last 20 or 25 years.  Every

10 time that we've given interest instead of taking that check and

11 cashing it, you automatically reinvested it --

12 A    Right.

13 Q    -- and paid yourself.  So I want to know if -- so, right

14 now, what our balance is should be our principal.  There

15 shouldn't be any -- the only interest there, it should be the

16 interest that accumulated when you stopped making payments to

17 us.

18 A    Right, correct.

19 Q    So, for the record, what my balance is, there's five, six

20 notes we have there, those -- all those notes that reinvested

21 in, all the other people out there that have notes that the

22 money is then reinvested with you, instead of taking the money

23 out monthly, yearly or quarterly, however they had it set up,

24 that money is now considered principal not interest?

25 A    Correct.

1    MR. DOVE:  This is Jeff Dove of Barclay, Damon.  Mr.

2  Marshall's opinion on the topic is certainly relevant.  It may

3  not be the legal answer that the Court issues, but that is an

4  open topic that will be discussed under the Chapter 11 Plan and

5  will be discussed with the Creditor's Committee.

6    MR. SULLIVAN:  So, Mr. Dove, so what you are stating

7  is that when we've had money, we're going to go back, we're

8  going to say 1998, okay, and that year, the interest, we didn't

9  get a check from him, now, it's rolled-over to reinvest with

10 him, automatically, through Burt, you're saying that's not

11 considered principal, now?  You're saying that's considered

12 interest only?

13    MR. DOVE:  No.  That's not what I said.  What I said

14 was, that issue is an open issue at this point in time, and at

15 the end of the day, the Bankruptcy Court will have the ultimate

16 determination as to how to characterize the interest that was

17 reloaned to Mr. Marshall, unless there is a consensual

18 resolution of that topic.

19    MR. SULLIVAN:  Okay.

20 BY MR. SULLIVAN:

21 Q    Next question.  Burt, recently, the Miles B. Marshall

22 recently closed and moved to the Hamilton office, which is

23 part of your business there.  Was that your mom's business that

24 moved to Hamilton or was that closed or is that part of your

25 business that was in Morrisville?

Marshall - Garland                          123

1   A    I own that business, Miles B. Marshall, Inc., Morrisville

2   and Hamilton                    .

3   Q    Also, for the record, a friend also had no clue about

4   today's meeting and so, I mentioned it to her, and in

5   discussing things with her, where she was unable to get on the

6   phone, one of the things was the life insurance policy would

7   cover was a big topic, also, and many people, myself, I wasn't

8   told that, because I was going through my parents that were

9   invested through you, but that has been a topic I heard from

10  many, many people that the life insurance policy would cover

11  it, if there was ever any issues, so just for the record.

12  A    Thank you.

13  Q    All right .

14          MS. CHAMPION:  Do you have any further questions?

15          MR. SULLIVAN:  That's all.  No further questions.

16  Thank you.

17          MS. CHAMPION:  Okay.  So, next, we have Richard

18  Garland?

19          MR. GARLAND:  Hello?

20          MS. CHAMPION:  Yeah, we can hear you, go ahead.

21          MR. GARLAND:  Okay, thank you.

22                          EXAMINATION

23  BY MR. GARLAND:

24  Q    Yeah, my question is, in terms of the rental portfolio

25  income, what is the net profit on a monthly basis?

1          Hello?

2  A    It looks like $11,547.

3  Q    Okay.  And where is that money currently going to?

4  A    Into the checkbook of Burt Marshall.

5  Q    Okay.  Well, I hope they're going to stop order on that,

6  and why isn't that being distributed to the creditors?

7  A    That's a -- you'd have to ask the attorneys that question.

8  I don't know that.

9          MR. DOVE:  This is Jeff Dove.

10          MR. GARLAND:  Well, I'm asking them now.

11          MR. DOVE:  This is Jeff Dove.  Mr. Marshall is

12  considered a debtor-in-possession and remains in possession and

13  control of his assets during the pendency of the bankruptcy

14  case, unless and until there is an order to the contrary.  It

15  is the ordinary course and business in a Chapter 11 case for

16  the Debtor to remain in possession and control of the income of

17  his business, and so that's exactly what is going on at the

18  moment.

