> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

In re:

| | |
|---|---|
| M. BURTON MARSHALL, | Case No. 23-60263-PGR |
| a/k/a BURT MARSHALL, | Chapter 11 (Main case) |
| a/k/a MILES BURTON MARSHALL, *et al.*, | Case No. 23-60723-PGR |
| | (Jointly Administered) |

Debtors.

## DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Fred Stevens
Lauren C. Kiss

*Counsel to Fred Stevens, Chapter 11*
*Trustee of the Estate of M. Burton*
*Marshall a/k/a Burt Marshall a/k/a Miles*
*Burton Marshall*

*and*

*Counsel to Miles B. Marshall, Inc., Debtor*
*and Debtor-in-Possession*

Dated: New York, New York
February 20, 2024

## <u>TABLE OF CONTENTS</u>

I.    PURPOSE AND LIMITATIONS OF DISCLOSURE STATEMENT .............................1

    A.  Purpose of Disclosure Statement  ..........................................................................1

    B.  Definitions and Exhibits .........................................................................................1

    C.  Enclosures ...............................................................................................................2

    D.  Representations and Limitations.............................................................................2

    E.  Important Dates.......................................................................................................3

    F.  Solicitation Procedures ..........................................................................................5

    G.  Recommendation ....................................................................................................5

    H.  Inquiries .................................................................................................................5

II.    BACKGROUND ................................................................................................................5

    A.  History of the Debtors.............................................................................................5

    B.  Events Leading to the Marshall Bankruptcy Filing ...............................................6

III.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES ...................................6

    A.  The Appointment of the Official Committee...........................................................6

    B.  The Appointment of the Trustee .............................................................................6

    C.  The Bankruptcy Filing of Miles B. Marshall, Inc. by the Trustee.........................9

    D.  Retention of Professionals ....................................................................................10

    E.  Schedules of Assets and Liabilities, Statement of Financial Affairs ....................11

    F.  Creditor Claims and the Bar Date for Filing of Claims
       Arising Prior to the Petition Dates .......................................................................11

    G.  Termination of Substantially all of the Debtors' Employees................................12

    H.  Disposition of Assets of During the Chapter 11 Cases.........................................13

    I.  Sale of the Properties in Connection with the Plan...............................................14

i

J.   Mortgages owned by the Marshall Bankruptcy Estate ...........................................17

K.   Investigation by the Official Committee.....................................................................17

L.   Claims Investigation and Reconciliation ....................................................................17

M.  Investigation of Claims Against Banking Institutions ...........................................20

N.   Term Life Insurance Policies .........................................................................................20

O.   Investigation by Governmental Entities.....................................................................21

P.   Tax Client Records ...........................................................................................................21

IV.   SUMMARY OF THE PLAN OF LIQUIDATION .....................................................................23

A.   General Plan Objectives...................................................................................................23

B.   Provisions Governing Order and Method for Distributions Under the Plan .........23

C.   Classes of Claims ...............................................................................................................24

   1.   Administrative Expense Claims..........................................................................24

   2.   Priority Tax Claims................................................................................................25

   3.   Professional Fee Claims........................................................................................25

   4.   Class 1 (Secured Claims) ......................................................................................27

   5.   Class 2 (Priority Non-Tax Claims) ....................................................................28

   6.   Class 3 (Marshall Inc. Claims) ...........................................................................28

   7.   Class 4 (Marshall General Unsecured Claims) ...............................................28

   8.   Class 5 (Marshall Inc. Intercompany Interests) .............................................30

V.   MEANS OF IMPLEMENTING THE PLAN ..................................................................................30

A.   No Substantive Consolidation.........................................................................................30

B.   Plan Funding .......................................................................................................................30

C.   Appointment of Plan Administrator..............................................................................31

(a)  Appointment Plan Administrator ............................................................31

(b)  Bond ...........................................................................................................31

(c)  Governance ...............................................................................................31

(d)  Succession Matters ...................................................................................31

(e)  Funding of Plan Administrator's Activities .............................................31

(f)  Indemnification .........................................................................................32

D.  Powers and Duties of the Plain Administrator ........................................32

(a)  Powers and Duties.....................................................................................32

E.  Establishment of Oversight Committee ...................................................34

(a)  Appointment of Oversight Committee......................................................34

(b)  Reimbursement of Costs and Expenses ...................................................34

(c)  Liability of Members of the Oversight Committee ..................................34

(d)  Indemnification .........................................................................................34

F.  Establishment of Reserve Funds .............................................................35

(a)  Administrative Reserve.............................................................................35

(b)  Disputed Claim Reserves .........................................................................35

G.  Preservation of Causes of Action ...........................................................35

H.  General Disposition of Assets..................................................................35

I.  Exemption from Certain Transfer Taxes .................................................36

J.  Administrative Expense Claims Bar Date ...............................................36

K.  Deadline for Filing Applications for Payment of Professional Fee Claims...........36

L.  Execution of Documents to Effectuate Plan ...........................................37

M.  Dissolution of Marshall Inc. ...................................................................37

N.  Post-Confirmation Reports and Fees ....................................................37

O.  Official Committee ..............................................................................37

P.  Insurance Preservation .......................................................................37

Q.  Claims Administration Responsibility .................................................37

1.  Reservation of Rights....................................................................37

2.  Objection to Claims ......................................................................38

3.  Filing Objections...........................................................................38

4.  Determination of Claims ..............................................................38

R.  Treatment of Claims without Further Order of the Court.....................38

1.  Certain Scheduled Claims.............................................................38

2.  Late Filed Claims ..........................................................................39

S.  Timing of Distributions on Disputed Claims Substantially Allowed ...................39

T.  Payment or Distribution of Disputed Claims........................................39

U.  Disputed Claims..................................................................................39

V.  Limitations on Funding of Disputed Claims Reserve ...........................40

W.  Tax Requirements for Income Generated by Disputed Claims Reserve ..............40

VI.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................40

A.  General Provisions ..............................................................................40

B.  Notice of Deemed Rejection/Rejection Bar Date .................................40

C.  Compensation and Benefit Programs....................................................41

VII.    INJUNCTIONS; EXCULPATIONS ................................................................41

A.  General Injunctions .............................................................................41

1. Injunctions Against Interference with Consummation
   or Implementation of Plan ...................................................................41

2. Plan Injunction ....................................................................................41

3. Release of Collateral ............................................................................41

B. Exculpation ...............................................................................................42

C. All Distributions Received in Full and Final Satisfaction ......................42

D. No Modification.........................................................................................42

E. Discharge of Claims for Marshall Only...................................................43

F. Extension of Time to Object to Discharge or Dischargeability..............43

VIII.    CONDITIONS PRECEDENT ...........................................................................43

A. Conditions Precedent to Confirmation of the Plan .................................43

B. Conditions Precedent to the Effective Date ............................................44

C. Waiver of Conditions Precedent ..............................................................44

IX.    PROCEDURES FOR DISTRIBUTIONS UNDER PLAN ................................44

A. Distribution by Plan Administrator..........................................................45

B. Indefeasibility of Distributions ...............................................................45

C. Frequency of Distributions ......................................................................45

D. Payments in U.S. Dollars .........................................................................45

E. Claims in U.S. Dollars .............................................................................45

F. Distributions Only on Business Days ......................................................45

G. Transmittal of Payments and Notices ......................................................45

H. Record Date for Distributions ..................................................................46

I. Unclaimed Distributions ..........................................................................46

J.  No Payments of Fractional Cents or Distributions of Less than One Hundred Dollars .................................................................................................46

K.  Setoff and Recoupment ...........................................................................47

L.  Payments of Taxes on Distributions Received Pursuant to the Plan ...................47

M.  Compliance with Tax Withholding and Reporting Requirements.........................47

N.  Disputed Distribution...............................................................................47

X.    RETENTION OF JURISDICTION BY BANKRUPTCY COURT..................................48

XI.   CERTAIN TAX CONSEQUENCES OF THE PLAN .......................................................49

A.  General.................................................................................................49

B.  Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally...49

1.  Recognition of Gain or Loss ..............................................................50

2.  Bad Debt or Worthless Security Deduction.....................................50

3.  Receipt of Interest ..........................................................................50

XII.   CONFIRMATION OF PLAN - REQUIREMENTS .........................................................50

A.  Absolute Priority Rule ............................................................................51

B.  Best Interest of Creditors Test; Liquidation Analysis...........................................51

XIII.  PLAN RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .......................................................................53

A.  Certain Bankruptcy-Related Considerations........................................................53

1.  Parties in Interest May Object to the Plan Proponents' Classification of Claims .........................................................................................53

2.  Risk of Plan Not Being Confirmed .................................................53

3.  Nonconsensual Confirmation........................................................53

4.  Risks that Conditions to Effectiveness Will Not Be Satisfied.........................53

5. Actual Plan Distributions May be less than Estimated for Purposes of the Disclosure Statement ........................................................................................54

6. Claims Objections/Reconciliation Process .......................................................54

B. Alternatives to the Plan and Consequences of Rejection.......................................54

1. Alternative Plans .................................................................................................54

2. Chapter 7 Liquidation ........................................................................................54

XIV.    PROCEDURES FOR VOTING ON PLAN ....................................................................54

XV.     CONFIRMATION HEARING...........................................................................................56

XVI.    RECOMMENDATION .....................................................................................................57

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY.  THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN WHICH IS ENCLOSED WITH THIS DISCLOSURE STATEMENT.  THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALLOWED CLAIMS AGAINST THE DEBTORS.**

Fred Stevens, Chapter 11 trustee (the "Trustee") of the estate of M. Burton Marshall a/k/a Burt Marshall a/k/a Miles Burton Marshall ("Marshall"), and debtor Miles B. Marshall, Inc. ("Marshall Inc.," Marshall and Marshall Inc. each a "Debtor" and collectively, the "Debtors") submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to accompany the Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code dated February 20, 2024 (the "Plan"), which has been filed with the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court").

## I.  PURPOSE AND LIMITATIONS OF DISCLOSURE STATEMENT

### A.  Purpose of Disclosure Statement

The purpose of the Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises holders of Claims[1] and Interests of their rights under the Plan, (iii) assists creditors entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

You are urged to read the Disclosure Statement in order to determine what rights you may have to vote on or object to the Plan and before making any decision on any such course of action. Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they existed before the institution of these Chapter 11 Cases.  Please note, however, that this Disclosure Statement cannot tell you everything about your rights.  For instance, this Disclosure Statement cannot and does not provide a complete description of the financial status of the Debtors, all of the applicable provisions of the Bankruptcy Code, or other matters that may be deemed significant by creditors and other parties in interest.  You are also encouraged to consult with your lawyers and/or advisors as you review and consider the Disclosure Statement and the Plan to enable you to obtain more specific advice on how the Plan will affect you.

### B.  Definitions and Exhibits

Definitions  Unless otherwise defined herein, capitalized terms used in this Disclosure Statement will have the meanings ascribed to such terms in the Plan.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

1

Exhibits  The following exhibits are annexed hereto and expressly incorporated herein:

| Exhibit | Description |
|:---:|:---|
| A | Liquidation Analysis |
| B | Proposed Treatment of Class 4 General Unsecured Claims |

**C.      Enclosures**

The following materials are included with this Disclosure Statement:

1.   A copy of the Plan;

2.   A copy of an order approving the Disclosure Statement (the "Disclosure Statement Approval Order"), which states: (a) the date by which objections to confirmation of the Plan must be served and filed, (b) the date by which all votes with respect to the Plan must be cast, (c) the date of the hearing in the Bankruptcy Court to consider confirmation of the Plan, and (d) other relevant information;

3.   Notice of Confirmation Hearing.  A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the Confirmation Hearing and the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice");

4.   A ballot (and return envelope) for voting to accept or reject the Plan;

5.   An assignment of Bank Litigation Claims (and return envelope) for holders of Class 4 Claims who want to assign their Bank Litigation Claims, if any, and participate in any recovery of Bank Litigation Claims by the Plan Administrator;

6.   A W-9 form to complete and return; and

7.   A letter from counsel to the Official Committee encouraging acceptance of the Plan.

**D.      Representations and Limitations**

**NO PERSON IS AUTHORIZED IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF VOTES THEREON TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ANNEXED HERETO OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE PLAN PROPONENTS.**

**NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH HEREIN.  ANY REPRESENTATIONS OR**

**INDUCEMENTS TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU.**

**THE INFORMATION CONTAINED HEREIN HAS BEEN PREPARED BY THE PLAN PROPONENTS IN GOOD FAITH, BASED UPON UNAUDITED INFORMATION AVAILABLE TO THEM AS OF THE DATE HEREOF. ALTHOUGH THE PLAN PROPONENTS HAVE USED BEST EFFORTS TO ENSURE THAT SUCH INFORMATION IS ACCURATE, THE INFORMATION CONTAINED HEREIN IS UNAUDITED. THE PLAN PROPONENTS BELIEVE THAT THIS DISCLOSURE STATEMENT COMPLIES WITH THE REQUIREMENTS OF THE BANKRUPTCY CODE.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT AND/OR THE DATE THAT THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.**

**THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST THE DEBTORS.**

**THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF. EACH CREDITOR IS ENCOURAGED TO READ, CONSIDER, AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.**

    E.    <u>**Important Dates**</u>

The Bankruptcy Court approved this Disclosure Statement by and through the Disclosure Statement Approval Order entered on [_____], 2024 after notice and a hearing and in accordance with section 1125 of the Bankruptcy Code. The Bankruptcy Court found that the information contained herein is of the kind, and is sufficiently detailed, to enable a hypothetical, reasonable investor typical of the class being solicited to make an informed judgment concerning the Plan. **HOWEVER, THE BANKRUPTCY COURT HAS NOT CONFIRMED THE PLAN, NOR IS THIS DISCLOSURE STATEMENT OR THE DISCLOSURE STATEMENT APPROVAL ORDER TO BE CONSTRUED AS APPROVAL OR ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

As stated in the Disclosure Statement Approval Order, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for [_____], 2024 at __ a.m. (EST).  Holders of Claims and other parties in interest may attend this hearing.  Objections to confirmation of the Plan must be filed on or before [_____], 2024 as set forth in the Disclosure Statement Approval Order.

All Ballots with respect to the Plan must be completed in full and signed to be counted in the tabulation of the votes and must be received by the Voting Agent no later than **5:00 p.m. (EST) on [_____], 2024**.

Completed and signed Ballots should be returned by first class mail to the Voting Agent at the below address in the enclosed self-addressed return envelope:

*By First Class Mail or Overnight/Hand Delivery:*

M. Burton Marshall Ballot Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

Additionally, Ballots can be submitted electronically to the following website:

https://cases.stretto.com/BurtMarshallChapter11

All Assignments with respect to any Bank Litigation Claims by Holders of Class 4 Claims (General Unsecured Claims against Marshall) must be completed in full, signed, and received by the Trustee if such Creditor wants to participate in any Bank Litigation Fund.

Completed and signed Assignments of Bank Litigation Claims should be returned by first class mail to the Trustee by no later than **5:00 p.m. (EST) on May 31, 2024**.

*By First Class Mail or Overnight/Hand Delivery:*

Fred Stevens, Chapter 11 Trustee[2]
c/o Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, NY 10036

Additionally, scanned original copies of the completed and signed Assignments of Bank Litigation Claims can be sent to:

Fred Stevens at fstevens@klestadt.com; and
Lauren C. Kiss at lkiss@klestadt.com

---

[2] If the Trustee is not selected by the Official Committee as the Plan Administrator, he will forward all Assignments of Bank Litigation Claims timely received to the designated Plan Administrator.

F.    **Solicitation Procedures**

Creditors holding Claims that are impaired have the right to vote to accept or reject the Plan. Generally speaking, a Claim is impaired if the Plan alters the legal, contractual or equitable rights of the holder of the Claim.  A Class of creditors accepts the Plan when creditors holding two-thirds in amount of such class and more than one-half in number of the Claims in such class who actually cast their ballots vote to accept the Plan.

In these Chapter 11 Cases, the Plan contains five (5) Classes of Claims.  The Plan provides that holders of Claims in one (1) Class of Claims are impaired in that the Plan alters the legal, contractual and equitable rights of the holders of such Claims.

G.    **Recommendation**

In the opinion of the Plan Proponents, the treatment of creditors under the Plan contemplates a greater recovery than that which is likely to be achieved under any other alternative for the liquidation of the Debtors' assets under chapter 11 or chapter 7 of the Bankruptcy Code.  Accordingly, the Plan Proponents believe that confirmation of the Plan is in the best interests of the Debtors' creditors and recommend that all holders of Claims entitled to vote on the Plan vote to accept the Plan.

H.    **Inquiries**

If you have any questions about the packet of materials that you have received, please contact the Voting Agent by telephone at **855-613-4535** during normal business hours.

II.    **BACKGROUND**

A.    **History of the Debtors**

The following information regarding Marshall's businesses is taken from the *Declaration of M. Burton Marshall Pursuant to Local Bankruptcy Rule 2015-2* (the "Marshall Declaration") [Docket No. 7].  As set forth in greater detail in the Marshall Declaration, prior to the Trustee's appointment, Marshall owned and operated a tax return preparation services business through Marshall Tax Service, a storage services business through Marshall Moving and Marshall Storage, a printing services business through M&M Press, and real estate rental services through Marshall Maintenance and Marshall Rentals.  *See* Marshall Declaration, ¶ 1.  Marshall individually owns over one hundred rental properties containing over 240 residential units through M. Burton Marshall d/b/a Marshall Rentals.  *Id.* at ¶ 2.  Nineteen of the rental properties are subject to mortgages, and fourteen of the mortgages contain an assignment of rent provision, pledging rent received from tenants as additional collateral to the mortgagee.  *Id.*  Marshall's businesses were funded by personal borrowing pursuant to unsecured, 30 day demand notes.  *Id.* at ¶ 5.  "Numerous creditors believe they are victims of a wide-ranging, long-standing Ponzi scheme, wherein they were promised an 8% return for investing in a fund [Marshall] claimed to be maintaining."  *See Joint Stipulation of Facts*, Docket No. 195, ¶ 18.  "[Marshall] denies any fraud and claims that his

obligations to noteholders were loans he intended to repay through the appreciation of the value of his real estate holdings." *Id.* at ¶ 19.

Prior to the Marshall Inc. Petition Date, according to the documents filed in the Marshall Bankruptcy Case, Marshall owned 100% of the stock in Marshall Inc. *See Debtor's Motion for Orders Pursuant to Sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 6004: (A) Authorizing the Sale of All Asset of Miles B. Marshall, Inc. Free and Clear of All Liens, Claims, Interests and Encumbrances; and (B) Authorizing Debtor to Consummate All Transactions Related to the Proposed Sale*, Docket No. 213, ¶ 10. Marshall Inc. was an independent insurance agency with offices in Hamilton, New York. *Id.* at ¶ 12. Marshall Inc. is a New York corporation, founded in 1962, and is classified under the Standard Industrial Classification Code 6411. *Id.* Prior to the Marshall Inc. Petition Date, Marshall Inc. provided personal and commercial lines of insurance coverage to its clients. *Id.* at ¶ 13. Marshall Inc. represented a variety of carriers, providing its clients with auto, home, business and workers compensation insurance. *Id.*

### B.    Events Leading to the Marshall Bankruptcy Filing

According to Marshall, his bankruptcy filing was largely a result of his hospitalization prior to the Marshall Petition Date during which time he underwent two (2) surgeries. *See* Marshall Declaration, ¶ 6. While he was out of the office, Marshall estimates that he lost approximately $600,000 in income from his tax return preparation business. *Id.* In addition, as news of his illness spread, there was an increase in requests by noteholders for return of their principal and/or interest, which requests could not be fulfilled by Marshall. *Id.* The Trustee's subsequent investigation has revealed that the liquidation value of Marshall's assets is less than one-fifth the estimated amount of valid Claims against his bankruptcy estate.