19  BY MR. GARLAND:

20  Q    Okay.  And can you, please, tell us if that money is

21  staying in that account or is it being used to pay any kind of

22  salary?

23  A    Peoples' salaries are being paid per usual.  I'm paying a

24  shitload of attorney's fees and will have some financial

25  expenses here from the Elgon Group shortly, so that's what the

Marshall - Garland                                125

1  money is going for currently.

2  Q    I see.  Okay.  And, you know, just one comment I wanted to

3  make, because, you know, I happen to be a real estate

4  professional, and I was born in Hamilton, upstate New York, and

5  the property value has not gone up much, you know, like that --

6  I brought this house over a decade ago, sold it for, maybe, a

7  $20,000 profit, and that was the market late at the time.  That

8  was before COVID.  So I'm just curious, you know, how you kind

9  of get into this all confused lie that the interest that you

10 were promising people would be able to, you know, well, the

11 real estate investment would be able to catch up with that?

12 A    I don't know how to answer that question.  I always

13 thought the real estate would appreciate more than the interest

14 would cost, and --

15 Q    But, Mr. Marshall, the interest never even came close to

16 catching up.  You were in water practically from, you know, the

17 '90s.  If you do the math, you're losing around, you know, $2

18 million a year in principal that you owe people, not to mention

19 the interest that you're promising them.  The deficit is so

20 large --

21      MR. DOVE:  This is Jeff Dove, I'm going to interrupt.

22 Is there a question here or is this commentary?

23 BY MR. GARLAND:

24 Q    No.  The question is, how did he feed into this argument

25 that he's making that the interest would be able to catch up

Marshall - Garland                    126

1  with the real estate investment, because it clearly has never

2  done.  If you look at the data, if you look at the Market over

3  the last 30 years of Hamilton real estate or Morrisville or

4  Upstate New York, Utica, it's barely gone up in value.

5           MR. DOVE:  I think that Mr. Marshall has been asked

6  and answered that question several times.  He may not like the

7  answer, but he has given an answer.

8           MR. GARLAND:  But based on pure facts, right  --

9           MR. DOVE:  I'm not going to argue with you, sir, I'm

10  simply stating that he has been asked the question; he has

11  answered the question.

12           MR. GARLAND:  I'll rephrase the question.

13           MR. DOVE:  So, whether it's this year, last year,

14  five years ago, ten years ago, 20 years ago, the Hamilton real

15  estate has barely gone up in value, correct, so --

16           MR. DOVE:  I don't know if that is an accurate

17  statement.

18           MR. GARLAND:  I mean, compared to other urban

19  markets, it is.

20           MR. DOVE:  Okay, if that's your position, that's your

21  -- that's not a fact, so that's fine.

22  BY MR. GARLAND:

23  Q    So, what is Mr. Marshall's assessment on how much his real

24  estate portfolio has gone up in value over the last 30 years?

25  A    I have no assessment to compare it to.  I could look at

1  some values from 30 years ago and see what they are today.

2  Real estate is not (indiscernible) particularly in Hamilton.

3  There's a house across the street from us that just sold for

4  700-and-some thousand dollars that just three years ago sold

5  for 50 or $60,000.  I mean, real estate has gone up.

6  Q    Okay.  All right.  That's my only question.  Thank you.

7        MS. CHAMPION:  I see we have Peter Crosby.  Do you

8  have questions for Mr. Marshall?  Mr. Crosby?

9        MR. CROSBY:  Yes, I'm sorry.  I was having

10  difficulty.

11        MS. CHAMPION:  Yes, that's okay.  Do you have

12  questions?  You can go ahead.