## III.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES

### A.    The Appointment of the Official Committee

On May 9, 2023, the U.S. Trustee formed the Official Committee in the Marshall Bankruptcy Case  [Docket No. 52], appointing the following parties as members of the Official Committee: (i) Mark Brennan; (ii) East Schuyler Cemetery; (iii) Kevin Fuller; (iv) Cheryl A. Hallam; (v) Robyn G. Lamb; (vi) Kevin Sharpe (Chairperson); and (vii) Charles J. Wharton.

### B.    The Appointment of the Trustee

On June 27, 2023, the U.S. Trustee filed the *United States Trustee's Motion Under 11 U.S.C. § 1104(a) to Appoint a Chapter 11 Trustee or, in the Alternative, to Appoint an Examiner Under 11 U.S.C. § 1104(c), and Memorandum of Points and Authorities in Support and Reservation of Rights* (the "Motion to Appoint  a Trustee") [Docket No. 106]. Under Section 1104(a)(1) of the Bankruptcy Code, a bankruptcy court must appoint a trustee if, after notice and a hearing, a movant demonstrates "cause." 11 U.S.C. § 1104(a)(1). Section 1104(a)(1) provides four non-exclusive circumstances constituting "cause" for the appointment of a trustee "including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . ." *Id.* In its

Motion to Appoint a Trustee, the U.S. Trustee asserted that a finding of cause based on fraud was warranted because "1) [Marshall] induced more than a thousand individuals to lend him millions of dollars, promising a return of 8% interest on a 30-day demand note; 2) [Marshall] financed the Eight Percent Fund investment scheme by admittedly borrowing new sums of money to service existing debts; 3) [Marshall] knew that he could not repay noteholders through his tax preparer and rental property businesses, yet he continued to borrow more money; and 4) [Marshall] admittedly issued Form 1099-INT statements to noteholders in lieu of repaying them, causing them to incur greater losses by paying taxes on money they did not receive." Motion to Appoint a Trustee, ¶ 28. The U.S. Trustee argued that based on the facts and circumstances of Marshall's business model, the hallmarks of a Ponzi scheme were present. *Id.* at ¶ 21. In addition, the U.S. Trustee asserted that a finding of cause based on gross mismanagement was warranted because "[Marshall] continued to convince community members, their friends, and families to invest their money knowing that the value of his real estate portfolio was insufficient to cover the debt he owed to noteholders, putting his creditors at risk of recovery with every new dollar that he convinced them to invest." *Id.* at ¶ 36.

The Motion to Appoint a Trustee was joined by the Official Committee (the "Joinder") [Docket No. 140] and was supported by two groups of creditors [Docket Nos. 130 and 132]. The Joinder filed by the Official Committee asserted that the appointment of a trustee was warranted under both sections 1104(a)(1) and 1104(a)(2) of the Bankruptcy Code. Under section 1104(a)(2), even when there is no cause to appoint a trustee under section 1104(a)(1), the court may consider whether the appointment of trustee is "in the interests of creditors, any equity security holders, and other interests of the estate . . ." 11 U.S.C. § 1104(a)(2).

The Motion to Appoint a Trustee was opposed, in part, by Marshall ("Marshall's Partial Objection") [Docket No. 137] and Marshall's wife Megan Marshall [Docket No. 135]. In Marshall's Objection, Marshall asserted that the U.S. Trustee failed to meet its burden in establishing cause for the appointment of a trustee. *See* Marshall's Partial Objection, ¶ 4. In particular, Marshall argued that because he had been removed from management of his businesses in favor of Algon Capital, LLC d/b/a Algon Group ("Algon"), his past conduct was irrelevant to the appointment of a trustee under section 1104(a)(1) of the Bankruptcy Code. *Id.* Marshall argued that Algon was impartial, had assumed full control of his businesses, and there are no allegations of any kind pertaining to either his or Algon's post-petition conduct, thereby rending the U.S. Trustee's allegations in the Motion to Appoint a Trustee irrelevant and insufficient. *Id.* at ¶¶ 22, 51.

On July 24, 2023, the U.S. Trustee filed a declaration in further support of the Motion to Appoint a Trustee [Docket No. 150].

On July 25, 2023, the Bankruptcy Court heard oral argument on the Motion to Appoint a Trustee and on July 28, 2023, the Bankruptcy Court issued a Memorandum-Decision and Order determining that an evidentiary hearing was necessary (the "Decision Requiring Evidentiary Hearing") [Docket No. 160]. The Bankruptcy Court noted that if Marshall was still managing his businesses, it would find cause and appoint a trustee without an evidentiary hearing. *See* Decision Requiring Evidentiary Hearing, p. 6-7 ("Although the precise pathway is obscure, there is no conceivable way [Marshall] reached this destination absent massive fraud, dishonesty,

incompetence, or gross mismanagement."). However, Marshall's retention of Algon and its expanded role in the case required further consideration. As detailed in the Decision Requiring Evidentiary Hearing, Marshall engaged Algon as financial advisor and chief restructuring officer shortly after the Marshall Petition Date, with Marshall remaining responsible for operating his businesses. *Id.* In July of 2023, Marshall informed the Bankruptcy Court that Algon's role had "significantly evolved" and that Marshall had "ceded all decisional authority over the businesses . . . to Algon", which now had "full control over the businesses['] finances and bank accounts." *Id.* at p. 8 (citations omitted). The Bankruptcy Court concluded that "[o]n the current record, this Court finds no basis on which to conclude that Algon has engaged in fraud, dishonesty, incompetence, or gross management and/or that any other aspect of Algon's management of Marshall's affairs constitutes cause sufficient to justify the extraordinary remedy of appointing an 1104 trustee." *Id.* at p. 9. Accordingly, the Court determined that the question of whether to appoint a trustee under section 1104(a)(1) turns on the identity of "current management." *Id.* After considering the evidence before it, the Court concluded the following:

> The record presently before this Court indicates that Algon is currently managing [Marshall's] businesses, Algon is free of any taint from [Marshall], and there are no grounds for establishing cause sufficient to remove Algon and appoint a trustee under § 1104(a)(1).

> However, given the nature and extent of [Marshall's] pre-petition conduct, as well as the highly personal, closely-held nature of the underlying businesses, this Court finds that an evidentiary hearing is warranted. With respect to this aspect of the Motion, the Court will be seeking evidence as to (a) whether there has actually been a change in management and (if so) whether there is (b) cause of concern regarding Algon's management and (c) whether sufficient safeguards can be established to ensure [Marshall] remains divested of control and deprived of any opportunity to engage in fraud, dishonesty, incompetence, or gross mismanagement.

*Id.* at p. 17.

The Bankruptcy Court then analyzed whether the appointment of a trustee was appropriate under section 1104(a)(2) of the Bankruptcy Code. While the Motion to Appoint a Trustee did not seek relief under section 1104(a)(2), the Joinder filed by the Official Committee advocated for appointment of a trustee under both sections 1104(a)(1) and 1104(a)(2) and the appointment of a trustee under section 1104(a)(2) was addressed at oral argument. *Id.* at p. 17, fn. 7. The Bankruptcy Court reasoned that although judicial discretion is broad under section 1104(a)(2), courts generally consider the following factors: "(i) the trustworthiness of the debtor, (ii) the debtor in possession's past and present performance and prospects of the debtor's rehabilitation; (iii) the confidence – or lack thereof – of the business community and of the creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of appointment." *Id.* at p. 18 (citations omitted). Upon examination of the factors, the Bankruptcy Court concluded that further development of the record was required for a proper determination of the section 1104(a)(2) factors. *Id.* at p. 20.

On August 30, 2023 the parties filed a Stipulation of Facts [Docket No. 195] and Statements of Contested Legal and Evidentiary Issues [Docket Nos. 196, 197, 198 and 199]. An evidentiary hearing was held before the Bankruptcy Court in Utica, New York on September 6 and 12, 2023.

After presentation of the evidence, the Bankruptcy Court heard oral argument and issued an oral ruling granting the Motion to Appoint a Trustee pursuant to section 1104(a)(1) of the Bankruptcy Code. On September 20, 2023, the Bankruptcy Court issued a *Memorandum-Decision and Order Granting Motion to Appoint a Trustee* (the "<u>Trustee Decision</u>") [Docket No. 221]. The Court found that "it is not legally possible, or practically feasible, to separate [Marshall's] businesses from [Marshall] himself, as would be necessary to consider the businesses under new 'management.' As such, this Court [found] clear and convincing evidence of cause sufficient to require the appointment of a trustee under 1104(a)(1) of the Bankruptcy Code." Trustee Decision, p. 6. In reaching this conclusion, the Bankruptcy Court noted that "a sole proprietorship has no legal existence apart from its owner." *Id.* at p. 7 (citations omitted). Recognizing a change in management of [Marshall] would require the recognition of the sole proprietorships as separate entities, separate and apart from [Marshall], which is not possible or permitted under the law. *Id.* at pp. 7-8. Further, the Bankruptcy Court concluded that even if it were to consider Algon as new management, "the evidence establishes that [Marshall] retains vestiges of control and that Algon cannot act as an independent fiduciary with respect to this Chapter 11 case." *Id.* at p. 9. The Bankruptcy Court's finding that a trustee was warranted under section 1104(a)(1) rendered the appointment of a trustee under section 1104(a)(2) moot.

On September 21, 2023, the U.S. Trustee filed an application requesting the entry of an order approving the appointment of Fred Stevens as Chapter 11 Trustee [Docket No. 224]. Also on September 21, 2023, the Bankruptcy Court approved the appointment of Fred Stevens as Chapter 11 Trustee and signed the *Order Approving the United States Trustee's Appointment of Chapter 11 Trustee* [Docket No. 225].

### C.    The Bankruptcy Filing of Miles B. Marshall, Inc. by the Trustee

All the equity interests in Marshall Inc. are owned by the Marshall Bankruptcy Estate and, as a result, are under the Trustee's control. On September 25, 2023, the Trustee facilitated the closing on the sale of substantially all of Marshall Inc.'s assets to Skeele Agency, Inc. as authorized by the Bankruptcy Court's order, dated September 22, 2023, authorizing the sale [Docket No. 226]. In the Trustee's business judgment, on September 26, 2023 (the "<u>Marshall Inc. Petition Date</u>") the Trustee commenced a voluntary petition for relief under chapter 11 of the Bankruptcy Code for Marshall Inc. for at least the following reasons: (i) to ensure control and transparency with respect to the corporate asset of the Marshall Bankruptcy Estate; (ii) to create a mechanism to determine the existence of any creditors of Marshall Inc. prior to distributing Marshall Inc.'s assets consisting primarily of the proceeds of the sale of the insurance business to the Marshall Bankruptcy Estate, its sole shareholder; (iii) to create claims that may exist in favor of Marshall Inc.'s estate under Chapter 5 of the Bankruptcy Code and a means of pursuing those claims, if any; and (iv) to use Marshall Inc. for continuing to employ and compensate ordinary course consultants and employees necessary for the orderly winddown and liquidation of the Marshall Bankruptcy Estate and all of its assets, including Marshall Inc.

### D.    **Retention of Professionals**

On May 31, 2023, the Bankruptcy Court entered an order granting the application to employ Barclay Damon LLP as counsel to Marshall [Docket No. 81].

On June 28, 2023, the Bankruptcy Court entered an order granting the application to employ HKA Global, LLC ("HKA"), as financial advisor to the Official Committee [Docket No. 114].

On July 27, 2023, the Bankruptcy Court entered an order granting the application to employ Bond, Schoeneck & King, PLLC as counsel to the Official Committee [Docket No. 155].

On September 29, 2023, the Bankruptcy Court entered an order granting the application to employ Klestadt Winters Jureller Southard & Stevens ("KWJS&S") as general counsel to the Trustee effective as of September 21, 2023 [Docket No. 237].

On September 29, 2023, the Bankruptcy Court entered an order granting the application to employ RK Consultants, LLC as financial advisors to the Trustee effective as of September 21, 2023 [Docket No. 238].

On October 12, 2023, the Bankruptcy Court entered an order granting the application to employ KWJS&S as general counsel to Marshall Inc. effective as of September 26, 2023 [Docket No. 23 in Case No. 23-60723].

On October 19, 2023, the Bankruptcy Court entered an order granting the application to employ Stretto, Inc. ("Stretto") as administrative advisor to the Trustee effective as of September 22, 2023 [Docket No. 251].

On May 23, 2023, Marshall filed an application for an order authorizing him to retain Algon as his financial advisor (the "Algon Application") [Docket No. 72].  On July 18, 2023, creditors Gerard Locascio and the Wanda Warren Berry Living Trust represented by Longstreet & Berry, LLP, creditors represented by Tina M. Wayland-Smith, Esq., and the Official Committee filed objections to the Algon Application (collectively, the "Algon Objections") [Docket Nos. 129, 131, 133 & 138, respectively].  Following the filing of the Algon Objections, Marshall filed replies and other pleadings in support of the Algon Application [Docket Nos. 151 and 183], and the U.S. Trustee and Official Committee filed supplements to their objections [Docket Nos. 176 & 182, respectively].  On October 23, 2023, the Bankruptcy Court "So Ordered" a certain *Stipulation and Order Resolving Objections to the Debtor's Application to Retain Algon Capital, LLC d/b/a Algon Group as Financial Advisors Effective as of May 22, 2023 but Reserving All Issues Related to Algon Capital, LLC's Fees and Reimbursement of Expenses* (the "Algon Stipulation" [Docket No. 256], pursuant to which Marshall's employment and retention of Algon as financial advisor was approved effective May 22, 2023 through and including September 21, 2023.  In addition, the Algon Stipulation preserved all parties rights to object to the allowance and award of any fees, commissions, compensation or reimbursement of expenses sought by Algon.

On October 23, 2023, the Bankruptcy Court entered an order granting the application to employ Stretto as claims and noticing agent effective as of September 22, 2023 [Docket No. 257].

On October 26, 2023, the Bankruptcy Court entered an order granting the application to employ Keen-Summit Capital Partners LLC ("Keen-Summit") as real estate broker to the Trustee effective as of October 11, 2023 [Docket No. 261].

On January 24, 2024, the Bankruptcy Court entered an order granting the application to employ Hancock Estabrook, LLP, as special real estate transactional counsel to the Trustee effective as of January 9, 2024 [Docket No. 310].

On February 8, 2024, the Bankruptcy Court entered an order granting the application to employ First Nationwide Title Agency LLC ("FNT"), as title report preparer to the Trustee effective as of January 31, 2024 [Docket No. 315].

### E.        Schedules of Assets and Liabilities, Statement of Financial Affairs

On April 20, 2023, Marshall filed schedules of assets and liabilities and a statement of financial affairs [Docket No. 3].

On October 10, 2023, Marshall Inc. filed schedules of assets and liabilities and a statement of financial affairs [Docket No. 19 in Case No. 23-60723].

### F.        Creditor Claims and the Bar Date for Filing of Claims Arising Prior to the Petition Dates

The Schedules filed by Marshall on April 20, 2023 listed the following amounts outstanding: (i) secured claims totaling approximately $2.3 million, and (ii) approximately 990 unsecured claims totaling approximately $90 million [Docket No. 3]. The Schedules filed by Marshall Inc. listed the following amounts outstanding:  (i) a secured claim totaling approximately $5,000; and (ii) a priority claim totaling approximately $4,000 (with the priority claim being listed as disputed).  Each claim scheduled by a Debtor is referred to as a "Scheduled Claim," and collectively, "Scheduled Claims".

On April 27, 2023, the Bankruptcy Court entered an order (the "Marshall Bar Date Order") [Docket No. 34] fixing a deadline (the "Marshall Bar Date") and establishing procedures for filing proofs of claim against Marshall and its bankruptcy estate pursuant to Federal Rule of Bankruptcy Procedure 3003(c)(3).  The Marshall Bar Date Order fixed August 21, 2023 as the bar date by which all Claims which arose prior to April 20, 2023, other than for governmental units, with respect to Marshall had to be filed.  The Marshall Bar Date Order also set a bar date of October 17, 2023 with respect to governmental entities.  On August 14, 2023, the Bankruptcy Court "So Ordered" a certain *Stipulation and Agreed Order Extending the Deadline for Creditors to File Proofs of Claim* [Docket No. 179], which extended the general bar date from August 21, 2023 to October 20, 2023.

On September 27, 2023, the Bankruptcy Court entered an order (the "Marshall Inc. Bar Date Order" and together with the Marshall Bar Date Order, the "Bar Date Orders") [Docket No. 7 in Case No. 23-60723] fixing a deadline (the "Marshall Inc. Bar Date") and establishing procedures for filing proofs of claim against Marshall Inc. and its bankruptcy estate pursuant to Federal Rule of Bankruptcy Procedure 3003(c)(3). The Marshall Inc. Bar Date Order fixed December 5, 2023 as the bar date by which all Claims which arose prior to September 26, 2023, other than for governmental units, with respect to Marshall Inc. had to be filed. The Marshall Inc. Bar Date Order also set a bar date of March 24, 2024 with respect to governmental entities.

Not Every Holder of a Claim Was Required to Timely File a Proof of Claim. The Marshall Bar Date Order and Marshall Inc. Bar Date Order only required creditors to timely file a proof of claim if (a) their Scheduled Claim is designated as *disputed, contingent,* or *unliquidated*, (b) they did not have a Scheduled Claim but believed they held a Claim against one or both of the Debtors, or (c) they disagreed with the amount of their Scheduled Claim. Otherwise, the creditor would be deemed to have timely filed a proof of claim in the amount of its Scheduled Claim.

In accordance with Federal Rule of Bankruptcy Procedure 3003(c)(2), holders of Claims other than Scheduled Claims who failed to comply with the terms of the Bar Date Orders, are forever barred from (i) filing a proof of claim with respect to such Claim, (ii) asserting such Claims against the Debtors or their Estates and/or property, (iii) voting on any plan filed in these Chapter 11 Cases, and (iv) participating in any Distribution in the Chapter 11 Cases on account of such Claims.

A total of 781 claims were filed against Marshall and its bankruptcy estate, most of which simply altered, or most often enhanced, the extent, validity, or priority of already Scheduled Claims. In the aggregate and on a consolidated basis, the claims asserted the following amounts: (i) secured claims in the amount of approximately $2.6 million; (ii) priority claims in the amount of approximately $30,000; and (iii) unsecured claims in the amount of approximately $116 million.