13                        EXAMINATION

14  BY MR. CROSBY:

15  Q    I have two questions.  One is that I assume from the

16  description you gave of the businesses and the Hamilton funds

17  that a single, as it were, consolidated tax return is filed for

18  the commercial activities, am I correct, there?

19  A    Miles B. Marshall, Inc. is a separate entity and files a

20  commercial tax return for that, and everything else is part of

21  my own individual tax return, so there's a number of Schedule

22  Cs and a hundred different schedules for each different rental.

23  Q    Second question would be whether or not the

24  (indiscernible) is done on an accrual or a cash basis?

25  A    Cash.

1  Q    Okay.  Thank you.

2  A    You're welcome.

3        MS. CHAMPION:  Next we can move to John Bierworth.

4        MR. BIERWORTH:  Yes, thanks, Erin, this is John

5  Bierworth.

6                         EXAMINATION

7  BY MR. BIERWORTH:

8  Q    My father has a fund unfortunately, and he has for 30

9  years, and he took ill.  And so, it brings me to the question

10 about beneficiaries.  How were those treated?

11 A    If the note was written on a joint account with right of

12 survivorship, it would automatically go to the survivor, and if

13 not, it would become of your dad's estate.

14 Q    Okay.  Well, we called.  There's five of us grown kids,

15 and my dad is currently in the hospital, and, you know, I

16 thought this was, like, everybody is saying the same thing, not

17 sustainable.  But, anyway, my question is, we did add

18 ourselves.  We called your office.  You passed me along to,

19 probably, Denise, and we added the children as beneficiaries.

20 But, at this point, that's good, but my question is, if there

21 wasn't any next of kin, how would you legally handle if you

22 couldn't locate anybody, did you ever keep the funds or is

23 there some --

24 A    I don't think that's ever happened.  It's always been, if

25 someone passed away, and there wasn't a beneficiary, it would

Marshall - Donaldson                    129

1  go to the estate.

2  Q   Okay.  All right.  That's my question.  Thank you.

3       MS. CHAMPION:  So, I have a couple of more people

4  that want to ask questions  that have already asked questions,

5  so I can go ahead and do that, but I would just remind you to

6  keep in mind, the questions that have already been asked of Mr.

7  Marshall, if we can avoid that, and if they are truly questions

8  versus statements, that is also helpful to the process, so,

9  just, if you could keep that in mind, and we will go back, now,

10 to Debbie Donaldson.

11      MS. DONALDSON:  Thank you, Ms. Champion.

12                      EXAMINATION

13 BY MS. DONALDSON:

14 Q   Mr. Marshall, you have consistently given the prior answer

15 that you thought real estate faster than interest would cull,

16 yet you have also told us that you only sold four properties in

17 the last, I want to say it was, in the last ten years, you'd

18 only sold four properties.  So, given that you were banking --

19 counting on the fact that the real estate would appreciate, why

20 did you only sell four.  Was your plan to sell more as the need

21 increased or what was the plan for the property to pay off?

22 A   Well, there was no formal, written plan, and as the cash

23 flow dictated what I did, and the longer I held the properties,

24 my belief was they would appreciate more and more, so the

25 longer I held them, the better off it would be from my

Marshall - Donaldson                    130

1 perspective back then.

2 Q    I can understand that.  That's all I have.

3         MS. CHAMPION:  Thank you.  We can now go back to

4 Karen Mirabella.

5         MS. MIRABELLA:  Thank you.

6                     EXAMINATION

7 BY MS. MIRABELLA:

8 Q    Mr. Marshall, when you became ill and started to realize

9 that you cash flow had decreased because you were no longer

10 doing tax preparation, did you have enough funds to stay

11 afloat, like most individuals or families have a two to six

12 month buffer that you can stay afloat if something happens.

13 Did you not think that you would just, you know, become well or

14 when you became well, just resume you tax business and just

15 continue the process?  Like, what made you say, I need to file

16 for bankruptcy at this point?