A total of three (3) claims were filed against Marshall Inc. and its bankruptcy estate. In the aggregate and on a consolidated basis, the claims asserted the following amounts: (i) priority claims in the amount of approximately $10,000; and (iii) unsecured claims in the amount of approximately $100.

The Plan Proponents have been working to reconcile the Scheduled Claims and proofs of Claim filed to determine which, if any, warrant objection. As set forth in the Plan, the Plan Administrator shall have the right to object to Claims in accordance with section 502(a) of the Bankruptcy Code following confirmation of the Plan.

G.    **Termination of Substantially All of the Debtors' Employees**

Prior to the Trustee's appointment, Marshall employed between 15-17 employees in jobs ranging from building and grounds maintenance, commercial printing, bookkeeping and general office work. Shortly after the Trustee's appointment, he took the following actions: (i) determined to sell or discontinue the printing business, M&M Press, and ultimately sold substantially all assets of that business to The Ad Group Agency, Inc., pursuant to a notice of sale dated October 26, 2023

[Docket No. 260], leading to the termination of all employees associated with the business, including Marshall's son, Matthew Marshall; (ii) determined to transition all property management activities to a third-party provider, Property Management Alliance LLC ("PMA"), and all employees associated with the business were either transitioned to PMA or terminated by the Trustee; and (iii) terminated all remaining employees who had not resigned except for Joi Young, who remains employed for purposes of responding to customer inquiries and managing remaining office affairs, and David Will, who remains employed on a part-time basis to provide any necessary IT support services.

### H.    Disposition of Assets of During the Chapter 11 Cases

On September 19, 2023, Marshall filed a motion seeking entry of an order (i) authorizing the sale of substantially all of Marshall Inc.'s assets free and clear of all liens, claims, interests and encumbrances, and (ii) authorizing Marshall to consummate all transactions related to the proposed sale (the "Insurance Sale Motion") [Docket No. 213].

On September 22, 2023, the Court entered an order granting the Insurance Sale Motion and authorizing the sale of substantially all of Marshall's Inc.'s assets free and clear of all liens, claims and encumbrances to Skeele Agency, Inc. ("Skeele") [Docket No. 226]. On September 25, 2023, the Trustee and Skeele closed on the sale of substantially all of Marshall Inc.'s assets pursuant to a certain Asset Purchase Agreement (the "APA"). In accordance with the terms of the APA, in exchange for the sale of substantially all of Marshall Inc.'s assets, Skeele paid $850,000 in cash and issued a promissory note to the Trustee in the amount of $488,000 (the "Skeele Promissory Note"). Pursuant to the terms of the Skeele Promissory Note, after deducting certain commission adjustments that were due to Skeele totaling $7,036.01, the Trustee received $480,963.99 from Skeele on account of the Skeele Promissory Note in late January 2024.

On October 13, 2023, the Trustee filed a motion (the "De Minimis Asset Sale Procedures Motion") seeking entry of an order authorizing the Trustee to implement expedited procedures to: (a) sell certain assets, including any rights or interests therein (collectively, the "De Minimis Assets") in any individual transaction or series of related transactions (each a "De Minimis Asset Sale") to a buyer with a sale price equal to or less than $25,000 as calculated within the Trustee's reasonable discretion, free and clear of all liens, claims, interests, and encumbrances (collectively, the "Liens"), without the need for further Court approval and with Liens attaching to the proceeds of such use, sale or transfer with the same validity, extent and priority as had attached to the De Minimis Assets immediately prior to the sale; (b) abandon De Minimis Assets to the extent that a sale thereof cannot be consummated at a value greater than the cost of liquidating such De Minimis Assets; and (c) pay those reasonable and necessary fees and expenses (if any) incurred in connection with the use, sale, or transfer of De Minimis Assets, including, but not limited to, commission fees to agents, brokers, auctioneers, and liquidators with the amount of proposed commission fees to be paid to be disclosed in the Sale Notice (as defined in the De Minimis Asset Sale Procedures Motion) [Docket No. 246].

On October 14, 2023, the Bankruptcy Court entered an order approving the De Minimis Asset Sale Procedures Motion (the "De Minimis Asset Sale Procedures Order") [Docket No. 284]. In accordance with the terms of the De Minimis Asset Sale Procedures Order, the Trustee closed

on the following De Minimis Asset Sales following entry of the De Minimis Asset Sale Procedures Order:

| Identification of Sale Assets | Purchaser of the Sale Assets | Purchase Price and Material Economic Terms and Conditions of the Sale: | Docket Number of Sale Notice |
|---|---|---|---|
| All of the Seller's right, title and interest in that certain printing business known as "M&M Press" (the "Business"), including the: <br>(A)    Customer List; <br>(B)    Good Will; <br>(C)    Telephone Numbers; <br>(D)    Inventory; and <br>(E)    Equipment. | The Ad Group Agency, Inc. | The Ad Group Agency, Inc. paid $20,000 to the Trustee. In addition, Matthew B. Marshall, Marshall's son who has managed the Business since in or around 2015 has agreed, as part of the sale, to release any and all claims that he has against Marshall's Bankruptcy Estate. | Docket No. 260 |
| 2019 Ford F250 Super Duty Regular Cab Pickup Truck with approximately 20,000 miles used in Marshall's property management business | Property Management Alliance | PMA paid $25,000 to the Trustee. | Docket No. 263 |
| Snow plow for pickup truck, snow blower, and ice salter used in Marshall's property management business | Property Management Alliance | PMA paid $4,000 to the Trustee. | Docket No. 264 |

## I.    Sale of the Properties in Connection with the Plan

The Plan shall be funded by a combination of the proceeds of sale of the Debtors' Assets, and proceeds from liquidation of remaining Assets, including the sale of the Properties. The Properties consist of the following:

| Tax ID | Street Number | Street Name | Municipality |
|---|---|---|---|
| 111.18-1-29 | | Reservoir Rd | 252601 - V. Morrisville |
| 111.18-1-37 | | Marshall Heights | 252601 - V. Morrisville |
| 111.18-2-32 | | Reservoir Road | 25269 - Eaton |
| 137.-3-10 | 2674 | Route 12B | 254089 - Madison |
| 153.12-1-14 | 2521 | Lake Moraine Rd | 254089 - Madison |
| 154.-2-30 | 4250 | E Lake Road | 254089 - Madison |
| 154.6-3-45 | 7209 | Butternut Lane | 254089 - Madison |
| 168.-1-37 | 1873 | Preseton Hill Road | 253289 - Hamilton |
| 168.11-1-23.1 | 131 | Lebanon Street | 253203 - V. Hamilton, Hamilton |

14

| Tax ID | Street Number | Street Name | Municipality |
|---|---|---|---|
| 168.11-1-37.3 | 98 | College Street | 253203 - V. Hamilton, Hamilton |
| 168.27-1-8 | 34 | Montgomery Street | 253203 - V. Hamilton, Hamilton |
| 168.28-1-52 | 20 | Payne Street | 253203 - V. Hamilton, Hamilton |
| 168.35-1-77 | 29 | Pine Street | 253203 - V. Hamilton, Hamilton |
| 114.-2-16 | 7531 | Route 20 | 254089 - Madison |
| 114.15-1-48 | 7407 | Route 20 | 254001 - Madison |
| 114.15-1-61 | 7382 | Route 20 | 254001 - Madison |
| 136.18-1-69 | 4101 | Route 26 | 252689 - Eaton |
| 137-01-42 | | Route 12B | 252689 - Eaton |
| 152.6-1-34 | 2804 | River Road | 252689 - Eaton |
| 153.-2-2 | | Route 12B | 254089 - Madison |
| 153.-2-32 | 6767 | Airport Rd | 254089 - Madison |
| 153.-2-44 | 2405 | Johnny Cake Hill Rd | 254089 - Madison |
| 153.19-1-40 | 75 | Utica St | 253203 - V. Hamilton, Hamilton |
| 153.19-1-41 | 73 | Utica St | 253203 - V. Hamilton, Hamilton |
| 153.19-1-44 | 67 | Utica St | 253203 - V. Hamilton, Hamilton |
| 153.20-1-35 | 48 | Madison St | 253203 - V. Hamilton, Hamilton |
| 153.20-1-40 | 36 | Madison St | 253203 - V. Hamilton, Hamilton |
| 153.83-1-5 | 32 - 34 | Eaton St | 253203 - V. Hamilton, Hamilton |
| 153.83-1-6 | 28-30 | Eaton St | 253203 - V. Hamilton, Hamilton |
| 153.83-1-9 | 22 | Eaton St | 253203 - V. Hamilton, Hamilton |
| 153.83-1-28 | 66 | Utica St | 253203 - V. Hamilton, Hamilton |
| 153.83-1-29 | 68 | | 253203 - V. Hamilton, Hamilton |
| 153.83-1-32 | 15 | Wylie St | 253203 - V. Hamilton, Hamilton |
| 153.83-1-33 | 13 | Wylie St | 253203 - V. Hamilton, Hamilton |
| 153.84-1-3 | 28 | Madison St | 253203 - V. Hamilton, Hamilton |
| 153.84-1-4 | 26 | Madison St | 253203 - V. Hamilton, Hamilton |
| 154.-2-8 | 2677 | Lake Moraine Rd | 254089 - Madison |
| 154.-2-34.2 | 7220 | Butternut Ln | 254089 - Madison |
| 154.6-3-42 | 4332 | E Lake Rd | 254089 - Madison |
| 154.17-1-6 | 12 | E Lake Rd | 253203 - V. Hamilton, Hamilton |
| 154.17-2-9 | 7019 | Payne St | 253289 - Hamilton |
| 168.-1-6 | 2000 | Randallsville Rd | 253289 - Hamilton |
| 168.-1-28.2 | | Route 12B | 253289 - Hamilton |
| 168.7-1-26 | 82 | Lebanon St | 253203 - V. Hamilton, Hamilton |
| 168.11-1-10 | 134 | Lebanon St | 253203 - V. Hamilton, Hamilton |
| 168.11-1-24 | 135 | Lebanon St | 253203 - V. Hamilton, Hamilton |
| 168.11-1-37.2 | 175 | Lebanon St | 253203 - V. Hamilton, Hamilton |
| 168.11-1-37.4 | 173 | Lebanon St | 253203 - V. Hamilton, Hamilton |
| 168.15-2-6 | 87 | College St | 253203 - V. Hamilton, Hamilton |
| 168.27-1-18 | 14 | Montgomery St | 253203 - V. Hamilton, Hamilton |
| 168.27-1-33 | 39 | Montgomery St | 253203 - V. Hamilton, Hamilton |

| Tax ID | Street Number | Street Name | Municipality |
|---|---|---|---|
| 168.27-1-46 | 34 | Lebanon St | 253203 - V. Hamilton, Hamilton |
| 168.27-1-52 | 59-61 | Lebanon St | 253203 - V. Hamilton, Hamilton |
| 168.27-1-53 | 53 | Lebanon St | 253203 - V. Hamilton, Hamilton |
| 168.27-1-56 | 45 | Lebanon St | 253203 - V. Hamilton, Hamilton |
| 168.27-1-86 | 11 | Madison St | 253203 - V. Hamilton, Hamilton |
| 168.28-1-17 | 33-37 | Lebanon St | 253203 - V. Hamilton, Hamilton |
| 168.28-1-20 | 11 | Maple Ave | 253203 - V. Hamilton, Hamilton |
| 168.28-1-22 | 15 | Maple Ave | 253203 - V. Hamilton, Hamilton |
| 168.28-1-29 | 4 | W Pleasant St | 253203 - V. Hamilton, Hamilton |
| 168.28-1-56 | 7 | Charles St | 253203 - V. Hamilton, Hamilton |
| 168.35-1-4 | 25-27 | Milford St | 253203 - V. Hamilton, Hamilton |
| 168.35-1-9 | 37 | Milford St | 253203 - V. Hamilton, Hamilton |
| 168.35-1-18 | 8 | Montgomery St | 253203 - V. Hamilton, Hamilton |
| 168.35-1-24.11 | 71 | Lebanon St | 253203 - V. Hamilton, Hamilton |
| 168.35-1-44.1 | 89-91 | Lebanon St | 253203 - V. Hamilton, Hamilton |
| 168.35-1-47 | 99 | Lebanon St | 253203 - V. Hamilton, Hamilton |
| 168.35-1-59 | 16 | Pine St | 253203 - V. Hamilton, Hamilton |
| 168.35-1-72 | 11 | Pine St | 253203 - V. Hamilton, Hamilton |
| 168.35-1-74 | 15 | Pine St | 253203 - V. Hamilton, Hamilton |
| 168.35-1-75 | 21 | Pine St | 253203 - V. Hamilton, Hamilton |
| 168.36-1-53 | 13 | Hamilton St | 253203 - V. Hamilton, Hamilton |
| 168.43-1-17 | 21-23 | West Kendrick Ave | 253203 - V. Hamilton, Hamilton |
| 168.43-1-18 | 19 | West Kendrick Ave | 253203 - V. Hamilton, Hamilton |
| 168.52-1-2 | 24 | College St | 253203 - V. Hamilton, Hamilton |
| 169.-1-3 | 2032 | Spring St | 253289 - Hamilton |
| 169.-1-4 | 2024 | Spring St | 253289 - Hamilton |
| 183.-1-8.1 | | Preston Hill Rd | 253289 - Hamilton |
| 183.-1-8.2 | | Preston Hill Rd | 253289 - Hamilton |
| 183.-1-8.3 | | Preston Hill Rd | 253289 - Hamilton |
| 183.-1-8.4 | | Preston Hill Rd | 253289 - Hamilton |
| 183.-1-8.5 | | Horton Rd | 253289 - Hamilton |
| 183.-1-8.6 | | Horton Rd | 253289 - Hamilton |
| 183.-1-8.7 | | Horton Rd | 253289 - Hamilton |
| 183.-1-8.8 | | Horton Rd | 253289 - Hamilton |
| 213.16-1-6.1 | 101-103 | N Main St | 253201 - V. Earlville |
| 213.16-1-6.5 | | Off N Main St | 253201 - V. Earlville |
| 213.20-1-5 | 35 | Fayette St | 253201 - V. Earlville |
| 213.20-2-2 | 4 | Fayette St | 253201 - V. Earlville |
| 213.20-2-23 | | Fayette St | 253201 - V. Earlville |
| 213.20-2-23.1 | 60-62 | Fayette St | 253201 - V. Earlville |
| 213.20-3-13 | 1 | Clark St | 253201 - V. Earlville |
| 213.20-3-26 | 16 | N Main St | 253201 - V. Earlville |

| Tax ID | Street Number | Street Name | Municipality |
|---|---|---|---|
| 213.20-3-29 | 5 | E Main St | 253201 - V. Earlville |
| 213.20-3-43 | 6 | Madison St | 253201 - V. Earlville |
| 213.20-3-45 | 15 - 21 | E Main St | 253201 - V. Earlville |
| 214.17-1-11 | 45 | Clyde St | 253201 - V. Earlville |
| 214.17-1-16 | 40 | Clyde St | 253201 - V. Earlville |
| 214.17-1-19 | 34 | Clyde St | 253201 - V. Earlville |
| 214.17-1-38 | 83-85 | E Main St | 253201 - V. Earlville |
| 213.19-1-5 | 84 | W Main St | 253400 - Lebanon |
| 136.18-1-68 | 4097 | Route 26 St | 252689 - Eaton |
| 114.15-1-72 | 7336 | Route 20 | 254001 - V. Madison |
| 114.15-1-75 | 3618 | South St | 254001 - V. Madison |
| 153.-2-1 | 2649 | Route 12B | 254089 - Madison |
| 153.11-1-9 | 5227 | English Ave | 254089 - Madison |
| 137.-3-10 | 2674 | Route 12B | 254089 - Madison |
| 126.-1-7.111 | 3534 | Route 12B | 254089 - Madison |
| 126.-1-74.1 | 3530 | Route 12B | 254089 - Madison |
| 138.14-1-12 | 918 | Taylor Grove Rd | 254089 - Madison |

The Trustee intends to file a motion within a few weeks of the date of this Disclosure Statement, seeking entry of orders: (i) (a) approving bidding procedures and potential bidder protections for the sale and potential auction (the "Auction") of the Properties; (b) scheduling an Auction, if necessary, and a hearing to approve the sale of the Properties (the "Sale Hearing"); and (c) approving the form and manner of the Notice of the Auction and Sale Hearing (the "Sale Notice"); and (ii) approving the sale of the Properties free and clear of all liens, claims and encumbrances, security interests and other interests to the successful bidder(s) at the Auction.

### J.    Mortgages owned by the Marshall Bankruptcy Estate

Marshall listed on his Schedules four (4) mortgages which were issued to Marshall by certain individuals that Marshall loaned money to. The aggregate value of the mortgages listed on the Schedules is $302,871.26. The properties secured by the mortgages are located in Earlville, Hubbardsville and Hamilton, New York. The Trustee and his professionals are in the process of marketing these mortgages for sale.

### K.    Investigation by the Official Committee

The Official Committee is conducting a forensic investigation into Marshall's prepetition business practices, as well as Marshall's current and historical books and records to identify and trace funds and assets of Marshall, including any potentially diverted assets that may be recovered for the benefit of the estate. In furtherance of the Official Committee's investigation, on August 4, 2023, the Official Committee filed an application pursuant to Bankruptcy Rule 2004 for an order directing production and turnover of documents by and examination of Berkshire Bank ("Berkshire") by an officer, director or managing agent with knowledge of Marshall's financial affairs (the "2004 Application") [Docket No. 164]. On September 15, 2023, the Bankruptcy Court

17

entered an order granting the 2004 Application (the "2004 Order") [Docket No. 218]. The Official Committee subsequently issued a subpoena to Berkshire and the professionals to the Official Committee are in the process of reviewing the documents produced by Berkshire in response to the subpoena.

The Official Committee, together with the Trustee, is investigating whether there are grounds to deny Marshall a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code, which provides that a debtor will not receive a discharge of debts when the following elements are met: (1) the plan provides for the liquidation of all or substantially all of the property of the estate, (2) the debtor does not engage in business after consummation of the plan, and (3) the debtor would be denied a discharge under Bankruptcy Code section 727(a) if the case were a case under chapter 7. *See* 11 U.S.C. § 1141(d)(3). Under section 727(a)(5) of the Bankruptcy Code, "[t]he Court shall grant the debtor a discharge unless . . . the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). The Trustee has been in discussions with Debtor's counsel regarding the Debtor's voluntary waiver of discharge pursuant to sections 727(a)(10) and 1141(d)(3)(C) of the Bankruptcy Code and is hopeful that the parties will be able to reach a consensual resolution. If, however, a consensual resolution is not reached, to the extent it is warranted, the Official Committee and/or the Trustee will file a complaint objecting to Marshall's discharge.