17 A    Many people filed judgments against me.  In order to

18 preserve what assets I have, and in fairness to the people that

19 didn't file the judgments, which is a bulk of people, I had to

20 file reorganization bankruptcy, because, otherwise, the people

21 that filed the judgments would just seize money out before

22 anybody else is my understanding.

23 Q    Okay.  And based on your knowledge of the definition of

24 Ponzi scheme, do you consider this a Ponzi scheme, do you

25 consider this a Ponzi scheme?

1  A    I do not.

2  Q    Okay.  No further questions.  Thank you.

3       MS. CHAMPION:  Okay.  This is Erin Champion again.  I

4  just have a couple of housekeeping items, and one question for

5  you, Mr. Marshall.  Since you filed the bankruptcy case on

6  April 20th, have you been able to keep up with those post-

7  petition obligations or bills that are coming due?

8       MR. MARSHALL:  Yes.

9       MS. CHAMPION:  So you haven't fallen behind on

10  anything?

11      MR. MARSHALL:  No.

12      MS. CHAMPION:  That's fine, okay.  And you understand

13  that you have a requirement to file monthly operating reports

14  that would include bank statements on all of the information

15  about the income that you took in and the disbursements that

16  you made each month, correct?

17      MR. MARSHALL:  Yes, we filed the one that was -- that

18  ended April 30th.  We filed it by May 21st, I think it was the

19  date.  And I'm not sure if I'm doing it or if the financial

20  guys are doing the next one, but we'll have that filed on time

21  by June 21st.

22      MS. CHAMPION:  Okay, great.  Okay, so I just want to

23  thank everybody for participating today.  It's been a long

24  meeting, but I appreciate everybody who has joined the call,

25  participating, asking very important, valuable questions.

1  Thank you to you, Mr. Marshall and Counsel, for appearing and

2  asking our questions.  I think, at this point, we have gotten

3  through what we needed to today.  I am going to keep the

4  meeting open and adjourn it, at this point, for control

5  purposes to June 26th at 10:00 a.m.  It would be the same

6  conference line, if the meeting does go forward.  You know, any

7  individual concerned that they won't get notice, just you can

8  email me, which -- okay -- so, also, if you are interested in

9  getting a recorded copy of the 341 meeting, you can email me

10  that request, as well.  So, I'll give you my email address now

11  and my telephone number, so if you can, you know, write it

12  down, you have it in front of you, you can make that request.

13       So, you can contact me at my email address, which is

14  Erin.Champion@USDOJ.Gov, and that's E-R-I-N, dot, Champion,

15  C-H-A-M-P-I-O-N, at U-S-D-O-J, dot, Gov.  Feel free to also

16  call my direct line in my office.  That number is (315)793-

17  8127.  We will get back to you as soon as we can.  We get a lot

18  of calls, as you can imagine, but we will get back to you about

19  any information that you want, as far as administrative

20  procedures or with respect to the 341 meeting.

21       So, again, this is the only official recorded

22  meeting, so if you want a copy, email me.  I gave you the email

23  address, but just to be sure, I'll give it to you one more

24  time.  It's Erin.Champion@USDOJ.Gov.  I will probably have some

25  document requests of my own, Mr. Marshall, for your attorney,

1  and I will reach out separately to him.  And then I will also

2  be in touch whether we need to have a continued 341 on the

3  26th, but, at this point, I am going to just adjourn it to that

4  date and time for control purposes.

5       So, with that, again, everybody, thank you, and you

6  have my information.  If you need any additional information,

7  you can give me a call or email me.  So, we can conclude

8  today's portion of the meeting.

9       Thank you.

10                    * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

134

**C E R T I F I C A T I O N**

1

2          I, JACQUELINE MULLICA, court approved transcriber,

3     certify that the foregoing is a correct transcript from the

4     official electronic sound recording of the proceedings in the

5     above-entitled matter, and to the best of my ability.

6

7     /s/ Jacqueline Mullica

8     JACQUELINE MULLICA

9     J&J COURT TRANSCRIBERS, INC.    DATE:  June 12, 2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25