L.      **Claims Investigation and Reconciliation**

The Bankruptcy Code requires debtors to file a schedule of assets, liabilities, expenses, obligations, and debts owed to creditors and other parties in interest. The amount that a debtor lists for how much it owes a creditor is known as a "scheduled claim." Scheduled claims are presumed to be allowed unless they are labeled as "disputed," "contingent," or "unliquidated" on the debtor's schedules. Holders of claims presumed to be allowed may receive a distribution on account of that scheduled claim under a chapter 11 plan. Any creditor with a claim that is not scheduled, or scheduled as disputed, contingent, or unliquidated, or who disagrees with the scheduled claim amount, may file a proof of claim, which will replace and supersede any scheduled claim. To determine whether a filed proof of claim is accurate or valid, a claims reconciliation process is typically conducted to reconcile filed proofs of claim against the debtor's books and records. If the debtor does not object to the filed proof of claim, the filed proof of claim will be deemed "allowed," or considered accurate and valid, and the creditor will be able to receive distributions under a chapter 11 plan. If the debtor disputes a filed proof of claim by filing an objection, the Bankruptcy Court must determine whether to "allow" or "disallow" the filed proof of claim.

Significant allegations have been made in this chapter 11 case regarding irregularities in Marshall's pre-petition business practices. Due to these allegations, the Trustee and the Official Committee have explored the possibility that Marshall was engaged in a fraudulent scheme during some or all times in the history of his businesses and through his practice of obtaining funds from noteholders with a guaranteed rate of return while insolvent. In many chapter 11 cases involving similar fraudulent schemes, creditors' claims are subjected to a "net equity" analysis that determines whether holders of claims received more or less than the claim to which each holder is

entitled. Additionally, claims in excess of the initial principal balance may be reduced by "fictitious profits" through a claim objection process, and avoidance actions may be commenced to recover distributions received pre-petition by a creditor that are greater than the principal balance of its original loan or investment. Such processes serve to address creditor recoveries in cases where a fraudulent scheme has been determined to have occurred.

If the Trustee or Plan Administrator were to implement these processes, they would have to conduct a detailed historic claims reconciliation review, and would require access to accurate and complete business records from Marshall regarding note balances and distributions at all times in the history of Marshall's business operations. Each promissory note holder's principal balance must be known before the Trustee or Plan Administrator is able to determine whether payments received by each noteholder exceeded the initial investment. As set forth in greater detail below, the New York State Office of the Attorney General ("OAG") seized virtually all of Marshall's paper business records pertaining to the promissory notes. In January 2024, the OAG provided Marshall with a digitized copy of all of the business records they seized, which was then sent to the Trustee and Official Committee. However, there are 135,000 pages of documents without an index identifying where the relevant promissory note information can be found. Accordingly, until mid-January 2024, the Official Committee and the Trustee had access only to Marshall's electronic promissory note database that was created in or around January 2012.

In order to determine the accurate principal and interest balance of each promissory note, it would be necessary to conduct an extensive review of the unindexed digitized business records. It would also be necessary to obtain banking and other records going back to at least the 1990's, many of which may no longer exist. The Official Committee and its professionals, including HKA, have analyzed the scope of this undertaking and have reported that there are 471 active promissory notes containing principal funds provided to Marshall prior to 2012. This number does not include promissory notes that were transferred to other promissory notes prior to the time of conversion which, based on HKA's analysis of the post-2012 promissory notes, may require an additional 2,000 or more additional promissory notes to be extracted, reviewed, and digitized. Additionally, the promissory note database was not integrated with the Marshall accounting records. Therefore, payments made to noteholders were not accurately recorded in the noteholder database and Marshall's accounting system and bank statement records prior to 2014 are inadequate and may be insufficient to provide necessary factual support for any analysis.

In light of these issues, the Trustee, in consultation with the Official Committee, analyzed the utility of even attempting to engage in a "net equity" claims analysis in recognition of Marshall's irregular business practices and has determined that such a process would not be in the best interests of the estate. This is especially true where the Trustee and Plan Administrator may be ultimately unable to reach an accurate and supportable result for creditors due to Marshall's business record deficiencies, even if the note reconciliation process were undertaken at great cost to the estate. Therefore, the Trustee and Plan Administrator intend to rely primarily on scheduled claim amounts and the electronic database as a guide for any claim objections and avoidance actions. A critical factor in making this decision was that the cost of performing this analysis, to the extent that could even be accomplished, is estimated to exceed $300,000 just for the determination of principal balances alone and without an accounting of all payments that may have been made to each creditor which, in some cases, go back to the 1990's. The significant expense

19

associated with any such analysis would reduce the amount available for distribution which in the Trustee's business judgment is not in the best interests of creditors. Such a process, again assuming that it even could be completed with an acceptable degree of accuracy, would significantly delay distributions and could result in inconsistent outcomes for noteholders due to the unavailability of business records for certain time periods.

With the assistance of his and the Official Committee's professionals, the Trustee has calculated what he believes to be the proper amount of each claim in Class 4 as detailed in the schedule annexed hereto as **Exhibit B** [*to be filed and suppled prior to solicitation*]. The Plan Administrator will file an omnibus motion to allow such claims as set forth on the annexed schedule, as may be adjusted upon further analysis, although Class 4 claim holders will be permitted to vote the amount of their claims as scheduled or filed as the case may be.

### M.    Investigation of Claims Against Banking Institutions

As set forth by the U.S. Trustee in the Motion to Appoint a Trustee:

[T]he Debtor convinced the local community to invest in his real estate operations for a promised 8% return. The noteholders were paid their 8% interest with funds from new investors. But the Debtor's 'business' was insolvent, unable to pay the debts as they came due without new funds from new investors. The Debtor's business model contains all the hallmarks of a Ponzi scheme.

Motion to Appoint a Trustee, ¶ 21. Potential claims and causes of action may exist against certain banking institutions as a result of Marshall's alleged questionable prepetition business practices. These potential claims may include (i) aiding and abetting fraud, (ii) aiding and abetting breach of fiduciary duty, (iii) unjust enrichment, and (iv) avoidance and recovery of fraudulent transfers, among others. The Plan provides Creditors with the opportunity to assign their Bank Litigation Claim to the Plan Administrator for prosecution. Creditors that choose not to assign their Bank Litigation Claim to the Plan Administrator shall be permitted to pursue such claim individually but shall lose any entitlement to participate in the Plan Administrator's Bank Litigation Fund, if any.

### N.    Term Life Insurance Policies

Marshall has three significant term life insurance policies as follows:

| Issuer | Policy No. | Type-Maturity | Death Benefit | Notes |
|---|---|---|---|---|
| Allstate Life Insurance Co. | 03TC006208 | 08/22/2032 – T(to80) – Insured born 8/23/1951 | $6,000,000 | Annual premium through 2025 is $20,220, but then it jumps to $704,700 |
| Allstate Life Insurance Co. | 719 007 888 | 09/24/2032 – T(to80) – Insured born 08/23/1951 | $6,000,000 | Premium due starting in 2024 will jump from $26,220 annually to $618,480 |

| Issuer | Policy No. | Type-Maturity | Death Benefit | Notes |
|--------|-----------|---------------|---------------|-------|
| The United States Life Ins. Co. | WMA00000070 | T20 issued 11/05/2004 – Expires 11/05/2024 | $6,000,000 | Annual premium - $15,300 |

The Trustee's due diligence has revealed that given Marshall's apparent good health following his medical issues earlier in 2023 (described above), that these policies do not have significant value on the secondary market. Accordingly, subject to a final determination by the Plan Administrator, the Trustee intends to: (i) retain the Policy No. 03TC006208 until the annual premium increases to $704,700 after 2025 at which time it will be permitted to lapse; (ii) retain the Policy No. 719 007 888 until the annual premium increases to $618,480 after 2024 at which time it will be permitted to lapse; and (iii) retain the Policy No. WMA00000070 until it expires on November 5, 2024. Thus, if hypothetically Marshall were to pass away in early 2024, the Plan Administrator would recover $18 million in life insurance policy benefits for the benefit of the Estate, but if Marshall were to live until the lapse of Policy No. 03TC006208, nothing will be realized on account of the policies.

### O.    Investigation by Governmental Entities

On or about July 5, 2023, the OAG obtained a search warrant from the State Court of New York, County of Madison to search, seize and remove documents, business records, financial records, computers, and other specified property located on the first floor and basement of 11 Maple Avenue, Hamilton, New York 13346 on the basis that such property may constitute evidence or tend to demonstrate that the crimes of Grand Larceny in the First Degree under Penal Law Article 155, Scheme to Defraud in the First Degree under Penal Law Article 190, and Securities Fraud under New York State General Business Law Article 23-A have been committed by Marshall, or that a particular person participated in the commission of such crimes for the time periods June 1, 1995 through March 18, 2023. The OAG executed the search warrant on or around July 6, 2023 and removed certain records from Marshall's offices. It is the Trustee's understanding that Marshall is being investigated as a target for criminal prosecution by the OAG.

On or about September 28, 2023, the United States Securities and Exchange Commission (the "SEC") issued subpoenas (collectively, the "SEC Subpoenas") to Marshall and Marshall Inc. The Trustee and his professionals as well as professionals for the Official Committee have had numerous discussions with the SEC in connection with the SEC Subpoenas and on October 23, 2023, the Trustee started producing documents to the SEC that were responsive to the SEC Subpoenas.

### P.    Tax Client Records

On October 12, 2023, the Trustee sent a letter to former clients (each a "Tax Client", collectively the "Tax Clients") of Marshall's tax preparation business (the "Marshall Tax Business") informing Tax Clients that: (i) the Trustee and Marshall Bankruptcy Estate were not operating the Tax Business; and (ii) where to submit requests for copies of Tax Clients' records if they needed them ("Tax Records"). On October 19, 2023, an amended letter was sent by the

Trustee to Tax Clients to correct a typographical error in the email address for submissions of requests for Tax Records.

Since sending the letters to Tax Clients, the Trustee received several communications and requests from Tax Clients that indicate a lack of clarity on these issues. As a result, the purpose of the foregoing information is intended to clarify those issues.

1. **Where to Send Requests for Tax Records**. All requests for Tax Records should be submitted by email to [taxman@mbmarshall.com](mailto:taxman@mbmarshall.com). Please do not contact the Trustee or any individual directly. It is important that all inquiries be sent to the designated email address so that the Trustee can respond expeditiously and maintain a clear record of such requests and the response.

2. **What the Trustee will Provide if Requested**. The Trustee will provide Tax Clients with copies of previously prepared tax returns. The Trustee will not provide other documents or records to Tax Clients. The Trustee will also not provide original tax returns. If Tax Clients already have copies of their previously filed tax returns, they should not make a request for Tax Records as they already have everything that the Trustee is able to provide.

3. **The Trustee is NOT Destroying Tax Records Except in Accordance with Law and Approval by the Bankruptcy Court**. The Trustee has received several requests for Tax Records from Tax Clients who have some of the following misconceptions: (i) that the Trustee is destroying all Tax Records and that if requests are not made now, no Tax Records will be maintained by or available from the Marshall Bankruptcy Estate, and/or (ii) that the Trustee can provide original documents and records to Tax Clients and then afterwards maintain no Tax Records for those Tax Clients. Neither of those things is true. The Trustee intends to maintain Tax Records for at least approximately four (4) years and, subject to Bankruptcy Court approval, will systematically destroy Tax Records that are older until no Tax Records are maintained by in or around 2028 (subject to the requirements of subsection "c" below). The reason for this is as follows:

   a. **IRS Rules**. IRS Rules require tax preparers to maintain detailed client lists or copies of returns prepared for three years after the close of the return period. *See* 26 U.S.C. §§ 6060(c), 6107(b), 6695(d), and 7701(a)(36), Regs. Sec. 1.6695-2(b)(4)(ii), and IRS Publication 4687;

   b. **NYS Rules**. NYS Rules require tax preparers to maintain returns for the later of three years after the due date of the return, or three years after the return was presented to the taxpayer for signature. *See* NY Consol. Law, TAX § 658(g), NYS DTF Publication 58 (1/15); and

   c. **Legal Requirements Under Document Hold Demands**. The Trustee has received subpoenas and/or document hold demands from the OAG and the SEC, who are conducting investigations of Marshall. Out of an abundance of

caution, the Trustee is maintaining all Tax Records until the legal requirements under those holds and subpoenas are lifted.[3]

4. **Any Requests for the Destruction of Documents Must be Submitted to the Bankruptcy Court on Proper Notice**.  If after reading this notice, a Tax Client still intends to seek the Trustee's turnover and destruction of all Tax Records related to the Tax Client, the Tax Client must seek such directive from the Bankruptcy Court by proper application.  Such request must be made on proper notice to each of the relevant taxing authorities, the OAG, the SEC, and any other individual or entity entitled to such notice under the Bankruptcy Code and the Bankruptcy Rules.

The Plan Administrator will keep and make available the required records of Tax Clients for at least three (3) years in accordance with the laws of the United States and State of New York.

## IV.    SUMMARY OF THE PLAN OF LIQUIDATION

### A.    General Plan Objectives

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization but can also be used by individuals.  Asset sales, stock sales, and other liquidation efforts, however, can also be conducted during a chapter 11 case or pursuant to a chapter 11 plan.  Under chapter 11, the individual or company endeavors to restructure its finances such that it maximizes recovery to its creditors.

Formulation of a chapter 11 plan is the primary purpose of a chapter 11 case.  A chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors with respect to their claims against one or more debtors.  According to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited by the proponent of a plan only after a written disclosure statement has been provided to each creditor or equity holder who is entitled to vote on the plan.

The Plan is a plan of liquidation.  In general, a chapter 11 plan of liquidation (i) divides claims into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the Plan.  Under the Bankruptcy Code, "claims" are classified rather than "creditors" because such entities may hold claims in more than one class.

### B.    Provisions Governing Order and Method for Distributions Under the Plan

The Plan divides Claims against the Debtors and Interests into five (5) "Classes" according to the underlying basis and subsequent treatment for each.  Claims within the same Class are treated identically and each Class in the Plan is treated differently.

---

[3] When destroying Tax Records, the Trustee (or successor to the Trustee) will ensure that such Tax Records are shredded, such that no personally identifiable information contained in the documents is revealed to any third party.

Administrative Expense Claims, the Priority Tax Claims and Professional Fee Claims, are not classified but are treated in the manner set forth in Article 3 of the Plan and summarized below.

### C.    Classes of Claims

The following classes of Claims are designated pursuant to and in accordance with section 1123(a)(1) of the Bankruptcy Code, which Classes shall be mutually exclusive:

| Class | Claim | Treatment | Status | Voting Rights | Estimated Distribution |
|-------|-------|-----------|--------|---------------|------------------------|
| Class 1 | Secured Claims | Plan § 4.1 | Unimpaired | Presumed to Accept | See treatment of Class 1 |
| Class 2 | Priority Non-Tax Claims | Plan § 4.2 | Unimpaired | Presumed to Accept | 100% |
| Class 3 | Marshall Inc. Claims | Plan § 4.3 | Unimpaired | Presumed to Accept | 100% |
| Class 4 | Marshall General Unsecured Claims | Plan § 4.4 | Impaired | Entitled to Vote | Between 8% and 10%[4] |
| Class 5 | Marshall Inc. Intercompany Interests | Plan § 4.5 | Unimpaired | Presumed to Accept | See treatment of Class 5 |

1.    *Administrative Expense Claims*

Administrative Expense Claims are not classified consistent with section 1123(a)(1) of the Bankruptcy Code. All Allowed Administrative Expense Claims, other than Professional Fee Claims, shall be paid by the Plan Administrator from the Marshall Post-Confirmation Estate Fund or Marshall Inc. Post-Confirmation Estate Fund, as applicable, in full, in Cash, in such amounts as are incurred in the ordinary course of the liquidation of the Debtors, or in such amounts as may be Allowed by the Bankruptcy Court (a) as soon as practicable following the later of the Effective Date or the date upon which the Court enters a Final Order allowing any such Administrative Expense Claim, or (b) upon such other terms as may exist in accordance with the ordinary course of the Debtors' liquidation, or (c) as may be agreed upon between the holder of any such Administrative Expense Claim and the Plan Administrator. In the event there exists any Disputed Administrative Expense Claims on the Effective Date, the Plan Administrator shall at all times hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Administrative Expense Claims. Administrative Expense Claims are not Impaired by the Plan.

---

[4]  This estimated distribution presumes that: (i) no recovery is made on Marshall's life insurance policies with combined death benefits of $18 million; and (ii) nothing is realized on the Bank Litigation Claims.  If, Marshall dies prior to expiration of one or more of his life insurance policies and/or the Bank Litigation Claims are determined to be viable and result in a recovery, this estimated distribution could be enhanced significantly.

As of the filing of this Disclosure Statement, no parties have filed or otherwise asserted Administrative Expense Claims. In addition, the Plan Proponents are not aware of any material unpaid Administrative Expense Claims.[5] It is also important to note that no bar date for Administrative Expense Claims has yet been established in these Chapter 11 Cases. Moreover, though the Plan Proponents believe they have timely paid the necessary and beneficial costs of administering these Chapter 11 Cases, it is possible that Administrative Expense Claims may be asserted in the future. Pursuant to Section 5.10 of the Plan, the bar date for Administrative Expense Claims will be thirty (30) days after mailing of notice that the Effective Date (as defined in the Plan) has occurred.

## 2. *Priority Tax Claims*

Priority Tax Claims are not classified consistent with section 1123(a)(1) of the Bankruptcy Code. On the Effective Date, or as soon thereafter as is reasonably practical, in full and final satisfaction of such Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall receive (a) an amount in Cash equal to the Allowed amount of such Priority Tax Claim to be paid from the Marshall Post-Confirmation Estate Fund or Marshall Inc. Post-Confirmation Estate Fund, as applicable, or (b) such other treatment as to which the Plan Administrator and the holder of such Allowed Priority Tax Claim shall have agreed upon in writing. In the event any Disputed Priority Tax Claims exist on the Effective Date, the Plan Administrator shall hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Priority Tax Claims until such dispute is resolved consensually or by order of the Bankruptcy Court. Priority Tax Claims are not Impaired by the Plan.

For the avoidance of doubt, the treatment of Priority Tax Claims that are secured by tax liens or warrants shall be treated consistent with section 1129(a)(9)(D) of the Bankruptcy Code.

As of the filing of this Disclosure Statement, the Department of Treasury - Internal Revenue Service (the "IRS") filed a Priority Tax Claim against Mashall in the initial amount of approximately $35,000, which was subsequently amended by the IRS to zero.

## 3. *Professional Fee Claims*

Professional Fee Claims are not classified consistent with section 1123(a)(1) of the Bankruptcy Code. The Plan Administrator shall pay all Professional Fee Claims from the Marshall Post-Confirmation Estate Fund or Marshall Inc. Post-Confirmation Estate Fund, as applicable, in the amount Allowed by the Bankruptcy Court as soon as practicable after entry of a Final Order awarding such compensation and reimbursement of expenses pursuant to proper application in accordance with Section 5.11 of the Plan. In the event any Disputed Professional Fee Claims exist on the Effective Date, the Plan Administrator shall hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Professional Fee Claims until such dispute is resolved consensually or by order of the Bankruptcy Court. Professional Fee Claims are not Impaired by the Plan.

---

[5] The Marshall Bankruptcy Estate will be liable to the taxing authorities for any tax liability that results as a result of the sale of the Properties and receipt of the Assets of the Marshall Inc. Bankruptcy Estate.

The outstanding and unpaid Professional Fee Claims as of January 31, 2024 are set forth in the below chart.  Additional Professional Fee Claims will accrue until the Effective Date of the Plan.

*Marshall Inc.:*

| Firm | Accrued and Unpaid Fees | Accrued and Unpaid Expenses | Total Accrued and Unpaid Fees and Expenses |
|---|---|---|---|
| Klestadt Winters Jureller Southard & Stevens, LLP<br><br>*Counsel to Marshall Inc.* | $22,105.50 | $1,856.66 | $23,962.16 |

*Marshall*:[6]

| Firm | Accrued and Unpaid Fees | Accrued and Unpaid Expenses | Total Accrued and Unpaid Fees and Expenses |
|---|---|---|---|
| Fred Stevens, as Chapter 11 Trustee of the Estate of M. Burton Marshall a/k/a Burt Marshall a/k/a Miles Burton Marshall | $232,432.50 | $4,835.98 | $237,268.48[7] |
| Klestadt Winters Jureller Southard & Stevens, LLP<br><br>*Counsel to the Trustee* | $215,794.50 | $1,772.84 | $217,567.34 |
| RK Consultants, LLC<br><br>*Financial Advisor to the Trustee* | $425,479.75 | $17,177.29 | $442,657.04 |

---

[6] Not included in this chart is Keen-Summit, the Trustee's real estate broker, and FNT, the Trustee's title report preparer.  Keen-Summit's compensation of 3.5% of the gross proceeds realized from the sale of the Properties is based upon a percentage of the proceeds of any final transaction consummated in connection with the Properties and is due simultaneously with the closing or other consummation of the Properties.  In addition, should the successful buyer of the Properties be represented by a broker who has registered with Keen, then such broker shall be entitled to a buyer's broker fee of 2%.  FNT's compensation and reimbursement of expenses is also to be paid at the closing of the Properties.  FNT is to be paid between $500 to $750 per title report, plus reimbursement of expenses which primarily include photocopy costs.  Keen-Summit and FNT's compensation and reimbursement remain subject to the filing of a final fee application by the parties.

[7] This number represents the Trustee's time value, which is subject to, among other things, the statutory commission cap under section 326 of the Bankruptcy Code.

| Firm | Accrued and Unpaid Fees | Accrued and Unpaid Expenses | Total Accrued and Unpaid Fees and Expenses |
|---|---|---|---|
| Hancock Estabrook, LLP<br><br>*Special Real Estate Transactional Counsel to the Trustee* | $5,838.00 | $0.00 | $5,838.00 |
| Stretto, Inc.<br><br>*Administrative Advisor to the Trustee* | $0.00 | $0.00 | $0.00 |
| Bond, Schoeneck & King, PLLC<br><br>*Counsel to the Official Committee* | $566,655.00 | $7,035.54 | $573,690.54 |
| HKA Global, LLC<br><br>*Financial Advisor to the Official Committee* | $1,438,380.90 | $63,030.15 | $1,501,411.05 |
| Barclay Damon LLP<br><br>*Counsel to Marshall* | $296,816.50 | $3,477.13 | $300,293.63 |
| Algon Capital, LLC d/b/a Algon Group<br><br>*Financial Advisor to Marshall* | $1,082,753.71 | $69,419.92 | $1,152,173.63 |
| **TOTAL:** | **$4,264,150.85** | **$166,748.85** | **$4,430,899.70** |

4.     *Class 1 (Secured Claims)*

On the Effective Date, or as soon thereafter as is reasonably practical, each holder of an Allowed Secured Claim that has not already been satisfied at or in connection with the closing on the sale of its collateral, shall receive either (i) delivery of collateral securing such Allowed Secured Claim; (ii) the net proceeds, if any, of the sale or other disposition of the Assets on which such Holder has a Lien; or (iii) such other, less favorable treatment as may be agreed to in writing by the holder of such Allowed Secured Claim and the Plan Administrator.  Any Deficiency Claim which may arise on account of the lack of Collateral or otherwise resulting from the aforesaid treatment shall be treated as a Class 3 Marshall Inc. Claim or Class 4 Marshall General Unsecured Claim, as applicable.

Class 1 is unimpaired and Holders of Class 1 Secured Claims are presumed to accept the foregoing treatment and therefore are not entitled to vote on the Plan.

There is one (1) scheduled Class 1 Claim against Marhsall Inc. in the amount of approximately $5,000.  The Plan Proponents believe there will be no amounts treated as Class 3 Marshall Inc. Claims consistent with section 506(a)(1) of the Bankruptcy Code.

As of the Marshall Bar Date, approximately thirty (30) parties have filed or otherwise hold scheduled Class 1 Claims against Marshall in the aggregate amount of approximately $3.7 million. The Plan Proponents estimate that after reconciliation of such claims is complete and either negotiations or objections are concluded, remaining Class 1 Secured Claims against Marshall will total approximately $2.1 million and there will be no amounts treated as Class 4 Marshall General Unsecured Claims consistent with section 506(a)(1) of the Bankruptcy Code.

     5.    *Class 2 (Priority Non-Tax Claims)*

On the Effective Date, or as soon thereafter as is reasonably practical, each holder of an Allowed Priority Non-Tax Claim shall receive (a) an amount in Cash equal to the Allowed amount of such Priority Non-Tax Claim, or (b) such other treatment as to which the Plan Administrator and the holder of such Allowed Priority Non-Tax Claim shall have agreed upon in writing.

Distributions to holders of Allowed Class 2 Claims shall be made by the Plan Administrator from the Marshall Post-Confirmation Estate Fund until all Allowed Class 2 Claims are paid in full.

Class 2 is Unimpaired and Holders of Priority Non-Tax Claims are presumed to accept the foregoing treatment and therefore are not entitled to vote on the Plan.

As of the date of this Disclosure Statement, approximately five (5) parties have filed or otherwise asserted Class 2 Claims in the aggregate amount of approximately $30,000.

As set forth hereinabove, the Schedules filed by Marshall listed no former employees being owed priority claims.

The Plan Proponents estimate that after reconciliation of such claims is complete and either negotiations or objections are concluded, the aggregate amount of Allowed Class 2 Claims will not exceed approximately $31,000.

     6.    *Class 3 (Marshall Inc. Claims)*

Class 3 consists of Claims in the Marshall Inc. Bankruptcy Case that are asserted, filed or scheduled against Marshall Inc.  Each Holder of an Allowed Marshall Inc. Claim shall receive (a) an amount in Cash equal to the Allowed amount of such Claim, or (b) such other treatment as to which the Plan Administrator and the holder of such Allowed Claim shall have agreed upon in writing.

Distributions to holders of Allowed Class 3 Claims shall be made by the Plan Administrator from the Marshall Inc. Post-Confirmation Estate Fund until all Allowed Class 3 Claims are paid in full.

Class 3 is Unimpaired and Holders of Marshall Inc. Claims are presumed to accept the foregoing treatment and therefore are not entitled to vote on the Plan.

As of the Marshall Inc. Bar Date, three (3) parties have filed or otherwise hold scheduled Class 3 Claims in the aggregate amount of approximately $10,000.

### 7.    *Class 4 (Marshall General Unsecured Claims)*

Class 4 consists of General Unsecured Claims in the Marshall Bankruptcy Case that are asserted, filed or scheduled against Marshall.  Each Holder of an Allowed Marshall General Unsecured Claim shall receive their *pro rata* share from the remaining portion of the Marshall Post-Confirmation Estate Fund, after satisfaction in full of senior Claims.  The *pro rata* share of each Holder's Allowed Class 4 Claim shall be determined by a formula, the numerator of which is the then unsatisfied amount of such Holders' Class 4 Allowed Claim and the denominator of which is the aggregate unsatisfied amount of the remaining Allowed Class 4 Claims.

Distributions to holders of Allowed Class 4 Claims shall be made by the Plan Administrator from the Marshall Post-Confirmation Estate Fund until all Allowed Class 4 Claims are paid in full.

Class 4 is Impaired and Holders of General Unsecured Claims are therefore entitled to vote on the Plan.

Holders of Allowed Class 4 Claims that are holders of notes and investors in the so-called "Eight Percent Fund" may hold Bank Litigation Claims.  Those that choose to timely assign their Bank Litigation Claim to the Plan Administrator for prosecution shall receive, after payment to Bank Litigation Counsel of its fees and expenses, their *pro rata* share of the Bank Litigation Fund.[8] The *pro rata* share of each Holder's Bank Litigation Claim shall be determined by a formula, the numerator of which is the then unsatisfied amount of such Holders' Bank Litigation Claim and the denominator of which is the aggregate unsatisfied amount of the remaining Allowed Litigation Claims.  Holders of Allowed Class 4 Claims that choose not to assign their Bank Litigation Claim to the Plan Administrator shall be permitted to pursue such claim individually but shall have no right to participate in the Bank Litigation Fund, if any.

As of the filing of this Disclosure Statement, approximately 750 parties have filed claims

---

[8] All Assignments with respect to any Bank Litigation Claims by Holders of Class 4 Claims (General Unsecured Claims against Marshall) must be completed in full, signed, and received by the Trustee if such Creditor wants to participate in any Bank Litigation Fund.  Completed and signed Assignments of Bank Litigation Claims should be returned by first class mail to the Trustee by no later than 5:00 p.m. (EST) on May 31, 2024.

*By First Class Mail or Overnight/Hand Delivery:*

Fred Stevens, Chapter 11 Trustee
c/o Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, NY 10036

Additionally, scanned original copies of the completed and signed Assignments of Bank Litigation Claims can be sent to:

Fred Stevens at fstevens@klestadt.com; and
Lauren C. Kiss at lkiss@klestadt.com

in the aggregate amount of approximately $116 million and Marshall listed approximately $90 million in Class 4 Claims (including duplication).  For purposes of this disclosure statement, the Plan Proponents are assuming that Class 4 Claims will total approximately $90 million following the Plan Administrator's reconciliation process.

8.      *Class 5 (Marshall Inc. Intercompany Interests)*

Class 5 consists of the Interests of the Marshall Bankruptcy Estate in 100% of the equity in Marshall Inc. and the Marshall Inc. Bankruptcy Estate.  The Marshall Post-Confirmation Estate Fund shall receive all Assets of the Marshall Inc. Bankruptcy Estate after the passage of the Marshall Inc. Governmental Bar Date and the satisfaction in full of senior Claims, or the establishment of an Administrative Reserve and Disputed Claim Reserve.

Distributions to holders of Allowed Class 5 Interests shall be made by the Plan Administrator from the Marshall Inc. Post-Confirmation Estate Fund until the Marshall Inc. Post-Confirmation Fund is fully administered, and then shall be, at the option of the Plan Administrator, reinstated, set off, settled, distributed, contributed, cancelled and released.

Holders of Class 5 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f).  Holders of Class 5 Interests are not entitled to vote to accept or reject the Plan.

## V.     MEANS OF IMPLEMENTING THE PLAN

### A.      No Substantive Consolidation

The Plan is being proposed as a joint plan of liquidation of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of liquidation for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes set forth in the Plan.

### B.      Plan Funding

The Plan shall be funded by a combination of the proceeds of sale of the Debtors' Assets, and proceeds from liquidation of remaining Assets, including the sale of the Properties, and as set forth herein.  As a condition to effectiveness of this Plan, the Trustee must close on the Sale of substantially all of the Properties.  The Sale of the Properties is intended to be exempt from otherwise applicable transfer taxes in accordance with section 1146(a) of the Bankruptcy Code.

The Plan Administrator shall segregate the Administrative Reserve based upon the Wind-Down Budget.  With the Administrative Reserve established, the Plan Administrator shall utilize the Marshall Post-Confirmation Estate Fund for purposes of making distributions to holders of Allowed Claims in Classes 1, 2 and 4 after reserving for Disputed Claims.  The Plan Administrator shall utilize the Marshall Inc. Post-Confirmation Estate Fund for purposes of making distributions to holders of Allowed Claims in Class 3 and Allowed Interests in Class 5.  The Plan Administrator shall utilize the Bank Litigation Fund for purposes of making distributions to holders of Bank Litigation Claims in Class 4.

Upon or as a condition of the Effective Date, the Trustee shall disburse to the Marshall Post-Confirmation Estate Fund or the Marshall Inc. Post-Confirmation Estate Fund all Assets of the respective Debtors' Bankruptcy Estates. Even if the Plan Administrator utilizes the same bank accounts as the Trustee, all Cash held in the Trustee's accounts on the Effective Date shall be deemed to have been disbursed to the Marshall Post-Confirmation Estate Fund or the Marshall Inc. Post-Confirmation Estate Fund as the case may be.

### C.   <u>Appointment of Plan Administrator</u>

(a)   <u>Appointment of Plan Administrator</u>. The Confirmation Order shall provide for the appointment of the Plan Administrator. The Plan Administrator shall be deemed the Estates' exclusive representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified under sections 704 and 1106 of the Bankruptcy Code.

(b)   <u>Bond</u>. The Plan Administrator shall serve without a bond. The Oversight Committee, at its option, may require the Plan Administrator to obtain a bond, provided that there is sufficient Cash available in the Estates to purchase a bond.

(c)   <u>Governance</u>. The Plan Administrator shall be governed by the Plan and the Plan Administrator Agreement.

(d)   <u>Succession Matters</u>. In the event the Plan Administrator dies, is terminated, or resigns for any reason, the Oversight Committee shall designate a successor. If the Oversight Committee is unable to designate such a successor, the Bankruptcy Court may appoint a successor Plan Administrator from any candidate proposed by a party in interest. Such successor Plan Administrator shall be deemed to succeed the Plan Administrator in all respects, without need for further order of the Bankruptcy Court. In the event of resignation or removal of the Plan Administrator, the departing Plan Administrator shall promptly (a) execute and deliver such documents, instruments and other writings as reasonably requested by the successor Plan Administrator or as ordered by the Bankruptcy Court; (b) turn over to the successor Plan Administrator all property of the Estates in his or her possession, custody and control, including, but not limited to all funds held in bank accounts, and all files, books and records and other documents and information related to the Debtors; and (c) otherwise assist and cooperate in affecting the assumption of his or her obligations and functions by the successor Plan Administrator. The successor Plan Administrator may, in his or her discretion, retain such professionals as he or she deems necessary, including the Professionals of the departing Plan Administrator. If the Plan Administrator is replaced, the Professionals retained by the Plan Administrator shall be entitled to payment of their reasonable, undisputed fees and expenses from the Estates through the date of the Plan Administrator's replacement.

(e)   <u>Funding of Plan Administrator's Activities</u>. The Plan Proponents, the Plan Administrator, and the Official Committee shall agree to a reasonable wind-down budget (the "<u>Wind-Down Budget</u>") on or before the Effective Date. The duties and obligations of the Plan Administrator hereunder are subject to the Wind-Down Budget.

(f)     <u>Indemnification</u>. The Plan Administrator and his or her designees, employees or professionals or any duly designated agent or representative of the Plan Administrator shall not be liable for any act or omission taken or omitted to be taken in their respective capacities other than for acts or omissions resulting from willful misconduct, gross negligence, or fraud as determined by Final Order of the Bankruptcy Court.  The Plan Administrator may, in connection with the performance of his or her functions, and in his or her sole and absolute discretion, consult with attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in good faith reliance on the advice or opinions rendered by such attorneys, accountants, financial advisors and agents, or any Final Order of the Bankruptcy Court.  Notwithstanding such authority, the Plan Administrator shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and his or her determination not to do so shall not result in the imposition of liability, unless such determination is based on willful misconduct, gross negligence or fraud as determined by Final Order of the Bankruptcy Court.  The Plan Proponents shall indemnify and hold harmless the Plan Administrator and his or her designees and Professionals, and all duly designated agents and representatives (in their capacity as such) from and against all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of this Plan; <u>provided</u> <u>however</u>, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

## D.     <u>Powers and Duties of Plan Administrator</u>

(a)     <u>Powers and Duties</u>. On the Effective Date, the Plan Administrator shall succeed to all of the rights of the Plan Proponents and the Estates as otherwise provided herein, with all powers necessary to protect, conserve, and liquidate all Assets, including, without limitation, control over (including the right to waive) all attorney-client privileges, work-product privileges, accountant-client privileges and any other evidentiary privileges relating to the Assets that, prior to the Effective Date, belonged to the Plan Proponents pursuant to applicable law.  The powers and duties of the Plan Administrator shall include, without further order of the Court, except where expressly stated otherwise, the rights:

i.     to open and close bank accounts for the Debtors and their Estates as the sole signatory, invest Cash in accordance with section 345 of the Bankruptcy Code, and withdraw and make distributions of Cash to Holders of Allowed Claims and pay taxes and other obligations in connection with the wind-down of the Estates in accordance with the Plan;

ii.     to engage attorneys, consultants, agents, employees and all professional persons, to assist the Plan Administrator with respect to the Plan Administrator's responsibilities, including professional persons that may have represented either the Trustee, Debtors or the Official Committee prior to confirmation of the Plan;

iii.     to execute and deliver all documents, and take all actions, necessary to consummate the Plan and wind-down the Estates;

iv.    to act on behalf of the Debtors and their Estates in all adversary proceedings and contested matters (including, without limitation, any Avoidance Actions and Causes of Action), then pending or that can be commenced in the Court and in all actions and proceedings pending or commenced elsewhere, and to settle, retain, enforce, or dispute any adversary proceedings or contested matters (including, without limitation, any Causes of Action) and otherwise pursue actions involving Assets that could arise or be asserted at any time under the Bankruptcy Code or otherwise, unless otherwise specifically waived or relinquished in the Plan;

v.    to dispose of, and deliver title to or otherwise realize the value of, all the remaining Assets;

vi.    to negotiate and accept assignments of claims, demands, and causes of action for the benefit of the Holders of Bank Litigation Claims, upon determining in the Plan Administrator's discretion that such claims, demands, and causes of action assert colorable and meritorious claims, and to recognize the claims of the assignor for purposes of participating in and receiving a distribution as a Holder of a Bank Litigation Claim in Class 4;

vii.    to coordinate the storage, maintenance and disposal of the Records as he or she determines in his or her reasonable discretion in compliance with any applicable state and federal rules;

viii.    to dissolve Marshall Inc. in accordance with Sections 4.5 and 5.13 of the Plan;

ix.    to oversee compliance with the Debtors' accounting, finance and reporting obligations;

x.    to prepare United States Trustee quarterly reports and financial statements, and such other reports and financial statements as may be necessary or helpful to the Plan Administrator to carry out his or her duties, and to manage the calculation and disbursement of U.S. Trustee fees;

xi.    to oversee the filing of final tax returns, audits and other corporate dissolution documents if required;

xii.    upon consultation with the Oversight Committee, to object to Claims against the Debtors;

xiii.    upon consultation with the Oversight Committee, to compromise and settle Claims by and against the Debtors;

xiv.    to perform any additional corporate actions as necessary to carry out the wind-down, liquidation and ultimate dissolution of the Debtors;

xv.    to implement and/or enforce all provisions of the Plan;

xvi. to implement and/or enforce all agreements entered into prior to the Effective Date;

xvii. abandon any Assets without the need for approval of the Court, and upon such abandonment, such Assets shall cease to be Assets of the Estates; and

xviii. to use such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or Order of the Bankruptcy Court or as may be necessary and proper to carry out the provisions of the Plan.

The duties and obligations of the Plan Administrator under the Plan are subject to the extent of available funds in the Administrative Reserve and the Wind-Down Budget.

## E.  Establishment of Oversight Committee

(a) Appointment of Oversight Committee. On or after the Effective Date, the Oversight Committee shall be appointed and shall consist of those members willing to serve, as selected by the Official Committee. The Oversight Committee shall not exceed seven (7) members. The Oversight Committee shall have the authority specified in the Plan and Plan Administrator Agreement. Any actions taken by the Oversight Committee shall be by majority vote. The Plan Administrator shall consult with and provide information to the Oversight Committee with respect to any material action to be taken or not to be taken by the Plan Administrator as set forth in the Plan and the Plan Administrator Agreement.

(b) Reimbursement of Costs and Expenses. Except for the reimbursement of reasonable, actual costs and expenses incurred in connection with their duties as members of the Oversight Committee, the members of the Oversight Committee shall serve without compensation. Reasonable expenses incurred by members of the Oversight Committee may be paid by the Plan Administrator upon presentation of proper documentation without the need for Court approval.

(c) Liability of Members of the Oversight Committee. Subject to any applicable law, the members of the Oversight Committee shall not be liable for any act done or omitted by any member in such capacity, while acting in good faith and in the exercise of business judgment. Members of the Oversight Committee shall not be liable in any event except for gross negligence or willful misconduct in the performance of their duties hereunder.

(d) Indemnification. Except as otherwise set forth in this Plan and to the extent permitted by applicable law, the members of the Oversight Committee shall not be liable for any act or omission taken or omitted to be taken in their respective capacities other than for acts or omissions resulting from willful misconduct, gross negligence, or fraud as determined by Final Order of the Bankruptcy Court. The Estates shall indemnify and hold harmless the members of the Oversight Committee from and against all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties; provided however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

### F.    Establishment of Reserves and Funds

(a) <u>Administrative Reserve</u>. On or prior to the Effective Date, the Administrative Reserve shall be established by the Trustee.  If the Plan Administrator determines that additional funding of the Administrative Reserve is required, from time to time, following the Effective Date, such funding shall be made from available Cash, if any.  Available Cash may be sourced from the Disputed Claims Reserve, the Marshall Post-Confirmation Estate Fund, or any other source available to the Plan Administrator.  Except as otherwise provided for herein, the Administrative Reserve shall be used to pay the Post-Confirmation Expenses, including, without limitation, costs and expenses of professionals or other advisors retained by the Plan Administrator.

(b) <u>Disputed Claim Reserves</u>. As soon as practicable following the Effective Date, the Disputed Claim Reserves shall be established by the Plan Administrator if and as required; provided, however, that the Plan Administrator shall have no obligation to fund the Disputed Claim Reserves until, at the latest, immediately prior to the making of a Distribution to holders of Allowed Claims.  The Disputed Claim Reserves shall be funded from available Cash in an amount equal to the amount holders of Disputed Claims would have otherwise been entitled but for the dispute.  The assets in the Disputed Claim Reserves shall be held separately from other assets held by the Plan Administrator subject to an allocable share of all expenses and obligations, on account of Disputed Claims.  Funds shall be removed from the Disputed Claims Reserves as the Disputed Claims are resolved, which funds shall be distributed as provided in Section 9.20 of the Plan. Notwithstanding any other provision of the Plan to the contrary, subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, the Plan Administrator may treat any assets allocable to, or retained on account of, the Disputed Claims Reserves as held by one or more discrete entities holding Disputed Claims for federal, and applicable state, local or other, income tax purposes, and may determine that such entity or entities shall constitute "disputed ownership funds" under, and may make the election permitted by, Treasury Regulation 1.468B-9, or any successor provision thereto.

### G.    Preservation of Causes of Action

Except as otherwise provided in this Plan or in any contract, instrument, release or agreement entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, all Claims or Causes of Action that the Debtors, the Trustee, the Official Committee, or the Estates may have against any person or entity are preserved, including without limitation any and all Causes of Action under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code.

### H.    General Disposition of Assets

Pursuant to section 1123(a)(5) of the Bankruptcy Code and subject to the terms of this Plan, as soon as is reasonably practicable following the Effective Date, the Plan Administrator shall sell or otherwise dispose of, and liquidate to or otherwise convert to Cash, any non-Cash Assets in such manner as the Plan Administrator shall determine is in the best interests of the Estates and holders of Allowed Claims.  The proposed sale or other disposition of any remaining Assets by the Plan Administrator, regardless of the value of those Assets, shall be done in the manner

consistent with the procedures established by the Bankruptcy Court's order, dated November 14, 2023 at Docket No. 284, except that the notice required to be given to the Official Committee shall instead be given by the Plan Administrator to the members of the Oversight Committee by email. No other or further order of the Bankruptcy Court shall be required for the Plan Administrator to effectuate a sale of any Assets, free and clear of any liens, claims, or encumbrances, provided that no timely objection is filed to any proposed sale or other disposition of Assets.

**I.**      **Exemption from Certain Transfer Taxes**

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale or transfer of any of the Assets, including, but not limited to, the Sale of the Properties, or any sale or transfer of, from or by any Debtor, pursuant to, in contemplation of, or in connection with the Plan or pursuant to the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**J.**      **Administrative Expense Claims Bar Date**

With the exception of Professional Fee Claims, persons asserting an Administrative Expense Claim must file a request for payment of such Administrative Expense Claim on or before 5:00 p.m. prevailing Eastern Time on the date that is 30 days after notice of the Effective Date has been mailed (the "Administrative Expense Claims Bar Date").  No payment or Distributions will be made on account of any Administrative Expense Claim until such Claim becomes an Allowed Claim. Any person asserting an Administrative Expense Claim that fails to file and serve an Administrative Expense Claim on or before the Administrative Expense Claims Bar Date shall be forever barred from asserting any such right to payment against the Debtors, their Estates, the Trustee, the Official Committee, the Plan Administrator, or the Oversight Committee.

**K.**      **Deadline for Filing Applications For Payment of Professional Fee Claims**

All parties seeking payment of Professional Fee Claims arising prior to the Effective Date must file with the Bankruptcy Court a final application and/or an application for payment of reasonable fees and expenses on or before the date that is 30 days after notice of the Effective Date has been mailed (the "Fee Application Deadline").  Any Professional failing to file and serve such application on or before the Fee Application Deadline shall be forever barred from asserting any such right to payment against the Debtors, their Estates, the Trustee, the Official Committee, the Plan Administrator, or the Oversight Committee.

**L.      Execution of Documents to Effectuate Plan**

From and after the Effective Date, the Plan Administrator shall have the exclusive power and authority to execute any instrument or document to effectuate the provisions of the Plan.  Entry of the Confirmation Order shall authorize the Plan Administrator to take, or cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan.  All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action.

**M.      Dissolution of Marshall Inc.**

Following the Effective Date, the Debtors, through the activities of the Plan Administrator, shall continue in existence for the purposes of, among other things, completing the liquidation of Assets, winding up affairs and filing appropriate tax returns.  Upon the entry of an order closing the cases, Marshall Inc. shall be deemed dissolved for all purposes.  No other actions or filings or payments shall be required in furtherance of such dissolution.

**N.      Post-Confirmation Reports and Fees**

Following the Effective Date and until the Chapter 11 Cases are closed, not less than once every ninety (90) days, the Plan Administrator shall file all post-Effective Date reports required during such periods and shall pay from the Administrative Reserve all post-Effective Date fees charged or assessed against the Estates under 28 U.S.C. §1930 during such periods together with applicable interest pursuant to 31 U.S.C. § 3717.

**O.      Official Committee**

On the Effective Date, the Official Committee shall be deemed to be dissolved and the members of the Official Committee shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Cases, provided, however, that the Official Committee shall remain in existence for the purpose of reviewing and approving fee applications of Professionals.

**P.      Insurance Preservation**

Nothing in this Plan shall diminish or impair the enforceability of any Insurance Policies that may cover Claims against the Debtors or any other Person.

**Q.      Claims Administration Responsibility**

1.      Reservation of Rights.  Unless a Claim is specifically Allowed prior to or after the Effective Date, prior to the Effective Date, the Plan Proponents, and after the Effective Date, the Plan Administrator, reserve any and all objections to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, secured or unsecured, including without limitation any and all objections to the validity or amount of any and all alleged Administrative Expense Claims, Priority Tax Claims, or Priority Non-Tax Claims, liens and

37

security interests, whether under the Bankruptcy Code, other applicable law or contract. The failure to object to any Claim prior to the Effective Date shall be without prejudice to the Plan Administrator's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the holder of the Claim.

2.    Objections to Claims. Prior to the Effective Date, the Plan Proponents shall be responsible for pursuing any objection to the allowance of any Claim. From and after the Effective Date, the Plan Administrator may dispute, object to, compromise or otherwise resolve all Claims, in accordance with Sections 5.3 and 5.4 of the Plan. Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to Claims shall be filed and served no later than one hundred eighty (180) days after the Effective Date, provided that the Plan Administrator may request (and the Bankruptcy Court may grant) one or more extensions of time by filing a motion with the Bankruptcy Court.

3.    Filing Objections. An objection to a Claim shall be deemed properly served on the claimant if the Plan Proponents or Plan Administrator, as applicable, effect service of any such objection in accordance with Rule 3007 of the Bankruptcy Rules by mailing or otherwise delivering the objection and a notice of hearing thereon to the claimant at the address set forth on such claimant's Proof of Claim at least thirty (30) days prior to the hearing thereon. The Plan Proponents or the Plan Administrator may also effectuate service of an objection to a claim: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for a claimant is unknown, by first class mail, postage prepaid, to the signatory on the Proof of Claim or interest or other representative identified on the Proof of Claim or interest or any attachment thereto or; (iii) by first class mail, postage prepaid, on counsel that has appeared on the behalf of the claimant in the Chapter 11 Cases.

4.    Determination of Claims. Except as otherwise agreed by the Plan Proponents or Plan Administrator, any Claim as to which a Proof of Claim or motion or request for payment was timely filed in the Chapter 11 Cases may be determined and liquidated after the Effective Date pursuant to (i) an order of the Bankruptcy Court (which order has not been stayed, reversed or amended and as to which determination or any revision, modification or amendment thereof, and the time to appeal or seek review or rehearing thereof, has expired, and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending), or (ii) applicable non-bankruptcy law. Any Claim determined to be an Allowed Claim after the Effective Date pursuant to this section shall be treated as an Allowed Claim in accordance with the Plan.

R.    **Treatment of Claims without Further Order of the Court**.

1.    Certain Scheduled Claims. As of the Effective Date, any Scheduled Claim designated as disputed, contingent or unliquidated in amount, and for which a Proof of Claim has not been filed by the Creditor, shall be deemed Disallowed and expunged. All Scheduled Claims that correspond to a Proof of Claim filed by a particular Creditor shall be deemed to have been superseded by such later filed Proof of Claim and the Scheduled Claims, regardless of priority, shall be expunged from the claims register; provided however, that such Proofs of Claim shall be subject to objection in accordance with Section 9.15 of the Plan.

2.      Late Filed Claims.  Any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation of this Plan, such later Claim has been deemed timely filed by a Final Order.

### S.      Timing of Distributions on Disputed Claims Subsequently Allowed

In the event that a Disputed Claim is Allowed, in whole or in part, after the Effective Date, a Distribution shall be made on account of such Allowed Claim on the next Distribution Date that is at least fifteen (15) business days after such Claim is Allowed.

### T.      Payment or Distribution of Disputed Claim

Notwithstanding any provision to the contrary herein, no payments or other Distributions shall be made on account of any Disputed Claim, or any portion thereof, unless and until such Claim or some portion thereof is allowed by Final Order of the Bankruptcy Court.  For the avoidance of doubt, no portion of any Disputed Claim is entitled to a Distribution.  Holders of Disputed Claims shall be bound, obligated and governed in all respects by this Plan.

### U.      Disputed Claims

1.      Except to the extent the Court determines that a lesser amount is adequate, the Plan Administrator shall, on each Distribution Date, deposit in a Disputed Claims Reserve, Cash equal to the Distributions that would have been made to holders of Disputed Claims if such Claims were Allowed Claims in their full amounts or such lower amount as to which the holder of such Claim has agreed in writing or, in the case where any such Claim is unliquidated and/or contingent, the greater of (i) $1, and (ii) such other amount as is reserved by order of the Bankruptcy Court made upon motion of the Plan Proponents, Plan Administrator, or the holder of such Claim.

2.      For purposes of effectuating the provisions of Section 9.17 of the Plan and the Distributions to holders of Allowed Claims, the Court, upon the request of any holder of a Claim, on the one hand, or the Plan Administrator, on the other hand, may estimate the amount of Disputed Claims pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts estimated shall be deemed to be the aggregate amounts of the Disputed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of Distribution under this Plan and for purposes of the Disputed Claims Reserve.

3.      When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the holder of such Allowed Claim, in accordance with the provisions of this Plan (but in no event later than the next succeeding Distribution Date), Cash in the amount of all Distributions to which such holder would have been entitled if such holder's Claim were Allowed on the Effective Date, to the extent of available Cash to make such Distribution.

4.      In no event shall any holder of any Disputed Claim be entitled to receive (under this Plan or otherwise) any Cash payment which is greater than the amount reserved, if any, for

such Disputed Claim pursuant to Section 9.17 of the Plan. In no event shall the Plan Administrator have any responsibility or liability for any loss to or of any amount reserved under this Plan unless such loss is the result of that party's fraud, willful misconduct, or gross negligence. In no event may any Creditor whose Disputed Claim is subsequently allowed, pursue or recover or from any other Creditor in respect of any funds received as Distributions under the Plan.

5.    To the extent that a Disputed Claim ultimately becomes an Allowed Claim and is entitled to a Distribution in an amount less than the amount reserved for such Disputed Claim, then on the next succeeding Distribution Date, the Plan Administrator shall make, in accordance with the terms of this Plan, a Distribution of the excess amount reserved for such Disputed Claim.

6.    Any Disputed Claims Reserve shall be treated as a disputed ownership fund, within the meaning of Treasury Regulation section 1.468B-9, for all purposes associated with taxation.

### V.    Limitations on Funding of Disputed Claims Reserve

Except as expressly set forth in the Plan, or otherwise agreed to in writing or ordered by the Court, the Plan Administrator shall have no obligation or duty to fund the Disputed Claims Reserve.

### W.    Tax Requirements for Income Generated by Disputed Claims Reserve

The Plan Administrator shall pay, or cause to be paid, out of the funds held in a Disputed Claims Reserve, any tax imposed by any federal, state, or local taxing authority on the income generated by the funds or property held in a Disputed Claims Reserve. The Plan Administrator shall file, or cause to be filed, any tax or information return related to a Disputed Claims Reserve that is required by any federal, state, or local taxing authority.

## VI.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    General Provisions

All executory contracts and unexpired leases of the Debtors shall be deemed rejected as of the Effective Date, unless a particular executory contract or unexpired lease (i) has previously been assumed or rejected pursuant to order of the Bankruptcy Court or applicable provisions of the Bankruptcy Code, or (ii) has expired or otherwise terminated pursuant to its terms.

### B.    Notice of Deemed Rejection/Rejection Bar Date

Any party to an executory contract or unexpired lease that is rejected in accordance with Section 6.1 of the Plan shall file a Proof of Claim for damages from such rejection no later than thirty (30) days after the Effective Date. The failure to timely file a Proof of Claim shall be deemed a waiver of any Claim in connection with the rejection of such contract or lease.

### C.    Compensation and Benefit Programs

To the extent not previously terminated, all employment and severance agreements and policies, and all employee compensation and benefit plans, policies and programs of the Debtors applicable generally to their employees, independent contractors or officers in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans, shall be terminated as of the Effective Date.

## VII.    INJUNCTIONS; EXCULPATIONS

### A.    General Injunctions

**The following provisions shall apply and shall be fully set forth in the Confirmation Order.**

#### 1.    Injunctions Against Interference with Consummation or Implementation of Plan

**All holders of Claims shall be enjoined from commencing or continuing any judicial or administrative proceeding or employing any process against the Debtors, the Trustee, the Estates, the Plan Administrator, the Official Committee (and its members) or the Oversight Committee (and its members) with the intent or effect of interfering with the consummation and implementation of this Plan and the transfers, payments and Distributions to be made hereunder.**

#### 2.    Plan Injunction

**Except as otherwise specifically provided for by this Plan, as of and from the Effective Date, all Persons shall be enjoined from (i) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order; (ii) the creation, perfection or enforcement of any encumbrance of any kind; and/or (iii) the assertion of any right of setoff, counterclaim, exculpation, or subrogation of any kind, in each case against the Debtors, the Trustee, the Estates, the Plan Administrator, the Official Committee (and its members) or the Oversight Committee (and its members) to the fullest extent authorized or provided by the Bankruptcy Code.**

#### 3.    Release of Collateral

**Except as expressly provided otherwise in the Plan, unless a Holder of a Secured Claim receives a return of its Collateral in respect of such Claim under the Plan, each Holder of (A) an Allowed Secured Claim; and (B) an Allowed Claim that is purportedly secured, on the Effective Date shall (x) turn over and release to the Debtors any and all property that secures or purportedly secures such Claim; and (y) execute such documents and instruments as the Debtors require to evidence such claimant's release of such property; and (ii) on the Effective Date, all claims, rights, title and interest in such property shall revert to the Debtors, free and clear of all Claims against the Debtors, including (without limitation) liens,**

41

charges, pledges, encumbrances and/or security interests of any kind. No Distribution hereunder shall be made to or on behalf of any Holder of such Claim unless and until such Holder executes and delivers to the Debtors such release of liens. Any such Holder that fails to execute and deliver such release of liens within 60 days of any demand thereof shall be deemed to have no further Claim and shall not participate in any Distribution hereunder. Notwithstanding the immediately preceding sentence, a Holder of a Disputed Claim shall not be required to execute and deliver such release of liens until the time such Claim is Allowed or Disallowed.

### B.    Exculpation

As of the Confirmation Date, the Plan Proponents and their professionals (including professional firms and individuals within such firms) shall be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  To the fullest extent permitted by section 1125(e) of the Bankruptcy Code, the Plan Proponents and their professionals (including professional firms and individuals within such firms), shall not have or incur any liability to any holder of any Claim or any other Person for any act or omission taken or not taken in good faith in connection with, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any act taken or omitted to be taken during the Chapter 11 Cases, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, including, without limitation, the steps taken to effectuate the transactions described in Article 5 of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions constituting fraud, willful misconduct or gross negligence as determined by a Final Order; and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

### C.    All Distributions Received in Full and Final Satisfaction

Except as otherwise set forth herein, all payments, all Distributions to be made in accordance with the Plan on account of Claims, and all rights conferred under this Plan shall be received in full and final satisfaction of the Estates' obligations for such Claims as against the Debtors, their property and the Estates.

### D.    No Modification

The provisions of Article 8 of the Plan are not intended, and shall not be construed, to modify the res judicata effect of any order entered in the Chapter 11 Cases, including, without limitation, the Confirmation Order and any order finally determining Professional Fee Claims to any Professional.

E.    **Discharge of Claims for Marshall Only**.

Pursuant to section 1141(d) of the Bankruptcy Code, upon completion of Distributions under the Plan, Marshall will be discharged from any debt that arose before the Confirmation Date and any debt of a kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code whether or not a proof of Claim based on such debt is filed or deemed filed under section 501 of the Bankruptcy Code, such Claim is Allowed or the Holder of such Claim has accepted the Plan, except to the extent that Marshall (i) is denied a discharge under section 1141(d)(3) and 727(a) of the Bankruptcy Code, or (ii) is denied the discharge of any particular Claims under section 1141(d)(2) and 523 of the Bankruptcy Code.

Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Confirmation Order will not discharge Marshall Inc. of any debts.

F.    **Extension of Time to Object to Discharge or Dischargeability**

The time for any Person to file an objection to the grant of a discharge to Marshall pursuant to section 727 of the Bankruptcy Code or for any Creditor to file an objection to the dischargeability of any debt pursuant to section 523 of the Bankruptcy Code is extended for cause under Bankruptcy Rules 4004 and 4007 to the date that all Distributions under the Plan are complete and Marshall is entitled to a discharge under Section 8.6 of the Plan.

## VIII.  CONDITIONS PRECEDENT

A.    **Conditions Precedent to Confirmation of the Plan**

The following conditions must be satisfied, or otherwise waived in accordance with Section 7.3, on or before the Confirmation Date:

(a)    The Disclosure Statement Approval Order shall have been entered and shall have become a Final Order; and

(b)    Entry of the Confirmation Order, which shall be in form and substance reasonably satisfactory to the Plan Proponents and the Official Committee, and shall contain provisions that, among other things:

(i)    authorize the implementation of the Plan in accordance with its terms;

(ii)    approve in all respects the other settlements, transactions, and agreements to be effected pursuant to the Plan;

(iii)    find that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud;

(iv)    approve the Plan Administrator Agreement; and

43

(v)    establish the Administrative Expense Claims Bar Date.

**B.    Conditions Precedent to the Effective Date**

The Effective Date shall not occur and no obligations under the Plan shall come into existence, unless each of the following conditions is met or, alternatively, is waived in accordance with Section 7.3 of the Plan, on or before the Effective Date:

(a)    The closing of the sale of substantially all of the Properties shall have occurred;

(b)    The Confirmation Order shall have become a Final Order;

(c)    The Confirmation Order shall have authorized and approved the appointment of the Plan Administrator and the Oversight Committee;

(d)    The Plan Proponents shall have sufficient Cash on hand to pay all Administrative Expense Claims and fund the Administrative Reserve;

(e)    The Wind-Down Budget shall be agreed to by the Plan Proponents, Plan Administrator and the Official Committee; and

(f)    the Trustee shall have disbursed to the Marshall Post-Confirmation Estate Fund or the Marshall Inc. Post-Confirmation Estate Fund all Assets of the respective Debtors' Bankruptcy Estates.  Even if the Plan Administrator utilizes the same bank accounts as the Trustee, all Cash held in the Trustee's accounts on the Effective Date shall be deemed to have been disbursed to the Marshall Post-Confirmation Estate Fund or the Marshall Inc. Post-Confirmation Estate Fund as the case may be.

**C.    Waiver of Conditions Precedent**

Each of the conditions precedent in Sections 7.1 and 7.2 hereof may be waived or modified without further Court approval, in whole or in part, but only with the consent of the Plan Proponents and the Official Committee.

**IX.    PROCEDURES FOR DISTRIBUTIONS UNDER PLAN**

Article 9 of the Plan establishes the procedures and guidelines for Distributions to be made to the terms of the Plan to the holders of Claims, including the timing, procedures and notice provisions related to same.  Distributions shall be made by the Plan Administrator as follows.

### A.    Distributions by Plan Administrator

The Plan Administrator shall make Distributions on account of Allowed Claims in accordance with Article 4 of the Plan.  The Plan Administrator may use the services of a third party to aid in the Distributions required to be made under this Plan, including the Distribution Agent.

### B.    Indefeasibility of Distributions

All Distributions made under the Plan shall be indefeasible.

### C.    Frequency of Distributions

The Plan Administrator shall make an initial distribution on the Effective Date or as soon as practicable thereafter and at such other times as may be determined to be appropriate by the Plan Administrator in consultation with the Oversight Committee.

### D.    Payments in U.S.  Dollars

All Cash payments required under the Plan shall be made in U.S. dollars by checks drawn on domestic bank(s) selected by the Plan Administrator in accordance with the Plan or by wire transfer from a domestic bank.

### E.    Claims In U.S. Dollars

Any Claims asserted in foreign currencies shall be converted to United States Dollars in accordance with the prevailing exchange rates published by the Wall Street Journal on the Confirmation Date.

### F.    Distributions Only on Business Days

Notwithstanding the foregoing provisions, if any Distribution called for under the Plan is due on a day other than a Business Day, then such Distribution shall instead be due the next Business Day.

### G.    Transmittal of Payments and Notices

Except as otherwise provided in the Plan, all Distributions shall be made to the holder of a Claim by regular first-class mail, postage prepaid, in an envelope addressed to such holder at the address listed on its Proof of Claim filed with the Bankruptcy Court or, if no Proof of Claim was filed, (i) at the address listed on the Debtor's Schedules, or (ii) at such address that a holder of a Claim provides to the Plan Administrator after the Effective Date in writing at least fifteen (15) business days prior to a Distribution Date. The Plan Administrator shall be under no obligation to ascertain the mailing address of any holder of a Claim other than as set forth herein. The date of payment or delivery shall be deemed to be the date of mailing.  Payments made in accordance with the provisions of this Section shall be deemed made to the holder regardless of whether such holder actually receives the payment.

### H.    Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 with appropriate filings ("Claim Transfer Document") made on or before the Effective Date (the "Distribution Record Date") shall be treated as the holders of those Claims for all purposes of this Plan, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer(s) may not have expired prior to the Distribution Record Date. The Plan Administrator shall be under no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date. In making a Distribution with respect to any Claim, the Plan Administrator shall be entitled to recognize and deal for all purposes hereunder only with the Person who is listed on the Proof of Claim filed with respect to such Claim, on the Schedules as the holder thereof, and upon such other evidence or record of transfer or assignment filed as of the Distribution Record Date.

### I.    Unclaimed Distributions

Unclaimed Distributions (including Distributions made by checks that fail to be cashed or otherwise negotiated within ninety (90) days after the Distribution Date or which Distributions are returned to the Plan Administrator as undeliverable to the addresses of record as of the Distribution Record Date, shall be canceled (by a stop payment order or otherwise), the Claim(s) relating to such Distribution(s) shall be deemed forfeited and expunged without any further action or order of the Bankruptcy Court. Any such Unclaimed Distributions shall, as soon as is practicable, be redistributed pursuant to the provisions of the Plan.

### J.    No Payments of Fractional Cents or
### Distributions of Less Than One Hundred Dollars

1.    Notwithstanding any provision to the contrary herein, for purposes of administrative convenience, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with a half-penny or less being rounded down and fractions in excess of half of a penny being rounded up.

2.    Notwithstanding any provision to the contrary herein, for purposes of administrative convenience, no Distribution of less than One Hundred Dollars ($100) shall be made pursuant to the Plan. Whenever any Distribution of less than One Hundred Dollars ($100) under the Plan would otherwise be required, such funds will be retained by the Plan Administrator for the account of the recipient until such time that successive Distributions aggregate to One Hundred Dollars ($100), at which time such payment shall be made, and if successive Distributions do not ever reach One Hundred Dollars ($100) in the aggregate, then such Distributions shall revert to the Estates and be redistributed in accordance with the Plan.

### K.    Setoff and Recoupment

Except as otherwise provided in the Plan, the Plan Administrator may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims, defenses or Causes of Action of any nature whatsoever that the Plan Administrator may have, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Plan Administrator of any right of setoff or recoupment against the holder of any Claim.

### L.    Payment of Taxes on Distributions Received Pursuant to the Plan

1.    The Plan Proponents shall provide the Plan Administrator with all available tax identification or social security numbers that they may possess for Creditors (collectively the "Tax Information") and the Plan Administrator may rely upon the same for purposes of Distributions and associated tax reporting and compliance.  Notwithstanding any provision to the contrary herein, as a condition to payment of any Distribution to a Creditor under this Plan, each Creditor shall provide a valid Tax Information if requested by the Plan Administrator for purposes of tax reporting.  All Persons that receive Distributions under the Plan shall be responsible for reporting and paying, as applicable, any taxes on account of their Distributions.

2.    At such time as the Plan Administrator believes that Distributions to a particular Class of Claims is likely, the Plan Administrator shall review the available Tax Information provided by the Debtors and where necessary, request Tax Information in writing from Creditors (the "Tax Information Request").  Any Creditor who fails to respond to Tax Information Request within ninety (90) days from the date posted on the Tax Information Request, shall forfeit all Distributions such Creditor may otherwise be entitled to under this Plan and such forfeited funds will revert to the Debtors to be disbursed in accordance with the terms and priorities established in this Plan.

### M.    Compliance With Tax Withholding and Reporting Requirements

With respect to all Distributions made under the Plan, the Plan Administrator will comply with all withholding and reporting requirements of any federal, state, local or foreign taxing authority.

### N.    Disputed Distribution

If a dispute arises as to the identity of a holder of an Allowed Claim who is to receive a Distribution, the Plan Administrator may, in lieu of making such Distribution to such holder, hold such amount until the dispute is resolved by Final Order of the Bankruptcy Court or by written agreement among the parties to such dispute.

## X.     RETENTION OF JURISDICTION BY BANKRUPTCY COURT

From the Confirmation Date until entry of a final decree closing the Chapter 11 Cases, the Bankruptcy Court shall retain such jurisdiction as is legally permissible over the Chapter 11 Cases for the following purposes:

(a) to hear and determine any and all objections to the allowance of any Claim, or any controversy as to the classification of Claims or any matters which may directly, indirectly or contingently affect the obligations of the Debtors to any Creditors, holders of Claims, or other parties in interest;

(b) to hear and determine any and all applications for compensation and reimbursement of expenses by Professionals;

(c) to hear and determine any and all pending motions for the assumption or rejection of executory contracts and unexpired leases, and to fix any Claims resulting therefrom;

(d) to adjudicate through final judgment such contested matters and adversary proceedings as may be pending or subsequently initiated in the Court including, but not limited to, the Causes of Action;

(e) to enforce and interpret the provisions of this Plan, the Confirmation Order, and the Plan Administrator Agreement;

(f) to hear and determine any matters relating to the appointment and replacement of the Plan Administrator;

(g) to issue any injunction or other relief appropriate to implement the intent of the Plan, and to enter such further orders enforcing any injunctions or other relief issued under the Plan or pursuant to the Confirmation Order;

(h) to modify the Plan pursuant to section 1127 of the Bankruptcy Code and the applicable Bankruptcy Rules;

(i) to correct any defect, cure any omission, or reconcile any inconsistency in this Plan, the Confirmation Order, or the Plan Administrator Agreement, as may be necessary to carry out the purposes and the intent of this Plan;

(j) to interpret and determine such other matters as the Confirmation Order may provide for, or as may be authorized under the Bankruptcy Code;

(k) to enter and implement such orders as may be appropriate in the event the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated; and

(l) to adjudicate any disputes between the members of the Oversight Committee or between the Oversight Committee and the Plan Administrator.

## XI.    CERTAIN TAX CONSEQUENCES OF THE PLAN

### A.    General

THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS LIMITED TO THE SPECIFIC FEDERAL INCOME TAX MATTERS DESCRIBED HEREIN.   IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN OR OTHER FEDERAL INCOME TAX MATTERS DISCUSSED HEREIN AND THIS DISCUSSION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. EACH TAXPAYER IS STRONGLY URGED TO SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM SUCH TAXPAYER'S INDEPENDENT TAX ADVISOR.

THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS SOLELY FOR THE PURPOSE OF COMPLIANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE") TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.   NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS") AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION OR ADVICE IS GIVEN BY THIS DISCLOSURE STATEMENT.

This description does not cover all aspects of federal income taxation that may be relevant to the Debtors or Holders of Claims.  For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and foreign taxpayers, nor is it intended to address all of the possible federal income tax consequences to Holders of Claims against the Debtors. This description also does not discuss the possible state tax or non-U.S. tax consequences that might apply to the Debtors or to Holders of Claims.

### B.    Tax Consequences of Payment of Allowed Claims
###        Pursuant to Plan Generally

The federal income tax consequences of the implementation of the Plan to the Holders of Allowed Claims will depend, among other things, on the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder's Claim is Allowed or Disputed on the Effective Date, and whether the Holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.  All Holders of Claims are

49

urged to consult with their tax advisors concerning the tax consequences applicable under the Plan. Nothing contained herein shall be relied upon as tax advice.

### 1. *Recognition of Gain or Loss*

In general, a Holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the Holder, the length of time the Holder held the Claim and whether the Claim was acquired at a market discount or premium. If the Holder realizes a capital loss, the Holder's deduction of the loss may be subject to limitation. The Holder's tax basis for any property received under the Plan generally will equal the amount realized.

### 2. *Bad Debt or Worthless Security Deduction*

A Holder who receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166 of the Internal Revenue Code. The rules governing the availability, character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 3. *Receipt of Interest*

The Plan does not address the allocation of the aggregate consideration to be distributed to Holders between principal and interest and the Plan Proponents cannot make any representations as to how the IRS will address the allocation of consideration under the Plan. In general, to the extent that any amount of consideration received by a Holder is treated as received in satisfaction of unpaid interest that accrued during such Holder's holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income and not otherwise exempt from U.S. federal income tax). Conversely, a Holder may be allowed a bad debt deduction to the extent any accrued interest was previously included in its gross income but subsequently not paid in full. However, the IRS may take the position that any such loss must be characterized based on the character of the underlying obligation, such that the loss will be a capital loss if the underlying obligation is a capital asset. Again, Holders of Allowed Claims should address all potential tax implications with their own tax advisors.

## XII.    <u>CONFIRMATION OF PLAN – REQUIREMENTS</u>

In order for the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the Plan Proponents disclose specified information concerning payments made or promised to insiders, and that the Plan comply with the applicable provisions of chapter 11 of the Bankruptcy Code. Section 1129(a) of the Bankruptcy Code also requires that at least one Class of Claims has accepted the Plan ("<u>Minimum Voting Threshold</u>"),

that Confirmation of the Plan is not likely to be followed by the need for further financial reorganization, and that the Plan be fair and equitable with respect to each Class of Claims that is impaired under the Plan. The Bankruptcy Court can confirm the Plan if it finds that all of the requirements of section 1129(a) have been met. The Plan Proponents believe that the Plan meets all of these required elements. With respect to the so-called "feasibility" test (i.e., that the Plan is not likely to be followed by the need for further financial reorganization), the Plan provides for an orderly liquidation of the Debtors' assets and the Plan Proponents believe that they will be able to consummate the Plan fully.

In the event that a Class of Claims votes to reject the Plan, the Plan does not satisfy all of the requirements of section 1129(a) of the Bankruptcy Code. Although the Minimum Voting Threshold is not met, the Bankruptcy Court nevertheless may confirm the Plan under the "cram down" provisions of section 1129(b) of the Bankruptcy Code if all of the other provisions of section 1129(a) of the Bankruptcy Code are met. Thus, the Plan Proponents presently intend, to the extent necessary, (i) to undertake to have the Bankruptcy Court confirm the Plan under the "cram down" provisions of section 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan to the extent necessary to obtain entry of the Confirmation Order.

In order to confirm a Plan over the dissenting vote of an impaired Class under section 1129(b) of the Bankruptcy Code that satisfies the remaining provisions of section 1129(a) of the Bankruptcy Code, the Bankruptcy Court, on request of the proponent of a plan, "shall" confirm the Plan if the Plan does not discriminate unfairly, and is fair and equitable with respect to each Class of Claims that is impaired under, and has not accepted, the Plan. For purposes of section 1129(b) of the Bankruptcy Code, a Plan is "fair and equitable" with respect to a class of unsecured Creditors if, at a minimum, it satisfies the "absolute "priority rule" and the "best interests of creditors test."

### A.    Absolute Priority Rule

To satisfy the absolute priority rule, the Plan must provide that the holder of any Claim that is junior to the Claims of the dissenting Class will not receive or retain under the Plan on account of such junior Claim any property unless the Claims of the dissenting Class are paid in full.

The Plan Proponents believe that the Plan satisfies the absolute priority rule. The Plan Proponents further believe that all non-accepting impaired Classes will receive or retain payment or Distribution, as the case may be, on account of their Claims, sufficient to permit full satisfaction of such Claims before junior Classes receive or retain any property on account of such junior Claims.

### B.    Best Interest of Creditors Test; Liquidation Analysis

Under the best interest of creditors test, the Plan is confirmable if, with respect to each impaired Class of Claims, each holder of an Allowed Claim in such Class has either (i) accepted the Plan, or (ii) receives or retains under the Plan, on account of its Claim, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

To determine what the holders of each Class of Claims would receive if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' remaining assets in a chapter 7 liquidation case. The amount that would be available for satisfaction of the Allowed Claims of the Debtors would consist of the proceeds resulting from the disposition of the remaining assets of the Debtors augmented by the cash held by the Debtors at the time of the conversion of the Chapter 11 case to a chapter 7 case. Such amounts would be reduced by the costs and expenses of the liquidation and by such additional Administrative Expense Claims and other priority Claims that might result from the chapter 7 case.

Here, the Plan contemplates the creation of a Plan Administrator to continue the wind-down of the Debtors' Estates. The Plan Proponents believe that a conversion of the Chapter 11 Cases to cases under chapter 7 would disrupt an orderly plan process which is expected to result in a prompt initial distribution to Holders of Allowed Class 4 Marshall General Unsecured Claims, and that Creditors would be harmed by the delay and expense that would result.

To determine if the Plan, as proposed, is in the best interests of Creditors, the present value of the distributions likely to be made to each class in a liquidation if the bankruptcy case proceeded under Chapter 7 are compared with the present value of the distributions to each impaired Class provided for by the Plan.

In applying the best interest test, it is possible that Claims in a chapter 7 case may not be classified in the same manner as provided for by the Plan. Priorities and order of distribution of estate assets are established by the applicable provisions of chapter 7. Under those provisions, each class of Claims is paid in a descending order of priority. No junior classes of Claims are paid until all senior classes have received payment in full. In the event that available assets are insufficient to pay all members of such class in full, then each member of the class shares on a pro rata basis.

The Plan Proponents believe that the primary advantages of the Plan over a chapter 7 liquidation is that Creditors will likely receive more under the Plan than they would in a chapter 7 case and receive their Distributions earlier. Costs would increase by the amount of the additional administrative expenses likely to be incurred in such a chapter 7 case, including the costs of time-consuming investigations and discovery. Under the Plan, the process of other Claims resolution will proceed without the necessity for additional investigation by a chapter 7 trustee and its separate and new professionals. The Plan offers the opportunity to avoid additional administrative costs and the resulting delay which would result from a chapter 7 liquidation.

The Plan Proponents therefore believe that the Plan will result in lower total administrative costs, and higher recoveries for Creditors than would the liquidation of the Debtors' Assets under chapter 7 of the Bankruptcy Code. A liquidation analysis that demonstrates the lower recovery for creditors in a chapter 7 liquidation is annexed hereto as **Exhibit A**.

Thus, the Plan Proponents believe the Plan satisfies the "best interests of creditors test," and, indeed, that the Plan is in the best interests of Creditors.

## XIII.  PLAN RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    Certain Bankruptcy-Related Considerations

1.    *Parties in Interest May Object to the Plan Proponents' Classification of Claims*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims in such class.  The Plan Proponents believe that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.    *Risk of Plan Not Being Confirmed*

Although the Plan Proponents believe the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that any negotiations regarding such modifications would not adversely affect the holders of the Allowed Claims or that any such modifications would not necessitate the re-solicitation of votes.

3.    *Nonconsensual Confirmation*

As set forth above, in the event any impaired class of claims does not accept a plan, a bankruptcy court may nevertheless confirm such plan of liquidation at the proponent's request if at least one impaired class has accepted the plan of liquidation (with such acceptance being determined without including the acceptance of any "insider" in such class) and, as to each impaired class which has not accepted the plan of liquidation, the bankruptcy court determines that the plan of liquidation "does not discriminate unfairly" and is "fair and equitable" with respect to non-accepting impaired classes.

In the event that any Impaired Class of Claims fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Plan Proponents reserve the right to seek nonconsensual confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code.

4.    *Risks that Conditions to Effectiveness Will Not Be Satisfied*

Article 7 of the Plan contains certain conditions precedent to the effectiveness of the Plan. There can be no assurances that the conditions contained in Article 7 of the Plan will be satisfied.

     5.     *Actual Plan Distributions May Be Less Than Estimated for Purposes of the Disclosure Statement*

The Plan Proponents project that the Claims asserted against the Debtors will be resolved in and reduced to an amount that approximates the estimates set forth herein. However, there can be no assurances that these estimates will prove accurate. In the event that the allowed amounts of such Claims are materially higher than the projected estimates, actual distributions to Holders of Allowed Claims could be materially less than estimated herein.

     6.     *Claims Objections/Reconciliation Process*

The Plan Proponents and the Plan Administrator, as applicable, reserve the right to object to the amount of any Claim, except as provided in the Plan. The estimates set forth herein cannot be relied on by any Holder of a Claim whose Claim is subject to an objection. Any such Holder of a Claim may not receive its specified share of the estimated distributions described in the Disclosure Statement.

     **B.**     <u>**Alternatives to the Plan and Consequences of Rejection**</u>

Among the possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan are the following: (i) an alternative plan could be proposed or confirmed; or (ii) the Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code.

     1.     *Alternative Plans*

With respect to an alternative plan, the Plan Proponents have explored various alternative scenarios and believe that the Plan enables the Holders of Claims to realize the maximum recovery under the circumstances. The Plan Proponents believe the Plan is the best plan that can be proposed and serves the best interests of the Debtors and other parties-in-interest.

     2.     *Chapter 7 Liquidation*

As discussed above, with respect to each Class of Impaired Claims, either each Holder of a Claim of such Class has accepted the Plan, or will receive under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code. The Plan Proponents believe that significant costs would be incurred by the Debtors as a result of the delay that would be caused by conversion of the Chapter 11 Cases to cases under chapter 7 and the Insider Settlement Contribution would not be available, resulting in a reduced distribution to all Creditors.

## XIV.  <u>PROCEDURES FOR VOTING ON PLAN</u>

As noted above, pursuant to the Bankruptcy Code, a plan groups various claims into classes, each consisting of parties having similar legal rights in relation to a debtor. Each class

may then be treated as either "impaired" or "unimpaired" under a plan.  There are three ways in which a plan may leave a claim or interest "unimpaired." First, a plan may not propose to alter the legal, equitable or contractual rights of the holder of the claim or interest.  Second, all defaults (excluding those covered by section 365(b)(2) of the Bankruptcy Code) may be cured and the original terms of the obligation reinstated.  Third, a plan may provide for the payment in full of the obligation to the holder of the claim or interest.  If a class is unimpaired, then it is conclusively presumed to vote in favor of a plan.

An impaired class that would receive nothing under a plan is deemed to have rejected such a plan.

An impaired class that is proposed to receive any Distribution (whether in Cash, securities or other property) has the right to vote, as a class, to accept or reject the plan.  A class of Creditors accepts a plan if more than one-half (1/2) of the ballots that are timely received from members of such class, representing at least two thirds (2/3) of the dollar amount of Claims for which ballots are timely received, vote in favor of such plan.  Section 1126(e) of the Bankruptcy Code provides that a Creditor's vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the Creditor's vote either to accept or reject a plan was not solicited or cast in good faith, or in compliance with the Bankruptcy Code.  A plan under which any class of Claims is impaired may be confirmed by the Bankruptcy Court only if it has been accepted by at least one such class.

Each holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and shall indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

Holders of Claims in an impaired Class entitled to vote will receive, together with this Disclosure Statement, a Ballot to be used in voting to accept or reject the Plan.  Voting instructions will accompany the Ballot.

Each Creditor should first carefully review this Disclosure Statement and the Plan.  The Creditor should then complete the portions of the Ballot indicating the Class in which the Creditor's Claim falls and the total dollar amount of the Claim.  It is critical that the Class and amounts(s) of the Claim be correctly stated on the Ballot, so that the Creditor's vote can be properly counted.

Next, the Creditor should mark in the space provided on the Ballot whether the Creditor wishes to accept or to reject the Plan.  Please be sure to fill in the name of the Creditor for whom the Ballot is being filed.  Finally, the Ballot must be signed by the Creditor, or by an officer, partner, or other authorized agent of the Creditor.  Please note that the Plan Proponents reserve the right to object to the allowance, designation of Class and/or allowable amount of any Claim set forth in a Ballot for purposes of voting and/or Distribution under the Plan.

55

Completed and signed Ballots should be returned to the Voting Agent at the following locations:

If by first class mail, in the return envelope provided with each, or by hand delivery or overnight mail:

> M. Burton Marshall Ballot Processing
> c/o Stretto
> 410 Exchange, Suite 100
> Irvine, CA 92602

If by electronic submission solely through the online balloting portal to the following website:

> https://cases.stretto.com/BurtMarshallChapter11

Completed Ballots should be returned as soon as possible, and in any event so that they are RECEIVED NO LATER THAN **[_____], 2024 AT 5:00 P.M. (EST)** ANY BALLOTS WHICH ARE RECEIVED BY THE VOTING AGENT AFTER **[_____], 2024 AT 5:00 P.M. (EST)** SHALL NOT BE COUNTED IN DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

## XV.    <u>CONFIRMATION HEARING</u>

The Confirmation Hearing will be held telephonically before the Honorable Patrick G. Radel, United States Bankruptcy Judge for the Northern District of New York, in the Alexander Pirnie U.S. Courthouse and Federal Building, 10 Broad Street, Room 236, Utica, NY 13501 on **[_____], 2024 at [____] (EST)**, as such date may be continued or adjourned by the Court. Any party wishing to appear at the hearing may do so in-person at the courthouse <u>or</u> by telephone using the Court's AT&T teleconference system by dialing (877) 411-9748 and entering access code 3229032#.  At that hearing, the Bankruptcy Court will decide whether the Plan should be confirmed, and will hear and decide any and all objections to the Plan.  Any Creditor, or other party in interest who wishes to object to Confirmation of the Plan, or to the classification of Claims or Interests provided in the Plan, must, not later than **5:00 p.m. (EST) on [_____], 2024**, file an objection with the Clerk of the United States Bankruptcy Court, Northern District of New York, Alexander Pirnie U.S. Courthouse and Federal Building, 10 Broad Street, Room 236, Utica, NY 13501, and serve a copy of the objection on the following persons:  (a) counsel to the Plan Proponents: Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, Attn:  Fred Stevens and Lauren C. Kiss, (b) the Office of the United States Trustee for the Northern District of New York, Alexander Pirnie U.S. Courthouse and Federal Building, 10 Broad Street, Room 105, Utica, New York 13501, Attn:  Erin Champion, (c) counsel to the Official Committee:  Bond, Schoeneck & King PLLC, One Lincoln Center, Syracuse, New York 13202, Attn:  Stephen A. Donato and Sara C. Temes, and (d) parties filing a notice of appearance and request for service herein.

Any objections to the Plan which are not filed and served by the above date may not be considered by the Bankruptcy Court.  Any person or entity who files an objection to Confirmation of the Plan or to the classification of Claims provided in the Plan must also attend the Confirmation Hearing, either in person or through counsel.

If the Plan is confirmed, its provisions will bind the Estates and any and all Persons, including all holders of Claims, whether or not the Claim of such Holder is impaired under the Plan and whether or not the Holder has, either individually or by a Class, voted to accept the Plan.

## XVI.    **<u>RECOMMENDATION</u>**

The Plan Proponents believe that the Plan provides for the fair and equitable treatment of the Debtors' Creditors and therefore recommends that Creditors vote to accept the Plan.

[*Signature Page Follows*]

Dated: February 20, 2024

                                      M. BURTON MARSHALL,
a/k/a BURT MARSHALL,
a/k/a MILES BURTON MARSHALL,

By: */s/ Fred Stevens*
    Fred Stevens, as Chapter 11 Trustee of
the estate of M. Burton Marshall a/k/a Burt
Marshall a/k/a Miles Burton Marshall

MILES B. MARSHALL, INC.

By: */s/ Fred Stevens*
    Fred Stevens, as Authorized Person as
Chapter 11 Trustee of the estate of M.
Burton Marshall a/k/a Burt Marshall a/k/a
Miles Burton Marshall

Approved as to form:

By: */s/ Lauren C. Kiss*
    Fred Stevens
    Lauren C. Kiss
    200 West 41st Street, 17th Floor
    New York, New York 10036
    Tel: (212) 972-3000
    Fax: (212) 972-2245
    Email: fstevens@klestadt.com
             lkiss@klestadt.com

*General Counsel to the Chapter 11 Trustee*

and

*Debtor Miles B. Marshall Inc.*

## Exhibit A

**Liquidation Analysis**

**M. Burton Marshall**
*Estimated Plan Distribution Analysis*
*Estimated as of January 31, 2024*

| | Balance Sheet 1/31/24 | Est. Plan Distribution Analysis | | Note | January 24 BS | Liquidation Analysis | |
|---|---|---|---|---|---|---|---|
| | | Low Estimated Value | High Estimated Value | | | Low Estimated Value | High Estimated Value |
| Cash | $ 347,000 | $ 347,000 | $ 400,000 | A | 346,528 | $ 347,000 | $ 400,000 |
| Accounts receivable | $ 26,000 | 6,500 | 10,000 | B | 25,862 | 6,500 | 10,000 |
| Mortgage receivables | $ 303,000 | 227,250 | 250,000 | B | 302,871 | 227,250 | 250,000 |
| FF&E | $ 21,000 | 5,250 | 10,000 | B | 20,500 | 5,250 | 10,000 |
| Deposits - Tenants | $ 256,000 | - | - | C | 256,363 | - | - |
| Real estate excluding the Debtor exemption | $ 17,652,000 | 16,500,000 | 21,000,000 | D | 17,652,173 | 14,850,000 | 18,900,000 |
| Personal property | $ 91,000 | - | - | E | 90,788 | - | - |
| Equity in Miles B. Marshall, Inc. | $ 1,338,000 | 1,263,000 | 1,263,000 | F | 1,338,000 | 1,234,000 | 1,234,000 |
| Other Inclusive of potential causes of action | | - | - | G | | - | - |
| **Estimated Proceeds from Liquidation of Assets** | **$ 20,034,000** | **18,349,000** | **22,933,000** | | **20,033,085** | **16,670,000** | **20,804,000** |
| | | | | | | | |
| **Administrative Claims** | | | | | | | |
| Wind-Down Budget / Ch 7 Professionals | | 500,000 | 750,000 | H | | 500,000 | 750,000 |
| US Trustee Fees / Ch 7 Trustee | | 147,000 | 183,000 | I | | 500,000 | 624,000 |
| Accounts payable - operating expenses | $ 39,000 | 39,000 | 150,000 | | 39,153 | 39,153 | 150,000 |
| Transaction costs and transfer taxes | | 973,000 | 1,248,250 | D | | 1,190,388 | 1,524,925 |
| Professional Fees - Marshall Bankruptcy Case | $ 4,430,000 | 5,180,000 | 5,930,000 | | 4,430,000 | 5,180,000 | 5,930,000 |
| Income tax expense  (2024 estimate) | | 1,914,000 | 3,178,000 | | | 1,014,000 | 2,040,000 |
| **Net Proceeds available after Administrative Claims** | | **9,596,000** | **11,493,750** | | **15,563,932** | **8,246,460** | **9,785,075** |
| | | | | | | | |
| **Secured Claims (Class 1)** | | | | | | | |
| Real estate taxes | $ 224,000 | 224,000 | 224,000 | | 223,553 | 224,000 | 224,000 |
| Mortgages | $ 2,089,000 | 2,089,000 | 2,089,000 | D | 2,088,636 | 2,089,000 | 2,089,000 |
| **Net Proceeds Available to Priority Creditors** | | **7,283,000** | **9,180,750** | | **13,475,296** | **5,933,460** | **7,472,075** |
| | | | | | | | |
| **Priority Claims** | | | | | | | |
| Tax claims | $ - | - | - | | - | - | - |
| Wage and employee claims (Class 2) | $ - | 30,000 | 30,000 | | | 30,000 | 30,000 |
| **Net Proceeds Available to Unsecured Creditors** | | **$ 7,253,000** | **$ 9,150,750** | | | **$ 5,903,460** | **$ 7,442,075** |
| | | | | | | | |
| Unsecured Claims (as of the Filing Date) | | | | | | | |
| General Unsecured Claims (Class 4) | $ 90,500,000 | $ 7,253,000 | $ 9,150,750 | J | $ 90,500,231 | $ 5,903,460 | 7,442,075 |
| | $ 90,500,000 | $ 7,253,000 | $ 9,150,750 | | 90,500,231 | $ 5,903,460 | $ 7,442,075 |
| | | | | | | | |
| **Percentage Return to Unsecured Creditors** | | **8.01%** | **10.11%** | | | **6.52%** | **8.22%** |

A. Cash and Cash Equivalents - As of the most recently filed monthly operating report, January 31, 2024.

B. Represents the estimated recovery net of cost to collect or sell the asset.

C. The Tenant deposits relate to real estate and storage lease holders and will transfer to the purchaser of the asset.

D. The Trustee has engaged a real estate broker to build and market a sale process for over 100 properties owned by Marshall.  The amounts reflect the potential aggregate sale price, the related transaction costs based on the sales price and the remaining mortgage amount due. The Chapter 7 Liquidation analysis includes additional transfer taxes related to the sale of the real estate.  The Plan Proponents factored in a 10% discount for the Liquidation Value on account of the limitations and lack of flexibility inherent in a chapter 7 process vs. a chapter 11 process.

E. Marshall filed with the Court his schedule of assets and liabilities which reflected certain assets as personal and potentially exempt.  At this point in time, these assets are reflected on Marshall's balance sheet but we do not include a recovery value for creditors on these assets.

F. Marshall is the sole owner of Miles B Marshall, Inc (Marshall Inc).  The value presented reflects the Marshall Inc net asset value to be distributed to Class 5 pursuant to the Plan.

G. This estimated distribution presumes (i) no recovery is made on Marshall's life insurance policies with combined death benefits of $18 million; and (ii) nothing is realized on the Bank Litigation Claims.  If, Marshall dies prior to expiration of one or more of his life insurance policies and/or the Bank Litigation Claims are determined to be viable and result in a recovery, this estimated distribution could be enhanced significantly.

H Currently, the Wind-Down Budget is an estimate as the Plan Proponents, Plan Administrator and the Official Committee have not agreed to the services at this time.

I US Trustee Fees equal 0.8% of the aggregate disbursements of the Marshall Bankruptcy Estate assuming the disbursements occur in the same quarter.  In a Ch. 7, US Trustee Fees are not paid but the Ch. 7 Trustee will receive compensation pursuant to Section 326 of the Bankruptcy Code.

J For purposes of this analysis the general unsecured claim amount reflects the amount noted by the Debtor on his statement of financial affairs filed with the Court (Doc #3).

**Miles B. Marshall, Inc. (Marshall Inc.)**
*Estimated Plan Distribution Analysis*
*Estimated as of January 31, 2024*

| | Est. Plan Distribution Analysis | | | Liquidation Analysis | |
| --- | --- | --- | --- | --- | --- |
| | Low Estimated Value | High Estimated Value | Note | Low Estimated Value | High Estimated Value |
| Cash | $ 1,343,000 | $ 1,343,000 | | $ 1,343,000 | $ 1,343,000 |
| Accounts receivable | 6,000 | 6,000 | | 6,000 | 6,000 |
| Other Assets (Including Intellectual Property) | - | - | | - | - |
| Other - Potential Causes of Action | - | - | | - | - |
| **Estimated Proceeds from Liquidation of Assets** | **1,349,000** | **1,349,000** | A | **1,349,000** | **1,349,000** |
| **Administrative Claims** | | | | | |
| US Trustee Fees / Ch 7 Trustee | 11,000 | 11,000 | B | 40,000 | 40,000 |
| Operating expenses | 5,000 | 5,000 | | 5,000 | 5,000 |
| Professional Fees - Marshall Inc. | 60,000 | 60,000 | | 60,000 | 60,000 |
| **Net Proceeds Available after Administrative Claims** | **1,273,000** | **1,273,000** | | **1,244,000** | **1,244,000** |
| Claims | | | | | |
| Marshall, Inc. Claims (Class 3) | $ 10,000 | $ 10,000 | | $ 10,000 | $ 10,000 |
| | $ 10,000 | $ 10,000 | | $ 10,000 | $ 10,000 |
| **Percentage Return to Unsecured Creditors** | **100%** | **100%** | | **100%** | **100%** |
| **Net Proceeds Available to Equity** | **$ 1,263,000** | **$ 1,263,000** | | **$ 1,234,000** | **$ 1,234,000** |

A.  Asset value were obtained from the January 31, 2024 monthly operating report.

B.  US Trustee Fees equal 0.8% of the aggregate disbursements of the Marshall Inc. Bankruptcy Estate assuming the disbursements occur in the same quarter.  In
a Ch. 7, US Trustee Fees are not paid but the Ch. 7 Trustee will receive compensation pursuant to Section 326 of the Bankruptcy Code.

**Exhibit B**

**Schedule of Proposed Allowance Amounts of Class 4 Claims**

[*to be provided prior to solicitation*]